**IN RE: Edgar Abner Reyes COLON, Debtor**

**CASE NO. 06-04675 (ESL)**

United States Bankruptcy Court, D. Puerto Rico.

Signed 09/02/2016

Filed 09/30/2016

George B. Cauthen, Nelson Mullins Riley & Scarborough LLP, Columbia, SC, Richard Greiffenstein, Richard David Lara, Curtis J. Mase, Mase Lara Eversole PA, Miami, FL, Jose L. Nieto-Mingo, Nieto Law Offices, Celina Romany, Celina Romay Law Offices, Fernando Van Derdys, Law Offices of F. Van Derdys, San Juan, PR, for Debtor.

## OPINION AND ORDER

Enrique S. Lamoutte, United States Bankruptcy Judge

The issue pending in this case is whether Banco Popular de Puerto Rico (hereinafter referred to as "Banco Popular" or "BPPR") and its affiliate Popular Auto, Inc. (hereinafter referred to as "Popular Auto") failed to comply with the requirements of 11 U.S.C. § 303(b) because at the time the involuntary petition was filed (November 22, 2006) against Dr. Edgar Abner Reyes Colón (hereinafter referred to as "Involuntary Debtor" or "Dr. Reyes") Dr. Reyes had more than twelve (12) creditors.

This court, in the opinion and order entered on May 23, 2012 (docket # 404) ('the "Opinion and Order"), In re Colon, 474 B.R. 330 (Bankr. D.P.R. 2012), found that as of petition date the Involuntary Debtor had 15 creditors and that there are only two petitioning creditors. However, the court also concluded that the judicially created "special circumstances exception" to the numerosity requirement in § 303(b) may apply if the petitioning creditors establish fraud, artifice or scam "based upon the alleged fraudulent transfers made by the Involuntary Debtor to various corporations prior to the filing of the bankruptcy petition." Thereafter, "if the petitioning creditors prove that special circumstances are indeed present in this case, then the court would have to determine whether the Involuntary Debtor was 'generally not paying such debtor's debts as such debts become due' pursuant to 11 U.S.C. § 303(h)(1) in order to grant the order of relief in this case." See order entered on August 10, 2015 (dkt. # 488).

This case is also before the court upon the Involuntary Debtor's renewed motion to dismiss the involuntary petition. The Involuntary Debtor reasserts its contention that the involuntary petition must be dismissed because the same fails to comply with the statutory provisions in 11 U. S. C. § 303(b)(1) and (2), requiring that whenever there are more than 12 creditors, at least three undisputed creditors must join the petition. The Involuntary Debtor also reaffirms its legal conclusion that after the Supreme Court's opinion in Law v. Siegel, —— U.S. ——, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014), the "special circumstances exception" addressed in this court's order of May 12, 2012 is not applicable, and that it has so been determined by recent decisions.

The travel and facts of this case are found in the opinion of May 12, 2012. In re

Reyes Colon, 474 B.R. 330 (Bkrtcy. D.P.R. 2012) (Lamoutte, BJ). See also the orders entered on August 10, 2015 (dkt. # 488) and October 28, 2015 (dkt. # 540). The issue pending after these decisions was whether there were facts warranting that the "special circumstances exception" to the creditor numerosity requirement, as determined in In re Moss, 249 B.R. 411 (Bankr. N.D. Tex. 2000), be applied in this case. After a thorough analysis of all the evidence presented to this court and the applicable law, the court concludes that there are special circumstances due to the Involuntary Debtor's scheme to misrepresent his financial condition, but that such misconduct may not override the statutory requirement that three or more creditors join in the filing of an involuntary petition when there are 12 or more creditors. In reaching this conclusion, the court acknowledges that after Law v. Siegel, its equitable powers have been significantly diminished.

The court held evidentiary hearings in November and December 2015 to consider whether there are special circumstances warranting the exception to the three or more creditor requirement in section 303(b). The minutes of said hearings include a detail of both the documentary evidence and the testimony of the witnesses presented. See docket numbers 633, 704, 706, 709, 716 and 720. The court incorporates said minutes and attaches the same hereto as constituting its findings of fact. The inferences from the testimony of the witnesses presented by the petitioning creditors, that is, professionals who have worked with or for the Involuntary Debtor, show that these professionals (accountants[Mr. Félix Román Dávila], certified public accountants [CPA Félix N. Negrón Román], attorneys [Eric Y. Reyes Colón, Esq.], notary publics [María Torres Cartagena, Esq.], friends and associates [Dr. Francisco J. Quintero Peña]) related to

Dr. Reyes exhibited convenient or selective amnesia to blur the economic scenario of Dr. Edgar A. Reyes and to orchestrate a scheme to deceive creditors by misrepresenting transactions to transfer assets, as well as the financial condition of the Involuntary Debtor and related entities, which misrepresentations ultimately were aimed at benefiting the Involuntary Debtor. These individuals voluntarily agreed to misinform creditors. The uncontroverted testimony and the reports (Exhibit 41 and Exhibit 42) of the expert witness, CPA Eduardo Soria, CPA/ABV, CVA, CIA, CFE, Esq., pellucidly established the involuntary debtor's fraudulent actions and scheme. The witnesses' testimony, as incorporated and analyzed by CPA Eduardo Soria, evince a puppet scheme approach on the part of Dr. Edgar A, Reyes to defraud Banco Popular. Therefore, the court finds that the scheme to defraud constitutes special circumstances.

However, only two creditors joined the petition, and the Involuntary Debtor had more than twelve creditors. Therefore, the court is compelled to balance the statutory requirements for filing an involuntary petition and the application of equity principles in the administration of bankruptcy proceedings.

The view that bankruptcy courts are courts of equity was summarized in The Official Committee of Unsecured Creditors of Cybergenics Corporation v. Chinery, 330 F.3d 548, 567 (3d Cir. 2003), as follows:

The Supreme Court has long recognized that **bankruptcy courts are equitable** tribunals that apply **equitable** principles in the administration of bankruptcy proceedings. See Local Loan Co. v. Hunt, 292 U.S. 234, 240, 54 S.Ct. 695, 78 L.Ed. 1230 (1934) ("[C]ourts of bankruptcy are essentially **courts of equity,** and their proceedings inherently pro-

ceedings in **equity**."). The enactment of the Code in 1978 increased the degree of regulation Congress imposed upon bankruptcy proceedings, but it did not alter **bankruptcy courts'** fundamental nature. *See* H.R. Rep. No. 95-595, at 359 (1977), *reprinted in* U.S.C.C.A.N. 5963, 6315 (stating that, under the Bankruptcy Code, "[t]he **bankruptcy court** will remain a **court of equity**") (citing *Local Loan Co.*, 292 U.S. at 240, 54 S.Ct. 695). Any lingering doubt on that point is dispelled by a string of post-enactment Supreme Court decisions—*see Young v. United States*, 535 U.S. 43, 50, 122 S.Ct. 1036, 152 L.Ed.2d 79 (2002) ("[B]ankruptcy courts [ ] are **courts of equity** and 'apply the principles and rules of equity jurisprudence.' ") (quoting *Pepper v. Litton*, 308 U.S. 295, 304, 60 S.Ct. 238, 84 L.Ed. 281 (1939)); *United States v. Energy Resources Co.*, 495 U.S. 545, 549, 110 S.Ct. 2139, 109 L.Ed.2d 580 (1990) ("[B]ankruptcy courts, as **courts of equity**, have broad authority to modify creditor-debtor relationships.")—and by the Code itself. *See* 11 U.S.C. § 105(a) ("The Court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.").

Equity in bankruptcy has been generally related to the "fresh start" principles, <u>Grogan v. Garner</u>, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Section 105(a) of the Bankruptcy Code, which allows bankruptcy judges to issue orders that are necessary or appropriate to carry out the provisions of the Code, has been used as the basis to claim equitable powers in

bankruptcy, <u>Marrama v. Citizens Bank of Massachusetts</u>, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). This was the rule in the First Circuit after <u>Marrama</u>. See <u>Malley v. Agin</u>, 693 F.3d 28 (1st Cir. 2012). The rule has been admittedly limited to exercising equitable powers to facilitate other code provisions and not a roving commission to do equity. <u>In re Ludlow Hospital Society, Inc.</u>, 124 F.3d 22 (1st Cir. 1997). See also <u>In re Nosek</u>, 544 F.3d 34 (1st Cir. 2008). However, the legal scenario changed in 2014. Change in bankruptcy is not a strange concept. As stated by the Supreme Court in <u>Wright v. Union Central Life Ins. Co.</u>, 304 U.S. 502, 513, 58 S.Ct. 1025, 82 L.Ed. 1490 (1938): "[t]he subject of bankruptcies is incapable of final definition. The concept changes."

After <u>Law v. Siegel</u>, the equitable powers of the bankruptcy courts, to the extent they existed, have been diminished or restricted whenever exercising such equitable powers contravenes specific statutory provisions. <u>Law v. Siegel</u>, making reference to the Supreme Court's decision in <u>Marrama</u>, specifically did not endorse "the view that equitable considerations permit a bankruptcy court to contravene express provisions of the Code." This change was acknowledged by the First Circuit in <u>U. S. v. Ledee</u>, 772 F.3d 21, 29 n. 10 (1st Cir. 2014). The First Circuit noted that "the Supreme Court's ruling does not restrict the bankruptcy court's discretion concerning amendments unrelated to exemptions . . ." This view was the one adopted by the court at the hearing held on November 12, 2015 when the following was stated:

> The court advanced to the parties, that this court's appreciation of the facts in 2012 in order to determine whether the special circumstances apply may be different in 2015. In the year 2012, the prevalent decision by the Supreme Court was <u>In re Marra-</u>

ma, 449 [549] U.S. 365 [127 S.Ct. 1105, 166 L.Ed.2d 956] (2007). The court stated that it is fully conscious that in the year 2014, the Supreme Court entered another decision, Law v. Siegel. Thus, in order to make a final determination based upon the facts as to whether special circumstances should be applied in this scenario (involuntary petition) which is different from the exemption scenario in Law v. Siegel and is different from the factual scenario in Marrama which was a motion to convert. The court stated that it has to make a decision based on the facts and it is conscious of the law and will apply the same as best as it can. However, the parties have the duty and responsibility to place the court in a position to be able to render a legal decision based upon the facts. The court cannot avoid making the decision because the parties are reticent to present the evidence to the court. This court will make a ruling based upon the evidence presented. The reasons for this hearing should have been clear since the court's May 22, 2012 decision which has been postponed basically because of the discovery issues that have been brought before the court. The court further stated that it was aware of the mandamus that was filed not for an action, but for the First Circuit to make a decision on the legal issue that is ultimately before the court. That is the First Circuit Court's province which I will not even attempt to delve into. The court stated that it may decline to grant the involuntary petition for relief, but that does not divest the court of jurisdiction to impose sanctions for violations of discovery orders and whether or not the ultimate sanction of granting the relief requested that is the entry of the order for relief is a legal determination that will be considered.

See minutes at docket # 633, page 8.

Supreme Court precedent lends support to this court's perspective at such juncture. In Taylor v. Freeland & Kronz, 503 U.S. 638, 646, 112 S.Ct. 1644, 118 L.Ed.2d 280 (1992) the Supreme Court found that there were no "unusual circumstances" warranting addressing equity arguments under section 105(a). Thus, implicitly, misconduct may be a factor to consider.

The First Circuit Court of Appeals recently addressed the subject of claims of equitable relief in the bankruptcy courts in In re Oak Knoll Associates, L.P., 835 F.3d 24 (1st Cir. 2016), and held that:

> Congress has given bankruptcy courts the authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). We have cautioned, however, that this does not give bankruptcy courts "a roving writ, much less a free hand" to provide equitable relief. In re Jamo, 283 F.3d 392, 403 (1st Cir. 2002). Rather, this statute "may be invoked only if, and to the extent that, the equitable remedy dispensed by the court is necessary to preserve an identifiable right conferred elsewhere in the Bankruptcy Code." Id.

The filing of a voluntary petition in bankruptcy has few limitations. On the other hand, an involuntary petition initiated by creditors is more limited as it must meet the requirements in § 303. Involuntary relief is only available in cases under chapter 7 or chapter 11. The entry of an order for relief is not automatic in an involuntary case as the petitioning creditors must establish the statutory grounds supporting relief. Charles Jordan Tabb, Law of Bankruptcy. Third Edition (2013), pgs. 120-121.

Creditors generally commence involuntary cases to protect themselves against dissipation or diminution of assets, particularly if the creditor is concerned that the debtor may be transferring assets outside their reach, David Wheeler, Involuntary Bankruptcy Petitions: Is § 303 Still a Viable Creditor Alternative? 29-9 ABIJ 36 (November 2010). The evidence before this court clearly shows that the reasons leading to the filing of the involuntary petition are the typical ones prompting creditors to take action. The Involuntary Debtor was transferring assets to related entities under his possession and control, and was engaged in a scheme to defraud his main creditor, Banco Popular de Puerto Rico.

An involuntary petition must be executed by the parties specified in § 303 (b). Hon. Joan N. Feeney, Hon. Michael G. Williamson, Michael J. Stepan, Esq., Bankruptcy Law Manual, Fifth Edition, Volume 2, § 14.8. The number of petitioning creditors depends on the number of creditors holding qualified claims. Hon. Joan N. Feeney, Hon. Michael G. Williamson, Michael J. Stepan, Esq., Bankruptcy Law Manual, Fifth Edition, Volume 2, § 14.9. This court has determined that there are more than twelve creditors. Therefore, at least three petitioning creditors must join the petition. 11 U. S. C. § 303(b)(1).

The bankruptcy court in In re Mateer, 525 B.R. 559, 567 (Bkrtcy. D. Mass. 2015), was faced with a similar predicament, determining whether the statute or equity should prevail. I share in the frustration inferred from the statements by Chief Judge Hoffman in Mateer, concluding that misconduct cannot override a statutory provision in the Bankruptcy Code. In this case there is a specific statutory requirement for the filing of an involuntary petition against a debtor who has more than twelve creditors. The involuntary petition must be filed by three or more creditors. A fraudulent scheme, after Law v. Siegel, is not a basis for a bankruptcy court to obviate the statutory requirement that there be three or more creditors joining the involuntary petition when there are twelve or more creditors. As stated by Professor Klee: "After Law, bankruptcy courts may be less likely to test the limits of their equitable powers. If they do, appellate courts should be less likely to tolerate a use of the equity powers that conflicts with the Bankruptcy Code." Professor Kenneth N. Klee on the Supreme Court's holding in Law v. Siegel, 571 U.S. ——, 134 S.Ct. 1188, 188 L.Ed.2d 146, 2014 U.S. Lexis 1784 (March 4, 2014), 2014 Emerging Issues 7162.

Thus, the Marrama holding that bankruptcy judges may take appropriate actions to avoid abuse of process under section 105(a) has been severely restricted by Law v. Siegel, as bankruptcy judges do not have equitable powers not found in the Bankruptcy Code, when the invocation of the equitable powers is based on bad faith or misconduct. Such is the law, and this court is obligated to follow the same. The notion that bankruptcy courts are courts of equity may now be more an illusory construct than a judicial precept. Perhaps rightly so, as "[t]he intended function of the federal courts is to apply the law as it comes to them from the hands of others." Robert H. Bork, The Tempting of America, The Political Seduction of the Law, pg. 4 (1990).

In view of the foregoing, the involuntary petition is hereby dismissed.

SO ORDERED.

### Attachment

### Minute Entry

*Hearing Information:*

Involuntary Debtor: Edgar Abner Reyes Colon

Case Number 06-04675

Date/Time/Room: 11/12/2015/ 09:30am/ osjcrt2

Bankruptcy Judge: Enrique S. Lamoutte

Courtroom Clerk: Darhma Zayas

Reporter/ECR: Jose Romo

### *Matter:*

Evidentiary hearing to consider the following: (i) whether there are special circumstances compelling the court to obviate the three (3) creditor statutory requirement in 11 U.S.C. § 303(b); (ii) whether the involuntary debtor was not paying his debts as they became due as required by 11 U.S.C. § 303(h) (Docket Nos. 404 & 488).

Motion for Entry of Order for Relief as a Sanction for Involuntary Debtor's Discovery Violations (Docket No. 501).

Opposition to Motion for Entry of Order for Relief and Request to Reconsider Denial of Order Limiting Scope of Discovery (Docket No. 518)

### *Appearances:*

Eldia Díaz Olmo, Banco Popular de Puerto Rico ("BPPR")

Roberto Abesada Aguet, BPPR

Gerardo Pavia Cabanillas, Popular Auto, Inc.

Fernando Van Derdys, Involuntary Debtor

José Nieto Mingo, Involuntary Debtor

### *Proceedings:*

Issues Before the Court

The court held an evidentiary hearing as to the following pending issues: (i) whether there are special circumstances compelling the court to obviate the three (3) creditor statutory requirement in 11 U.S.C. § 303(b); (ii) whether the Involuntary Debtor was not paying his debts as they became due as required by 11 U.S.C. § 303(h). In this hearing the court will also consider BPPR's motion requesting sanctions for involuntary debtor's discovery violations and the opposition thereto.

Opening Argument by Petitioning Creditors

Attorney Abesada, on behalf of BPPR, stated that the first threshold issue that had to be addressed is not whether the Involuntary Debtor has to be sanctioned, but rather the type of sanctions that should be imposed, since it is uncontested that Dr. Reyes has exhibited bad faith and callous disregard to the orders of this Court as recent as this year in Docket Nos. 488, 506, 511, 512, & 531, orders in which the court denied the limited discovery protective orders sought by Dr. Reyes and granted BPPR's request to perform the discovery that was required, which included not only events before the involuntary bankruptcy petition, but events after the petition was filed, to trace the monies and assets that had disappeared. As of today, Dr. Reyes has not complied with these court orders regarding the production of documents ordered by this court pursuant to Docket No. 506. When this court granted BPPR's motion to comply (Docket No. 490) at Docket No. 506, the Order incorporated a specific relief sought by petitioning creditor, which was that if Dr. Reyes did not appear at the deposition and did not produce the documents requested prior to his deposition, sanctions would be imposed, which included the entry of an order of relief or preclusion to presenting evidence in his favor in this evidentiary hearing that has been scheduled since August 10, 2015. Dr. Reyes did not appear to his scheduled deposition, which he attempted to cure by sending counsel to BPPR two communications stating that he was willing to be deposed but

that the same had to be limited in scope pursuant to prior motions that were filed and were rejected by this court.

Attorney Abesada further stated that what is before the court reminds us of this court's July 7, 2010 Order at Docket No. 241, in which this court denied Dr. Reyes' motion to stay discovery and stated that, "...it is time for the involuntary debtor to meet the merits of the issues before the court. Discovery is critical to such a decision." Discovery is indeed critical. Today, BPPR and Popular Auto are before the court ready for the evidential hearing, but with a fraction of the evidence they wanted to obtain through discovery. Petitioning Creditors have been unable to depose Dr. Francisco Quintero or Dr. Reyes. Moreover, Dr. Quintero and Dr. Reyes never produced the documents that they were ordered to produce within the time frame ordered. The depositions and document production were necessary to be ready for this hearing.

Attorney Abesada concluded by stating that, nonetheless, the court has sufficient violations of discovery rules and orders to impose severe sanctions of entering the order for relief which is justified given the orders that were violated during the year 2015. This court's Opinion and Order (Docket No. 404) provides a history of the discovery disputes and violations that Dr. Reyes has transgressed. Dr. Reyes at Docket No. 80 agreed pursuant to a joint discovery plan to conduct discovery as to the "special circumstances" in this case. Subsequently, Dr. Reyes filed several motions not only to stay discovery but to obstruct the same. The order of relief is justified by First Circuit jurisprudence pursuant to Rule 37(b)(2)(A). Thus, there is sufficient information on this record for this court to enter the order for relief. Petitioning creditors submit that pursuant to Fed. R. Civ. P. 37(b)(2)(A)(i) and (ii) that the proposed findings be established as findings of facts.

Opening Argument by Involuntary Debtor

Attorney Nieto, on behalf of the Involuntary Debtor, stated that the source of the problems that are being confronted today is due to the absence of clear rulings on specific threshold issues that have not been addressed by the court. In the Opinion and Order that this court issued on May 22, 2012 (Docket No. 404) established that the scope of the evidentiary hearing that was going to take place years ago. The scope was the following; "...evidence as to the special circumstances exception to the numerosity requirement of Section 303(b) to determine if the petitioning creditors can establish fraud, artifice or scam based upon the alleged fraudulent transfers made by the Involuntary Debtor to Debtor's corporations prior to the filing of the bankruptcy petition."

To this date, there is no explanation as to why evidence or discovery of issues pertaining after the filing of the petition are relevant. There is no explanation or determination from the court as to why that position which was taken by the court, when this case was resurrected by a motion for reconsideration after it had been dismissed because the case was not filed pursuant to the specific requirements of the Bankruptcy Code. Subsequently, the petitioning creditors have been requesting discovery of issues, matters, and transactions as recent as this year. As a result, Dr. Reyes filed a memorandum of law on August 11, 2014 (Docket No. 467) that this court has not ruled on that docket and the same is still pending. The memorandum of law requested that the court rule on two (2) issues, namely: (i) the applicability of the special circumstances doctrine in this Circuit; and (ii) a protective order to limit

discovery to matters arising after the filing of the involuntary petition. The basis for requesting the protective order was this Court's May 22, 2012 Opinion and Order which specifically stated that the inquiry regarding special circumstances and whether Dr. Reyes was paying his debts as they generally became due as the scope for discovery.

While Docket No. 467 was still pending, the petitioning creditors on March 15, 2015, filed a motion to inform the issuance of another subpoena regarding subsequent events to the filing of the involuntary petition (Docket No. 483). Dr. Reyes filed a motion to quash the subpoena on March 17, 2015 (Docket No. 484) and the court denied the motion to quash (Docket No. 486). The motion to quash was denied without an explanation or ruling from the court as to why it was relevant to allow events and transactions subsequent to the filing of the involuntary petition.

From the time the court denied the motion to quash on April 7, 2015 there was no activity in the case for almost four (4) months. Thus, since Docket No. 467 was still pending for almost an entire year, that in August 2015, Dr. Reyes filed a petition for mandamus before the United States Court of Appeals for the First Circuit requesting the Appellate Court to direct this court to rule on Docket No. 467. As a result of the filing of the mandamus petition, this hearing was scheduled. Prior to that, we had petition creditors pretending to embark on a completely unregulated, oppressive fishing expedition and Dr. Reyes trying to limit the discovery to the relevant period. There is still no ruling as to Docket No. 467.

After the evidentiary hearing was scheduled, petitioning creditors renewed their efforts to conduct discovery on post-petition matters and Dr. Reyes filed motions to quash which were denied. The court did not explain the reason the scope of the hearing was changed from what was determined on May 22, 2012 to now allow discovery regarding post-petition matters. On October 15, 2015, this court issued twelve (12) orders denying all of Dr. Reyes' motions to quash and granting all the petitions for discovery and other requests filed by BPPR. The court also denied a motion for reconsideration as to the scope of discovery. As a result, on October 29, 2015, Dr. Reyes filed a notice of appeal and statement of election (Docket No. 542) and motion requesting leave to file an appeal (Docket No. 543). It is abundantly clear that Dr. Reyes has been questioning the legality of the involuntary petition filed by BPPR and the efforts to conduct discovery on irrelevant matters. As of this date, there is still no ruling as to Docket No. 467. Dr. Reyes filed motions to quash because there has not been a ruling on Docket No. 467. Thus, this court should not enter an order for relief as a sanction for this case since that issue is still pending. Attorney Nieto cited the case of In re Rubin, 769 F.2d 611 (9th Cir. 1985) in which the Circuit reversed the B.A.P. for affirming the bankruptcy court's decision to enter an order for relief as a sanction for failure to comply with discovery.

Attorney Nieto reiterated that ten (10) years later we are still before the court because a threshold determination on a legal issue that should have been decided at the outset of this case remains to be decided. The issue is whether as a matter of law the involuntary petition filed by BPPR is legal or can be allowed in this Circuit. This court has not made that specific determination. The only thing that has been stated regarding the applicability of special circumstances in this Circuit is "that this court finds merit to this judicially created exception and that such require-

ments are not jurisdictional in nature." This conclusion was reaffirmed on the August 10, 2015 Order. The Court of Appeals denied the mandamus petition because "in light of the fact that this hearing had been scheduled were the issues raised in the petition of mandamus would be addressed." Attorney Nieto stated that it was the Court of Appeals' understanding that in this hearing this issue would be addressed, namely, whether in Puerto Rico a creditor without complying with the 3 creditor requirement may file an involuntary petition.

Attorney Nieto stated that the following preliminary matters had to be determined by the court in order to move forward; namely, (i) that the court make a ruling as to Docket No. 467 and explain the court's position regarding the reasons as to why relying on a case relying in a bankruptcy court in Texas, it may disregard the clear language of section 303(b). Also, the court should recognize the decision in the case of In re Rothery, 211 B.R. 929 (9th Cir. BAP 1997) in which the BAP specifically addressed the reasons In re Moss and other decisions relied upon this court are not sound and why it would be important in this Circuit in Puerto Rico to have a determination as to the reasons a creditor that does not comply with the statutory requirements that would require congressional action to be modified.

In addition, it is important to have a specific ruling regarding the scope of discovery, given that BPPR wants to conduct discovery as to post-petition matters. The court has stated that it has to determine whether there were special circumstances prior to the bankruptcy petition. The scope has to be limited to the relevant inquiry which was alleged fraudulent transfers made by the involuntary debtor to various corporations. When BPPR filed the invol-

untary petition, there was no reference to special circumstances and it knew of everything it is complaining about now, months before the filing of the petition, BPPR has utilized the involuntary bankruptcy proceedings to try to collect the debt. Attorney Nieto further stated that the filing took place when the parties were very close in reaching an agreement. Petitioning creditor is aware that Dr. Reyes offered $2 million to settle the debt and BPPR refused to accept the same and informed Dr. Reyes through their counsel that if he had a better offer, the same must be presented because if not they had been instructed to file the involuntary bankruptcy petition. There was no indication that BPPR was concerned about fraudulent transactions or that Dr. Reyes was depleting his assets. The negotiations took months. BPPR knew of the transactions, namely the transfers of real estate, that Dr. Reyes was undertaking, and BPPR had no problem with the same but it simply wanted more money.

Attorney Nieto argued that the Court of Appeals has to decide the issue as to whether the doctrine of special circumstances pursuant to a bankruptcy case decided in Texas is permitted in the First Circuit. BPPR's alternative proposal is that they want to conduct additional discovery regarding post-petition transactions. BPPR was also pursuing collection actions in the state court. BPPR has been trying to force Dr. Reyes to file a voluntary petition by cancelling the only line of credit that he had available and cancelling his credit cards. BPPR's is pushing hard for this case because if this case gets dismissed after ten (10) years, its exposure to liability is even greater.

Reply by Petitioning Creditors

Attorney Abesada replied that he was not going to comment against the accusatory

rhetoric made against his client in oral argument. The proposed findings show the relevancy of the post-petition discovery and they also show that one of the reasons this case was never settled was because Dr. Reyes never explained to BPPR why his net assets decreased by $8 million. Attorney Abesada stated that he will put the court in a position so that the court may render a ruling. Dr. Reyes states through his counsel that the motion for protective order to limit discovery at Docket No. 467 was never ruled upon. However, my reading of the docket is very different. The court denied Docket No. 467 at Docket No. 488 after considering BPPR's opposition to memorandum of law at Docket No. 471. That opposition has as an Exhibit, a sworn statement of our expert witness, Eduardo Soria putting the court in a position to understand why discovery after 2006 was relevant. That sworn statement was never opposed by Dr. Reyes or any witness or expert witness. It is important to explain to the court that not only was that motion denied at Docket No. 488, but when Dr. Reyes filed at Docket No. 492, his second motion for protective order the court had already denied the first one at Docket No. 488. Dr. Reyes' second protective order was denied after considering BPPR and Popular Auto's opposition at Docket No. 496. At Docket No. 512, the court granted BPPR's motion at Docket No. 496. The court has consistently held that discovery is critical to present the facts of the special circumstances and that this court's Order at Docket No. 488 was an implied denial of the motion for protective order at Docket No. 467.

Thus, it is very clear in this record that different judges, including the presiding Judge, have clearly stated that they would apply the special circumstances doctrine based upon the facts presented at the evidentiary hearing. The court cannot render advisory opinions as to whether the special circumstances doctrine applies in this Circuit. The special circumstances doctrine is a standard that has been accepted in bankruptcy courts. The Collier treatise states that 2 exceptions exist to the 3 creditor rule; namely, (i) when the creditor would otherwise be without an adequate remedy under nonbankruptcy law or when the petitioning creditors make a showing of special circumstances amounting to trick, fraud, artifice, or scam. Without the facts, the court cannot determine whether the special circumstances doctrine applies. The court has stated this same position when counselor Celina Romany represented Dr. Reyes. The most important thing is that Judge Carlo at Docket No. 77 allowed BPPR to perform discovery of the special circumstances issue which was agreed to by the parties at Docket No. 80. Judge Tester allowed discovery of the special circumstances issue at Docket No. 156. This is the 4th or 5th motion for reconsideration of this court's denial of the limited scope of discovery which was recently denied at Docket No. 531.

Attorney Abesada further stated that the oral arguments made by brother counsel is evidence that they do not respect the orders of this court and that they are trying to confuse what is evident from the record. This court at Docket Nos. 404 and 488 has already ruled as to the special circumstances doctrine.

Attorney Abesada stated that the cancellation of Dr. Reyes' line of credit with BPPR was subject to a lawsuit in the United States District Court before Judge Cerezo was dismissed on summary judgment with the imposition of attorney's fees and costs because Judge Cerezo found that the complaint was frivolous.

### Reply by Involuntary Debtor

Attorney Van Derdys stated that they have checked the record and Docket No. 467 has not been ruled upon. As shown in the motion to leave to appeal, since the inception of this case, BPPR expressly manifested that it wanted to conduct discovery as of the filing date. The bank's position was subsequently adopted by this court. Thus, any subsequent discovery to the petition date is irrelevant. The expert witness' report as amended shows that it is based on the pre-petition transactions. The real purpose for conducting post-petition discovery is not directed towards whether special circumstances existed as of the date of the filing of the petition is direct towards other purposes.

### Court

The court stated that there are 2 interrelated but separate issues for this court to determine; namely, (i) issues concerning whether the involuntary petition should be granted or not, which were the subject of this court's decision of May 22, 2012; and (ii) the second issue is whether there have been violations of the discovery orders by this court, and if so, what is the appropriate sanction. The petitioning creditors have argued that the court may impose as a sanction the granting of the involuntary petition. The court has heard the argument by counsel. The court stresses this because in spite of the years that have lapsed, the evidence is still not ultimately before the court, albeit part of it was submitted as part of the motions for summary judgment which were the object of this court's 2012 Order, where the court tried to be as comprehensive as possible. The zealous argumentation by Dr. Reyes' counsel misplaces the focus of the discovery requests by centering on the fact that post-petition discovery should have not been made or authorized by this court. This argument is a very limited perspective in the overall spectrum of all the motions filed and orders entered.

It is this court's position that the May 22, 2012, Order, was clear in stating that discovery was necessary because the special circumstances doctrine, assuming that it will be applied or may be applied, depends on the facts. A post-petition event may relate back to a pre-petition event, but that is discovery. This court will consider events occurring prior to the filing of the involuntary petition to determine if there are special circumstances. The court does not know why counsel for the Involuntary Debtor are still focusing so much on the issue of not providing discovery of post-petition events, when the relevant issues are pre-petition. Although post-petition events may relate back to pre-petition events. The Involuntary Debtor's failure to up-front provide has prevented the Petitioning Creditors to present the evidence and place this court in a position to make a determination. This court will not make a legal determination in a vacuum. The decision has to be based on the facts that are presented to the court, and which have yet to be presented. In fact, this has been the first time that the presiding Judge hears the parties directly and not by motion.

The court further stated that the issue of special circumstances limits what this court found in its decision. The court stated that it purposely detailed all the travel of the case for the benefit of whomever ultimately reviews this court's decision. The court stated that on page 351 of the decision the court stated: "[o]n May 24, 2010, a status hearing was held in which the Court ordered the following: (1) '[p]arties are granted sixty (60) days to conclude discovery only as to whether or not sufficient creditors have joined the petition and to whether the 'special circumstances' doc-

trine applies to the fact in this case; (2) This court finds that the bankruptcy court has not decided whether the special circumstances doctrine applies in this case, and consequently, no such order is on appeal; (3) Court furthers finds that a decision on whether or not the doctrine applies is fact intensive, and declines, at this juncture, to make such a determination'" In re Reyes Colon, 474 B.R. 330, 351. For the same reasons that I have stated, I will make a determination after considering the facts.

The court stated that the next reference is at page 361 in which the following is stated: "[t]he determination of whether the special circumstances doctrine applies in the instant case hinges upon the number of creditors Dr. Reyes had at the time of the bankruptcy petition. If the court determines that Dr. Reyes at the time of the bankruptcy petition had twelve (12) or more creditors, Banco Popular's involuntary petition would be defective and thus, special circumstances would have to be present for the latter to have standing to file an involuntary bankruptcy petition against Dr. Reyes. If the petitioning creditors prove that special circumstances are indeed present in this case, then the court would have to determine whether the Involuntary Debtor was 'generally not paying such debtor's debts as such debts become due' pursuant to 11 U.S.C. § 303(h)(1) in order to grant the order of relief in this case."

The next reference is at page 385 in which the court stated: "[t]he 'special circumstances exception' to the creditor numerosity requirement under Section 303(b) was initially created for single creditor cases, but has been applied in cases in which the involuntary debtor had more than eleven (11) eligible creditors and only two (2) petitioning creditors. See In re Moss, 249

B.R. 411 (Bankr. N.D. Tex. 2000)," The court further stated that whether the decision of In re Moss was made in Texas, Hawaii, California or Puerto Rico has no bearing on the merits of that decion. The Judge that made that decision, Barbara Houser, is a well respected Judge. It's the merits of the opinion that count not the place or the Judge that made that decision.

In the instant case, the petitioning creditors have the burden of proving that special circumstances exist in this case based upon alleged fraudulent transfers made by the Involuntary Debtor to various corporations prior to the filing of the bankruptcy petition. The court does not know why there is so much turmoil and doubt as to what is the relevant evidence that has to be presented before the court because, if the decision is read in detail, one would know what the court meant, and what it was going to judge and determine.

Lastly, at page 390, the court stated: "since there are more than 12 creditors as of the date of the filing of the petition, this court must first determine whether the special circumstances exception existed at the time Banco Popular filed this involuntary petition. The three creditor statutory requirement in Section 303(b) may be subject to the special circumstances exception. This court finds merit to such judicially created exception to the statutory requirements when the petitioning creditor(s) establish(es) fraud, artifice or scam as Section 303(b) is not jurisdictional in nature. However, the court will only consider the special circumstances exception to consider the number of petitioning creditors under Section 303(b). The court declines to extend the special circumstances exception to the requirements in Section 303(h) as the court implicitly did in In re Moss, 249 B.R. at 424." The court further stated that it is very important for this court to make a determination based upon the facts as they

are presented to the court. Those facts have not been presented to the court because of the reticence of one party to submit the discovery requests to petitioning creditors. We have to meet the facts to make a decision. If we do not meet the facts, it would be just an opinion, but not a decision. It's an opinion of what should be. The facts need to be considered to make a decision.

The court advanced to the parties, that this court's appreciation of the facts made in 2012 in order to determine whether the special circumstances apply may be different in 2015. In the year 2012, the prevalent decision by the Supreme Court was In re Marrama, 549 U.S. 365, 127 S.Ct. 1105, 166 L.Ed.2d 956 (2007). The court stated that it is fully conscious that in the year 2014, the Supreme Court entered another decision, Law v. Siegel, — U.S. ——, 134 S.Ct. 1188, 188 L.Ed.2d 146 (2014). Thus, in order to make a final determination based upon the facts as to whether special circumstances should be applied in this scenario (involuntary petition) which is different from the exemption scenario in Law v. Siegel, and is different from the factual scenario in Marrama which was a motion to convert. The court stated that it has to make a decision based on the facts and it is conscious of the law and will apply the same as best as it can. However, the parties have the duty and responsibility to place the court in a position to be able to render a legal decision based upon the facts. The court cannot avoid making the decision because the parties are reticent to present the evidence to the court. This court will make a ruling based upon the evidence presented. The reasons for this hearing should have been clear since the court's May 22, 2012 decision, which has been postponed basically because of the discovery issues that have been brought

before the court. The court further stated that it was aware of the mandamus that was filed not for an action, but for the First Circuit to make a decision on the legal issue that is ultimately before the court. That is the First Circuit Court's province which I will not even attempt to delve into. The court stated that it may decline to grant the involuntary petition for relief, but that does not divest the court of jurisdiction to impose sanctions for violations of discovery orders and whether or not the ultimate sanction of granting the relief requested that is the entry of the order for relief is a legal determination that will be considered.

Whether or not Docket No. 467 is pending, the court did not even consider because its decision was clear and if there was any doubt the court's decision at Docket No. 488 reaffirmed the same. The court needs to hear the facts to determine whether the doctrine applies. The court is adding at this time that it will have to go through a higher threshold in light of the decision of Law v. Siegel. That is the court's position.

### Petitioning Creditors

Attorney Abesada stated that he understands the court will reserve the determination as to the type of sanctions it will impose on this case so in that event BPPR and Popular Auto are ready to proceed with the evidentiary hearing.

Félix Román Dávila, Félix Román Negrón, Attorney Charles Cuprill, Criselid Rivera Muñoz, William Cameroon, Attorney María Torres Cartagena, Dr. Francisco Quintero, and the interpreter.

Attorney Eric Reyes was also subpoenaed for today. However, his attorney, Mr. Andreu Fuentes informed that Mr. Eric Reyes was not going to be available today because he is serving testimony before a grand jury before the United States District Court for the District of Puerto Rico,

Mr. Reyes requests to be excused and will be here as soon as he finishes the proceedings before the United States District Court.

The first witness BPPR and Popular called to testify was **Mr. Félix Román Dávila.**

Mr. Román Dávila is an accountant. He testified that he obtained a bachelor's degree in accounting from the University of Puerto Rico in 1964. Mr. Román Dávila testified that he started his own private practice in 1970 which primarily focused on bookkeeping and tax cases. For the tax cases he would represent clients (and some which were not clients) before the Puerto Rico Treasury Department. He testified that when he started his practice in the 1970's, the majority of his clients were from Bayamón and Corozal. He also testified that as part of his practice he prepares personal financial statements, but not audited financial statements because he is not a CPA. Mr. Román Dávila stated that he does not prepare compilations.

Mr. Román Dávila remembers that he was deposed by Attorney Abesada on October 22, 2015. He stated during the deposition that he prepared approximately 5-6 personal financial statements a year. Mr. Román Dávila stated that he rectifies his prior statement and that he prepares approximately 15 personal financial statements a year. He further stated that in the ordinary course in the preparation of personal financial statements he would use information from loan balances, the market value of properties, and any information requested by the bank. He also stated that in the preparation of the balance sheet, he would take into consideration the price a client had paid for an asset and would update the same to obtain the market value of assets. This practice was performed in the ordinary course of business. He further stated that sometimes client

would bring the deed of purchase and sale in order to assess the market value of real property for the balance sheet.

Mr. Román Dávila testified that he has a son that works as a CPA. His name is Félix Norman Román Negrón. He understands that his son has a professional corporation as part of his practice, RTC Román and Company. He is an employee of his son's professional corporation since the year 2005. He testified that before the year 2005 he had his own independent practice in the same office where his son has his practice at Bayamón Medical Plaza. The owners of the office are his wife and himself.

Mr. Román Dávila stated that he knows Dr. Edgar Reyes Colón because he used to visit the office. Dr. Reyes Colón was not his client. He testified that he represented Dr. Reyes Colón in a tax case in the district of Bayamón, but resigned from the case due to health reasons. He stated that he has never charged or invoiced Dr. Reyes Colón for any accounting service. Mr. Román Dávila knows Dr. Reyes Colón's parents, Porfirio and Ilsa. He has served as an accountant for purposes of filing the estate tax return for Dr. Reyes Colón's mother, Attorney Ilsa Colón in 2 probate cases.

Mr. Román Dávila further testified as to Dr. Reyes Colón financial statements. Mr. Román Dávila testified that he recognized the November 30, 2001 financial statement of Dr. Reyes Colón which had his letter head and signature. Exhibit I. The November 30, 2001 financial statements were prepared upon Dr. Reyes' request. He understands that his son was traveling outside Puerto Rico. He does not recall who specifically requested him to prepare the balance sheet. He stated that it is probable that Dr. Reyes needed it for the bank. Mr. Román Dávila testified that he prepared the November 30, 2001 financial statement

with the information provided by Dr. Reyes. He was not able to corroborate the verbal information provided by Dr. Reyes for the financial statements. Mr. Román Dávila testified that he took as correct the verbal information provided by Dr. Reyes to prepare the financial statements. He further stated that financial statement preparation based upon verbal information is done in the ordinary course of business as part of his regular practice. However, in his deposition Mr. Román Dávila stated that this type of practice was very irregular.

Mr. Román Dávila stated that in the November 30, 2001 financial statements, the total amount of assets is $9,925,950 and the liabilities are: $3,500, $400, $27,000 and $135, 000.

Mr. Román Dávila testified that he recognized the June 30, 2002 financial statement of Dr. Reyes Colón which had his letter head and signature. Exhibit 2. He stated that he prepared this financial statement based on the verbal information provided by Dr. Reyes. Dr. Reyes' total assets as of June 30, 2002 were in the amount of $9,530,550 and the total liabilities were in the amount of $130,700. Dr. Reyes' net worth as of June 30, 2002 was in the amount of $9,399,850.

Mr. Román Dávila testified that he recognized the October 31, 2002 financial statement of Dr. Reyes Colón which had his letter head. However, that is not his signature. He testified that it is his son's signature. Exhibit 3. He stated that as of October 31, 2002, Dr. Reyes was his son's client. He does not know whether his son charged Dr. Reyes for the preparation of financial statements. However, he does not recall whether he prepared this financial statement and thus, cannot testify as to the content of this financial statement. He does not know for a fact whether his son prepared this financial statement. Mr. Román Dávila testified that as of October 31, 2002, Dr. Reyes' total assets amount to $10,005,590 and Dr. Reyes' net worth amounts to $9,835,850.

Mr. Román Dávila testified that he recognized the July 31, 2005 financial statement of Dr. Reyes Colón which had his letter head. However, that is not his signature. He stated that he does not recognize the signature, Mr. Román Dávila testified that in the deposition he had testified that this was his son's signature, but now that he is concentrated on this financial statement, this is not his son's signature. He stated that if we compare this signature with that of Exhibit 3, they are very different. He stated that he does not know who signed this on his behalf without his knowledge. He also stated that he cannot pinpoint whether this document was prepared in his office. Exhibit 4. He stated that the financial statements disclose that Dr. Reyes' net worth as of July 31, 2005 was in the amount of $1,581,550. Mr. Román Dávila stated that he did not have any knowledge regarding the reasons Dr. Reyes' assets decreased from 2001 to 2005. He stated that it is irregular for his son to prepare a balance sheet using his letter head.

Mr. Román Dávila stated that he has never prepared financial statements for Dr. Francisco Quintero. He stated that he recognized Dr. Francisco Quintero Peña's financial statement as of June 30, 2000 which has his letter head and his name printed at the bottom. He testified that he did not prepare the same. He testified that he cannot state under oath whether his son prepared this document using his letter head. Exhibit 5. He further testified that his letter head is not saved in the computer system where his son works. This is done on the typewriter.

No cross-examination was conducted.

The second witness presented by the Petitioning Creditors was **Félix Norman Román Negrón.**

Félix Norman Román Negrón is a CPA since 1996. He testified that he went to the Seton Hall University in New Jersey and graduated in May 1992 with a bachelor's in science with a major in accounting. After graduating from college in 1992 he started working at his father's office. Around 1996-1997, he formed a partnership with CPA Joaquin Torres Hernandez which later became a corporation that lasted until late 2005. He stated that he began the professional corporation with CPA Torres around 2000-2001. Mr. Román Negrón stated that corporation of RTC Roman Torres is located at an office owned by his father.

Mr. Román Dávila stated that he knows Dr. Reyes since 1994 through a friend of his father's that informed him that Dr. Reyes had moved to Puerto Rico and was looking for an accountant. Mr. Román offered accounting services provided by his office to Dr. Reyes. Dr. Reyes was initially a client of the office Félix Román Dávila d/b/a Accounting and Computer Center. He stated that he was mostly the person who worked on Dr. Reyes accounting because bookkeeping could be worked by one of the employees of the office as well as some other matters. He stated that he cannot answer whether his father did work for Dr. Reyes because different tasks were assigned in the office.

Mr. Román stated that he knows Dr. Francisco Quintero because he was referred by Dr. Reyes around 1995-1996. He stated that his father might have done some work for Dr. Quintero such as revising the bookkeeping and done some entries. The work that an accounting office would do. He stated that he was still the CPA of Dr. Reyes. He stated that his office has done accounting work for Dr. Reyes and for the entities controlled by him such as bookkeeping, tax returns, deficiencies with the IRS, CRIM and financial statements. He stated that he worked on a 2005 financial statement in which he used the letter head of his father's office. Exhibit 4. He also stated that he worked on the October 31, 2002 financial statement. Exhibit 3.

Mr. Román Negrón stated that he signed the October 31, 2002 on behalf of his father because at the time when it was prepared his father might not be at the office. This was something that we used to do. He stated that Dr. Reyes was not a client of the professional corporation that he had with his partner. He also stated that Dr. Reyes' income tax returns for the year 2002 were prepared by him either by the professional corporation or under the tax preparer's name. Mr. Román Negrón stated that his father has indirectly prepared income tax returns for Dr. Reyes but he is not sure whether his father signed the income tax returns. He would have to see the documents.

Mr. Román stated that he used his father's letterhead instead of the professional corporation letterhead because the office clients before Mr. Torres joined the firm would be revenue of the d/b/a and the new clients would form part of the revenue of the professional corporation. He stated that he was an employee of his father and a partner in the professional corporation so he could do work for his father's clients and for the professional corporation. He further stated that his father's statement that Dr. Reyes had never been a client of his is an incorrect statement.

He stated that the October 31, 2002 balance sheet was prepared upon the client's request. Mr. Román Negrón stated that there is no way of knowing that he prepared the October 31, 2002 balance sheet.

Exhibit 3. Mr. Román Negrón stated that he prepared the July 31, 2005 balance sheet (Exhibit 4). However, he stated that he believed that was his signature but that he is not 100% sure. Mr. Román Negrón testified that the balance sheets which correspond to Exhibits 3 and 4 were prepared using verbal information provided by Dr. Reyes which he did not corroborate. He stated that he does not have any factual information for the diminution of Dr. Reyes' net worth from the year 2002 to 2005. Dr. Reyes has never explained to him the diminution of assets he suffered from the year 2002 to the year 2005.

Mr. Román Negrón identified the financial statements of Grupo Toraya de Puerto Rico for the years 12/31/2003 and 12/31/2002 that had the letter head of RTC Román Torres and Company PSC. He testified that he was a partner and shareholder of RTC Román Torres and Company PSC. He was the president of RTC Román Torres and Company PSC. He stated that Grupo Toraya is one of the corporations that Dr. Reyes had participation in the same. The independent auditor's report is dated April 7, 2004 and it is signed by the firm, RTC Román Torres and Company PSC. Exhibit 6. The third paragraph of the independent auditor's report reads as follows: "[i]n our opinion the financial statements referred to above presents fairly in all material respects the financial position of Grupo Toraya Puerto Rico Inc. as of December 31, 2003 and December 31, 2002 and the results of its operations and cash flows for the years then ended in conformity with Generally Accepted Accounting Principles in the United States of America." The last paragraph reads, "[t]he accompanying financial statements have been prepared assuming that the company will continue as a going concern. As discussed in note 9 to the financial statements, the company's significant operating losses bring substantial doubt about its ability to continue as a going concern. The financial statements do not include any adjustments that might result from the outcome of this uncertainty."

Mr. Román explained that "a company will continue as a going concern" if it does not make any operational adjustments, either lower expenses, increase revenue or a capital injection, then the ability to meet ends might not be possible in the near future. The financial condition of Grupo Toraya as of April 7, 2004 was that it had a cumulative deficit of $866,422 and stockholder's equity of $660,902 in deficit. The financial statements were prepared for income tax compliance purposes (which was due on April 15) and for the bank. Note 9 of the financial statements states: "[a]s shown in the company's financial statements, the company incurred a net loss of ($608,438) during the year December 31, 2003 and as of that date, the company's liabilities exceed the assets by $784,557 and its total liabilities exceeded its total assets by $660,902. Those factors as well as the uncertain conditions that the company faces regarding this loan agreement created an uncertainty as to the company's ability to continue as a going concern. Management of the company is developing a plan to reduce this liability through sale of assets, reducing administrative overhead, improving internal control over assets, and issuance of additional stock to shareholders. The ability of the company to continue as a going concern is dependent on the plan's success. The financial statements do not include any adjustment that might be necessary if the company is available to continue as a going concern."

Mr. Román Negrón reviewed Dr. Reyes' income tax returns from the years 2000 through 2006 and stated that he had prepared them. Exhibit 7. He stated that Dr.

Reyes' income tax return for the year 2000 was prepared by Félix Norman Román, CPA and it was signed by Roman Accounting and Tax Consulting which is his father's d/b/a. The income tax return was signed by Dr. Reyes. For the year 2000, the net income subject to income tax was $183,138 (blurry). Mr. Román testified that he signed the income tax return for the year 2001 using his personal registry number. The same is signed by Dr. Reyes and the accounting firm is Román Torres and Company PSC. The net income subject to income tax was $122,025 (blurry). CPA Román stated that he did not have an explanation as to how Dr. Reyes with that net income had almost $9 million in assets in the year 2001.

He stated that he prepared Dr. Reyes income tax return for the year 2002 using his own personal registry number and the accounting firm is Román Torres and Company PSC. The net income subject to income tax for the year 2002 was $101,870. Mr. Román testified that he does not have an explanation of how Dr. Reyes with a net income of $101,870 has assets of almost $10 million in October 2002. He also prepared Dr. Reyes income tax return for the year 2003 using his own personal registry number and the accounting firm is Román Torres and Company PSC. The net income subject to income tax for the year 2003 was $90,435. He also stated that he prepared Dr. Reyes income tax return for the year 2004 using his own personal registry number and the accounting firm is Román Torres and Company PSC. The net income subject to income tax for the year 2004 was $306,015. He testified that Dr. Reyes' income increased by approximately $200,000 in the year 2004 because he had income from a professional services corporation which is Cosmetic Hair and Surgery Center PSC. Mr. Román stated that he also prepares the income tax returns for Cosmetic Hair and Surgery Center PSC. Mr. Román stated that Cosmetic Hair and Surgery Center PSC is a pass through entity through subchapter N in Puerto Rico.

Mr. Román testified that he prepared Dr. Reyes income tax return for the year 2005 using his own personal registry number and the accounting firm is RTC Román and Company PSC. The 2005 income tax return is under the accounting firm of RTC Román and Company PSC because late in the year 2005 Joaquin Torres left and the corporate name was changed in early 2006. All clients that belonged to Román Accounting and Tax Consulting were merged into the professional services corporation and my father became an employee of the professional services corporation during late December 2005. The net income subject to income tax for the year 2005 was $498,376. Mr. Román testified that he does not have an explanation as to why even though Dr. Reyes' net income increased significantly during the years 2003 and 2004, his net worth in the year 2005 is only $1.5 million.

He also testified that he prepared Dr. Reyes' income tax return for the year 2006 under the accounting firm of RTC Román and Company PSC. The net income subject to income tax for the year 2006 was $141,752. He stated that Dr. Reyes' net income decreased during the year 2006 because he had more mortgage interest. The mortgage interest is disclosed in the forms the bank prepares and sends to the clients to prepare the tax returns. The two (2) mortgages for which he is deducting the interest are for a principal residence and a second residence which are both with R & G Mortgage Corporation. Mr. Román stated that Dr. Reyes deducted mortgage interest for the first mortgage in the amount of $57,635 and for the second

mortgage, the mortgage interest is $59,357. He stated that for the years 2004 and 2005, Dr. Reyes also deducted the mortgage interests pertaining to these two mortgages. However, in the year 2003, these mortgage interests were not deducted. He stated that Dr. Reyes began deducting these mortgage interests in the year 2004. It is also in the year 2004 in which there was a going concern with Grupo Toraya.

Mr. Román identified a comparison and review of balance sheet 2002 and 2005 of Edgar A. Reyes, M.D. revised by CPA Félix Román, He stated that the document's pages were numbered 1-5 and 27-69, but that pages 6-26 were missing. He stated that he did not prepare this document, but that he might have seen pages 1,2, 3 and 4. However, he stated that he did not prepare the document and that he does not know why that document has his name on it, Mr. Román stated that the explanation that is in the comparison of balance sheets on pages 1 through 5 is complete. Mr. Román stated that he did not revise this document or render an opinion on the document. He stated that he did not authorize for his name to be included in this document. He further stated that he does not use CPA Félix Román, instead he always uses CPA Félix Román Negrón. Mr. Román stated that this particular document has different sections; such as position of cash, the account receivables, the prepaid expenses and is showing moving balances of assets and liabilities. Exhibit 8 with limited purpose.

Mr. Román stated that he recognizes the group of documents of Inmobiliaria Canarias Corp. CXA because they were prepared by his office and signed by him. This corporation was created on December 22, 2003 with an effective date of January 1, 2004. He stated that he was the incorpo-rator and Eric Y. Reyes Colón, Dr. Reyes' brother, was the resident agent. Mr. Román stated that this corporation was created as part of Dr. Reyes' estate planning. He stated that Dr. Reyes and himself visited attorney Tcherine Andujar because he wanted to create a trust for estate planning purposes because Dr. Reyes had marketable securities in the United States and those would be taxable if he were to die plus he was in the process of getting a divorce and he has a child. Dr. Reyes also had an investment advisor (Ram Colluti) in the United States who wanted to create certain entities in the United States so that certain assets could be placed in those entities.

Mr. Román also stated that he attended a meeting with Dr. Reyes, attorney Manuel Villalón and Ram Colluti to discuss the tax effects. The separate entities were created at the same time for estate planning purposes. The 5 inmobiliarias and the professional services corporation were all created the same day, December 22, 2003. The names of the 5 inmobiliarias are the following: (i) Inmobiliaria Canarias; (ii) Inmobiliaria Asturias; (iii) Inmobiliaria Baleares; (iv) Inmobiliaria Galicia; and (v) Inmobiliaria Madrid. He testified that he does not know the reason Dr. Reyes does not appear in the certificates of incorporation of the 5 inmobiliarias. Mr. Román stated that Dr. Reyes gave him instructions to include his brother as resident agent of the inmobiliarias. Exhibit 9 (corporate documents from the State Department).

He further testified that he believes that the address that appears in the 2004 Inmobiliaria Canarias corporate annual report of condominio Adaligia on Ashford Avenue is the office of Eric Reyes. In the 2004 annual report of Inmobiliaria Canarias the President and Treasurer was Eric Reyes Colón. Inmobiliaria Canarias in the year 2004 did not have any assets and liabilities.

The sworn statement for this annual report was signed by Eric Reyes. Mr. Román testified that he prepared the annual report. In the 2005 annual report for Inmobiliaria Canarias, the resident agent is Eric Reyes and the President, Secretary and Treasurer is Francisco Quintero Peña. He stated that Francisco Quintero Peña is a client of his office and a friend of Dr. Reyes. Mr. Román testified that Dr. Francisco Quintero appeared as President of Inmobiliaria Canarias in the year 2005 instead of Eric Reyes pursuant to Dr. Reyes' instructions. He is not aware of any consideration given to Dr. Quintero for appearing as President of Inmobiliaria Canarias in 2005. The 2005 balance sheet of Inmobiliaria Canarias discloses assets in the amount of $1,950,000 in depreciable assets which consist of real estate. He stated that he does not have an explanation as to the income Inmobiliaria Canarias had to purchase this depreciable asset. He does not know whether Inmobiliaria Canarias was in a financial condition in the year 2005 to assume liabilities of $1.2 million. He stated that Dr. Reyes provided the information for the preparation of the 2005 annual report. The information provided was mostly verbal and he took the same as face value. However, he stated that he might have seen other information, but does not recall. The 2005 annual report of Inmobiliaria Canarias was signed by Dr. Francisco Quintero Peña. Mr. Román clarified that even though the sworn statement includes the name of Francisco Quiñones that is an error from the notary, because it was Dr. Francisco Quintero Peña who signed the sworn statement. He does not recall whether Dr. Francisco Quintero Peña was married in the year 2005.

Mr. Román testified that for the 2006 annual report for Inmobiliaria Canarias, Eric Reyes appeared as the resident agent, and Dr. Francisco Quintero Peña and Criselid J. Rivera Muñoz appear as officers of the corporation, Criselid Rivera Muñoz is his wife and an employee of RTC Román and Company. He explained that Criselid Rivera Muñoz appears as the vice president of this corporation because sometimes in order to fulfill the Department of State's requirement his father or his wife would sign as temporary officials in order to submit the annual reports. The annual report was submitted on July 17, 2007 and Criselid Rivera's appointment was until July 31, 2007. The assets that appear on the balance sheet total $1,863,233 of which $1,850,000 consist of depreciable assets and the remaining $13,233 is cash in bank. The information was provided from Dr. Reyes' bank statements and he prepared a worksheet with some of the bank transactions. Mr. Román stated that Inmobiliaria Canarias was a client of RTC Román and Company. He testified that he did not receive payment from Inmobiliaria Canarias for his accounting services. However, he stated that he received payment from Dr. Reyes for the overall accounting services that was provided to Dr. Reyes and his corporations. Mr. Román testified that RTC Román and Company prepared all the income tax returns for all the five (5) inmobiliarias. All the accounting information of the corporate annual reports and the income tax returns for the inmobiliarias was provided by Dr. Reyes. There were also some bank statements that had Francisco Quintero's address that were provided to his office for book keeping purposes.

Mr. Román testified that he believes that in the year 2005, the depreciable assets consisted of a pent house and another real estate asset. He stated that the depreciable assets that were included in the 2005 and 2006 annual reports were assets of Dr. Reyes in which he had been the seller. He further stated that he had no knowledge as

to why these assets had been transferred to Inmobiliaria Canarias. He stated that Dr. Reyes had shown him an Order from the state court, Bayamón part, in which the assets were sold to increase capital to pay Banco Popular. Mr. Román stated that Dr. Reyes did not show him a closing statement or title study of the real estate sales. He stated that Dr. Reyes did not inform him that those real estate sales authorized by the Bayamón court were subject to showing Banco Popular the title studies and closing statements. Mr. Román testified that since he prepared the tax returns, he included those sales in his personal tax return. However, he does not know what happened to the monies that were paid for these properties. He stated that he prepared the income tax return of Inmobiliaria Canarias when it purchased the real estate. He also stated that he cannot assure whether Inmobiliaria Canarias was paying the mortgage loan Dr. Reyes had on that property.

The court stated that it would reconvene tomorrow at 9:30am tomorrow.

/s/
Enrique S. Lamoutte
United States Bankruptcy Judge

## Minute Entry

### *Hearing Information:*

Involuntary Debtor: Edgar Abner Reyes Colon

Case Number 06-04675

Date/Time/Room: 11/13/2015/ 09:30am/ osjcrt2

Bankruptcy Judge: Enrique S. Lamoutte

Courtroom Clerk: Darhma Zayas

Reporter/ECR: Jose Romo

### *Matter:*

Evidentiary hearing to consider the following: (i) whether there are special circumstances compelling the court to obviate the three (3) creditor statutory requirement in 11 U.S.C. § 303(b); (ii) whether the involuntary debtor was not paying his debts as they became due as required by 11 U.S.C. § 303(h) (Docket Nos. 404 & 488).

Motion for Entry of Order for Relief as a Sanction for Involuntary Debtor's Discovery Violations (Docket No. 501).

Opposition to Motion for Entry of Order for Relief and Request to Reconsider Denial of Order Limiting Scope of Discovery (Docket No. 518)

### *Appearances:*

Eldia Díaz Olmo, Banco Popular de Puerto Rico ("BPPR")

Roberto Abesada Aguet, BPPR

Gerardo Pavia Cabanillas, Popular Auto, Inc.

Fernando Van Derdys, Involuntary Debtor

José Nieto Mingo, Involuntary Debtor

Manuel Segarra, Dr. Francisco Quintero

### *Proceedings:*

**Continuation of CPA Félix Norman Román Negrón's testimony (second witness)**

Mr. Félix Román Negrón testified that Inmobiliaria Canarias (Exhibit 9) was one (1) of six (6) corporations that were created on the same day on December 22, 2013 per the instructions of Dr. Edgar Reyes. He stated that Dr. Reyes controls and owns these six (6) corporations. When these corporations were created, no stock certificates were prepared. He stated that he had never seen certificates of stock or certificate of shares for these six (6) corporations.

**Dr. Edgar Reyes Colon July 31, 2005—Balance Sheet (Exhibit 4)**

Mr. Román testified that he prepared this balance sheet per the instructions and information provided by Dr. Reyes, He stated that he did not corroborate the balance sheet information. Mr. Román stated that he did not know that this Balance Sheet would be provided to Banco Popular. He does not recall Dr. Reyes telling him the purpose for the preparation of the July 31, 2005 Balance Sheet. The July 31, 2005 balance sheet under the Assets does not disclose that Dr. Reyes is the owner of closely held corporations; namely: (i) Inmobiliaria Canarias; (ii) Inmobiliaria Asturias; (iii) Inmobiliaria Baleares; (iv) Inmobiliarias Galicia; (v) Inmobiliarias Madrid; and (vi) Cosmetic Hair and Surgery Center, PSC. Mr. Román stated that in all six (6) corporations, Dr. Reyes has an interest and assets in the same. However, Dr. Reyes' interest in these six (6) corporations is not disclosed in the July 31, 2005 balance sheet.

## Exhibit 10—Inmobiliaria Asturias Corp. CXC

Mr. Román identified Identification # 10 as Inmobiliarias Asturias Corp. CXC certification of incorporation and several annual reports filed in the State Department for the years 2003-2012. He stated that he recognized and prepared these documents. Identification 10 was marked as Exhibit 10 with the same limitation as ordered by the court yesterday; namely that the rest of the corporate documents dated after 2006 are conditioned on deferred evidence that will be presented as to whether the same is relevant.

Mr. Román stated that Inmobiliaria Asturias is a corporate entity which he created pursuant to Dr. Reyes' instructions. Eric Reyes Colón, Dr. Reyes' brother was the resident agent, President and Treasurer for this corporation per the instructions of Dr. Reyes. In the annual report for the year 2004 there were no assets or liabilities for Inmobiliaria Asturias. Mr. Román stated that in the annual report for the year 2005, Eric Reyes still appears as the resident agent for Inmobiliaria Asturias. However, the President and Secretary of this corporation is now Francisco Quintero Peña per Dr. Reyes' instructions. In the 2005 annual report, the only disclosure is $1,000 in preferred/common stock. CPA Román testified that he had never seen a check issued for $1,000 nor the source of the $1,000.

In the 2006 annual report for Inmobiliaria Asturias, Eric Reyes appears again as the resident agent and Francisco Quintero Peña appears as President, Treasurer and Secretary and Criselid Rivera Muñoz appears as Vice-President and assistant Treasurer. Mr. Román stated that Criselid Rivera is his wife and an employee of RTC Román. Mrs. Criselid Rivera's appointment as Vice-President and assistant Treasurer is limited. Mrs. Criselid Rivera appears in this annual report because Francisco Quintero Peña could not sign the documents for the annual report. Mr. Román stated that in the year 2006 balance sheet there is $1.9 million in real estate, but he does not know how many properties comprise the $1.9 million. The liabilities are listed in the amount of $1,899,000. CPA Román stated that he did not know the source of the income used by Inmobiliaria Asturias to purchase the real estate assets. He stated that he did not know the source of income Inmobiliarias Asturias had to assume the $1,899,000 in liabilities. He testified that he did not know whether Inmobiliaria Asturias was operating as a corporation generating income in order to assume those liabilities. He testified that the only thing he knew is

that Inmobiliaria Asturias is owned and controlled by Dr. Reyes. Mr. Román testified that Dr. Reyes July 31, 2005 balance sheet does not reflect Inmobiliaria Asturias or the $1.9 million in real estate assets.

Mr. Román stated that RTC Román & Company does the accounting for all the six (6) corporations that were created by Dr. Reyes. However, RTC Román & Company only does the bookkeeping for Cosmetic and Hair Surgery. They do not do the bookkeeping of the other corporations (the Inmobiliarias) due to lack of information. Mr. Román explained that in the ordinary course of business, the bank records of the Inmobiliarias were hard to get because the office would request the same from Dr. Quintero and maybe Dr. Reyes and they did not have them available.

### Exhibit # 11—Inmobiliaria Asturias' Bank Statements (11/2006) & Exhibit # 12—Inmobiliaria Asturias CxA Corp. 2006 Corporation Income Tax Return

Mr. Román testified that Identification # 11 is an R-G Premier Bank Statement for the period of 11/01/2006 through 11/30/2006 and it reflects deposits and disbursements. The account is under the name of Francisco Quintero DBA Inmobiliaria Asturia CXA. He stated that he had seen Identification 11 before in part to prepare the income tax returns for Inmobiliaria Asturias and be able to calculate the amount of mortgage interest that Inmobiliaria Asturias will disclose in its income tax return. Mr. Román explained that the bookkeeping of the worksheet to get the data of the income and expenses is done by an employee which he supervises. Mr. Román stated that he recognizes Identification # 12 which is the 2006 corporate income tax return of Inmobiliaria Asturias because he prepared it and signed it.

Mr. Román stated that in Exhibit 11, there is a November 16, 2006 miscellaneous transaction which is a $10,936,04 debit that is described as RG Mortgage Corp/ at Transfer payment for mortgage loan 1304078 Edgar A. Reyes Col. This is a mortgage payment that is debited from the account of Francisco Quintero for the payment of a mortgage loan # 1304078. Mr. Román stated that this is the first time that he has seen that today, even though he has seen the entire bank statement. He stated that it might be for Dr. Reyes' mortgage loan.

Mr. Román stated that Dr. Reyes' year 2006 income tax return (Exhibit 2) discloses a deduction for mortgage interest for loan # 1304078 in the amount of $59,357 which is the same number as the bank statement. He further stated that in line item # 29 of the 2006 corporate income tax return of Inmobiliarias Asturias there is a mortgage interest deduction in the amount of $56,950.00. Mr. Román testified that Dr. Edgar Reyes was deducting in his individual tax return the mortgage interest for the same mortgage loan and the same real estate as Inmobilirias Asturias. Mr. Román explained that when he prepared th tax return, Dr. Reyes made representations that he did not have the bank informative, thus he provided me with the amount of the loan and the interest type and prepared an amortization table to obtain the interest. He further stated that eight, nine years ago he did not realize that he was taking the same mortgage interest deduction twice for the same loan. Mr. Román stated that Dr. Reyes did not inform him that he was taking that mortgage interest deduction twice.

CPA Román testified that he does not have an explanation as to why Francisco Quintero appears in the bank statement of Inmobiliarias Asturias (Exhibt 11). He stated that it is not until today that he

realized that it was a DBA. Mr. Román testified that if you open a corporate bank account you need a corporate EIN number. If you open a DBA account, you will use your personal social security number and it will not be related to the corporation. He explained that if you have a corporation, you should not open a DBA account because the assets and liabilities will not go to the corporation, they will go to the individual, not the corporate balance sheet.

## Exhibit #13—Inmobiliaria Baleares CXA Corp.—Corporate Documents

Mr. Román stated that he has examined Identification #13. Inmobiliaria Baleares was created on December 22, 2003 per the instructions of Dr. Reyes. Eric Reyes Colón appears as the resident agent per the instructions of Dr. Reyes. He testified that Eric Reyes Colón in the year 2004 appears as the President and Treasurer of Inmobiliaria Baleares per the instructions of Dr. Reyes. The 2004 balance sheet of Inmobiliaria Baleares discloses $146,425 in investments. Mr. Román testified that he did not know the source or origin of those investments, but he believed that these were Dr. Reyes Colon's investments.

In the year 2005 annual report, Eric Reyes still appears as resident agent, President and Treasurer of Inmobiliaria Baleares. Mr. Román testified that in the year 2005, the investments increased to $1,045,715. These are Dr. Reyes Colon's investments. He testified that he has seen a UBS account statement, but that he does not recall seeing Charles Schwab account statements. Mr. Román testified that the annual report information is pursuant to the verbal information provided by Dr. Reyes.

In the year 2006 annual report, Eric Reyes Colón appears as resident agent, President and Treasurer of Inmobiliaria Baleares.

Dr. Francisco Quintero was not the president and treasurer of Inmobiliaria Baleares because those were not the instructions of Dr. Reyes. He stated that his wife and employee of RTC Román & Company, Criselid Rivera Muñoz, appears as the vice president and assistant treasurer with a limited appointment until July 31, 2007. CPA Román stated that in this annual report, Criselid Rivera Muñoz appeared because nobody was available to sign the annual report. Mr. Román stated that his wife, Criselid Rivera Muñoz would appear in annual reports because nobody was available and this happened as well with 24 other clients in the office in the year 2006. In the 2006 annual report, there is a decrease in investments to $870,690 and there is a note receivable in the amount of $176,576. Mr. Román stated that he did not have an explanation or personal knowledge of the decrease in investments or of the note receivable. He stated that the those are Dr. Reyes' investments and he assumes that the note receivable is also of Dr. Reyes. The capital surplus in the amount of $1,000,000 is part of the capital that Dr. Reyes invested in the corporation.

Mr. Román Negrón testified that in Dr. Reyes' July 31, 2005 balance sheet (Exhibit 4), in the assets section, the Inmobiliarias Baleares' investments do not appear. He stated that these investments were supposed to be in the balance sheet, but they were not included because the information that appears in the July 31, 2005 is information that was taken at face value from Dr. Reyes.

## Exhibit #14—Inmobiiiaria Galicia CXA Corp.—Corporate Documents

Inmobiliaria Galicia was also created on December 22, 2003. Mr. Román stated that he was the incorporator of all these corporations. He stated that in the year 2004, Eric Reyes Colón appears as the resident

agent, President and Treasurer of Inmobiliaria Galicia. In the year 2004, Inmobiliaria Galicia did not have any assets or liabilities. In the year 2005, Eric Reyes Colón appears as the resident agent, President and Treasurer of Inmobiliaria Galicia. The 2005 balance sheet of Inmobiliaria Galicia discloses $1,045,715 in investments. Mr. Román testified that he just realized that it was a mistake which was done when the returns were being compiled, given that the investment information for Inmobiliaria Baleares for the year 2005 is the same. He stated that for this particular corporation for this year, it might have been in blank, meaning with no assets and no liabilities. The information was provided by Dr. Reyes for Baleares not for Galicia. He testified that this was a mistake of his office. Mr. Román stated that he does not know why Inmobiliaria Galicia never had assets or liabilities.

## Exhibit # 15—Inmobiliaria Madrid CXA Corp.—Corporate Documents

Inmobiliaria Madrid was also created on December 22, 2003 pursuant to Dr. Reyes' instructions. Mr. Román stated that he was the incorporator of this corporation. He stated that in the year 2004, Eric Reyes Colón appears as the resident agent, President and Treasurer of Inmobiliaria Madrid. In the year 2004, the balance sheet of Inmobiliaria Madrid discloses $1,342,288 in investments. Mr. Román testified that he believes that these monies belong to Dr. Reyes. He stated that he would have to assume that these monies are from Dr. Reyes' accounts because he has not seen any document regarding the transfer because he took as correct the information that Dr. Reyes requested to include in the balance sheet. The capital surplus of $1,300,000 that appears in the balance

sheet is the capital investment in the company by Dr. Reyes.

Mr. Román Negrón testified that the investments in Inmobiliaria Madrid in which Dr. Reyes invested were supposed to be in Dr. Reyes' July 31, 2005 balance sheet, but they were not included (Exhibit 4). In the 2005 annual report, the investments in Inmobiliaria Madrid were in the amount of $1,401,906 and the capital surplus was maintained the same, namely $1.3 million. Mr. Román stated that this information was provided by Dr. Reyes so that he could prepare the balance sheet.

In the 2006 annual report, Francisco Quintero appears as the president, treasurer and secretary of Inmobiliaria Madrid and Criselid Rivera Muñoz appears again as the vice president and assistant treasurer. In the 2006 annual report, the investments increased to $1,492,810 and the capital surplus remained the same at $1.3 million. The liabilities increased to $190,571. Mr. Román stated that he did not have personal knowledge regarding the increase of the liabilities and that these were Dr. Reyes' liabilities.

## Exhibit 16—Cosmetic Hair and Surgery Center, PSC—Corporate Documents

Mr. Román testified that Cosmetic Hair and Surgery is one of the corporations that he created pursuant to Dr. Reyes' instructions. He stated that he prepared the annual reports that appear in the Exhibits. Mr. Román stated that the financial statements of Cosmetic Hair and Surgery Center that are attached in this Exhibit were prepared because the company had more than one million dollars in gross income and up to the years 2009 or 2010, the law required that any corporation that had more than a million dollars in gross sales had to include an audited financial statement.

Mr. Román stated that on page 3 of the December 31, 2005 financial statements there is a description of depreciation regarding property and equipment. There is a building which is subject to thirty (30) years depreciation which he does not know which building it is. Mr. Román explained that these notes are accounting policies that are not necessarily inside the financial statement. Mr. Román testified that this note does not constitute a representation that Cosmetic Hair and Surgery had real estate. Mr. Román clarified that if there were buildings in the asset portion of the balance sheet, it might have been depreciated in thirty (30) years or a leasehold improvement in 10 years. The only assets Cosmetic Hair and Surgery had in the year 2005 were accounts receivables. Mr. Román stated that in the 2006 financial statements, the same note in the 2006 financial statements only referred to equipment and not the building depreciation for 30 years. Mr. Román stated that in the year 2006, the note was corrected from a previous error in the year 2005 notes.

**Exhibit 17—Fax dated 06/03/05 sent by Dr. Francisco Quintero Peña to Mr. Pérez & Exhibit 18—Francisco J. Quintero Peña Statement of Financial Condition May 31, 2005**

Mr. Román stated that 620-8445 is one of the faxes of the office. He stated that Dr. Quintero made some handwritten notes and in the ordinary course of business a client prepares these notes to prepare financial statements. CPA Román stated that his office uses the handwritten information by Dr. Quintero to prepare the financial statements. He further stated that the balance sheet of Dr. Quintero discloses two items; namely (i) investment in closely held corporations in the amount of $1,325,000; and (ii) marketable securities

at market value in the amount of $2,653,000 which were not included in Dr. Quintero's handwritten notes.

Mr. Román testified that the statement that appears on page 5 of Dr. Quintero's Statement of Position disclosing that "Mr. Francisco Quintero owns 100% of the stocks of Inmobiliaria Canarias CxA Corp. and Inmobiliaria Galicia CxA Corp." is not correct because Dr. Reyes is the owner of these stocks. Mr. Román stated that there is a false representation in these statements. CPA Román testified that Exhibit 3 which is Dr. Edgar Reyes—October 31, 2002 Balance Sheet shows a net worth in the amount of $9,835,850 and the only liabilities Dr. Reyes had back in October 2002 were accounts payable, payroll taxes payable, a credit line, and a mortgage with Doral Mortgage Corp. in the amount of $104,000. However, when we compare the October 2002 balance sheet with the July 31, 2005 balance sheet (Exhibit 4), there is a line item for mortgages payable to RG Mortgage Corporation in the amount of $2,959,000. Mr. Román testified that it was in the year 2004, that Dr. Edgar Reyes became responsible for the mortgages that appear in this statement. Mr. Román testified that Dr. Reyes' liabilities increased from having almost no liabilities in the year 2002 to almost $3 million in mortgages payable to RG Mortgage in the year 2005 based upon Dr. Reyes' representations that he was raising funds to pay off the Banco Popular case. CPA Román testified that one could assume that the monies obtained through these mortgages were transferred to Inmobiliaria Baleares and Inmobiliaria Madrid which combined had more than $2.5 million in investments. Mr. Román stated that he had not seen any documentation or checks tracing these transactions. He stated that in his opinion, it is probable that these transfers took place, given that he has been Dr. Reyes'

personal accountant and the accountant of all his corporations since 1994-1995.

No cross examination.

**Attorney Charles Alfred Cuprill Hernandez's Testimony (third witness)** Testifying under the same oath he took yesterday.

### Exhibit 19—letter from 12/08/2005 and letter from 12/13/2005

Mr. Charles Cuprill stated that he has been an attorney at law since December of 1968. Mr. Cuprill stated that he knew Dr. Edgar Abner Reyes Colón because he was a former client of his probably 7 to 8 years ago. Attorney Cuprill stated that if he recalled correctly he originally met Dr. Reyes Colón with a gentleman whose last name was Cusnier and they were involved in some sort of ice cream business. Thereafter, he became my client as a result of the endeavors of Banco Popular de Puerto Rico which eventually resulted in the filing of an involuntary petition by the bank against him. He testified that he does remember representing Dr. Reyes Colón regarding negotiations with Banco Popular de Puerto Rico, The attorney for Banco Popular de Puerto Rico as to the negotiations was Sergio Ramírez de Arellano.

Attorney Cuprill stated that he recognizes his signature on the December 13, 2005 letter which is the response to the December 8, 2005 letter. He stated that the December 8, 2005 letter from Attorney Sergio Ramírez de Arellano reads for itself as a request for an explanation as to the numerical diminution of capital reported to the bank by Dr. Reyes. As to the December 13 letter, Mr. Cuprill testified that there are paragraphs that are numbered one (1) to seven (7). He stated that the letter speaks for itself. This is a document of more than ten years, thus what the letter says is what it says. Mr. Cuprill testified that he does not recall whether he had an extensive meeting with Dr. Reyes as the letter states. He stated that the letter says that since the 2002 statement, Dr. Reyes divorced and that cost him $4 million dollars. Mr. Cuprill stated that at this time, he does not recall the particular information that appears on item 3, but whatever Dr. Reyes told me is within the scope of the client attorney relationship, thus I will not go into that. He further stated that he does not have any recollection as to the specific date of Dr. Reyes' divorce. He stated that he does not recall whether Dr. Reyes had a prenuptial agreement.

### Exhibit 20—Docket No. 372-3 (Divorce Petition)

Mr. Cuprill stated that he sees that it is Docket No. 372-3 which I imagine is appended to some other document if I had the other documents, I could refresh my recollection. However, I do not have an independent recollection as to this document. Mr. Cuprill stated that paragraph 3 of the document (Docket No. 372–3) states that Dr. Edgar Reyes and Mrs. Tañon Correa had a prenuptial agreement.

Mr. Cuprill testified that he does not recall whether at the time he wrote the statement in item number 3, that states that Dr. Reyes divorced had cost him $4 million dollars in 2002, he was aware that Dr. Reyes did not have any liquidation of assets in his divorce.

He testified that whether Dr. Reyes provided him with the information or a document regarding item # 4 of the December 13, 2005 letter regarding the decrease in technology stock that cost Dr. Reyes $1.2 million is within the scope of the attorney client relationship. Mr. Cuprill testified that whether items # 4 through 7 are facts that Dr. Reyes provided him with are

within the scope of the client attorney relationship. Mr. Cuprill testified that the December 13, 2005 letter was sent to Sergio Ramírez de Arellano as counselor for Banco Popular.

Attorney Cuprill stated that he vaguely remembers that the Bayamón Superior Court had conditionally authorized Dr. Reyes to sell some property. He stated that if his memory doesn't fail, the attorney John García was representing Dr. Reyes at the time.

### Exhibit 21—Debtor's Request for Authorization to Sell Property presented in the Bayamón Superior Court/ BPPR's Response and state Court's Order

Mr. Cuprill stated that the first document dated December 14, 2005 is a motion for authorization to sell real estate properties which was filed by attorney John García. The first paragraph of that documents reads in the Spanish language as follows: "El 5 de agosto de 2005 se celebró vista en el caso dereferencia. En dicha vista, la parte compareciente se allanó a que se emitiera una orden en la cual se prohibe la venta de sus propiedades inmuebles." He further stated that the next document is BPPR's position regarding the request for that authorization. Paragraph three (3) of the said document states that BPPR has no opposition to the sale of real estate properties, subject to two (2) conditions which are: (i) to submit a title study and a closing statement prior to the sale; and (ii) if there are any proceeds from the sale they have to be paid to BPPR. The state court on January 25, 2006 rendered an Order authorizing the sale of the properties subject to BPPR's conditions. Mr. Cuprill testified that he remembers seeing the motion authored by attorney John García and it is possible that I have seen the others before today.

He testified that he did not have personal knowledge of providing during that time to BPPR's attorney a title study regarding the sale of a property. He stated that he did not have personal knowledge of providing BPPR's counsel a closing statement regarding the sale of any real property.

No cross examination.

**Attorney María Torres Cartagena's Testimony (fourth witness)** Testifying under the same oath he took yesterday

Mrs. María T. Torres Cartagena stated that she is currently single and was previously married to Mr. César Sierra. She stated that she believes to have graduated from law school in the year 1991 or 1992. She testified that she has known the Reyes-Colón family for approximately thirty (30) years. She stated that she is not related by blood to the Reyes-Colón family. Attorney María Torres stated that she met the Reyes-Colón family because one of her brothers studied with the parents of Dr. Edgar Reyes; Mr. Porfirio Reyes and Mrs. Nilsa Colón. She stated that Mr. Porfirio Reyes and Mrs. Nilsa Colón are both lawyers and her brother went to law school with them. She stated that as a result of the thirty (30) year friendship with the Reyes-Colón family, she occasionally participated in family gatherings and celebrations. Attorney María Torres stated that she has been working at the law firm of Mr. Porfirio Reyes and Mrs. Nilsa Colón, the Reyes & Reyes Law Firm, for more or less seven (7) years. She stated that before working at the Reyes & Reyes Law Firm, she had her own office located at Nogal Avenue in Bayamón. Attorney Torres stated that she closed her private office and went to work at Reyes & Reyes Law Firm. She stated that at the Reyes & Reyes Law Firm she may have her own cases and may also work together on cases with attorney Nilsa Colón. She stated that she does not receive a salary (income)

from Reyes & Reyes. She only has an agreement to share space at the Reyes & Reyes office. She stated that she is not a partner of the Reyes & Reyes Law Firm. She testified that there are no other partners besides Porfirio Reyes and Nilsa Colón. She testified that she has known Dr. Edgar Reyes for thirty (30) years. She stated that she knew that there was a Gelato's business but she does not know anything about it. Attorney Torres testified that she never executed a deed regarding the Gélato's business. She stated that she was never aware that Dr. Edgar Reyes was having financial difficulty with the Gelato's business. Attorney Torres stated that Dr. Edgar Reyes' financial difficulty with the Gelato's business was not discussed at the office. She testified that she was aware that Dr. Reyes had incorporated Inmobiliaria Asturias and Inmobiliaria Canarias. She stated that she was not aware that he had also incorporated Inmobiliaria Baleares, Inmobiliaria Galicia and Inmobiliaria Madrid.

Attorney Torres stated that she recalls being subpoenaed to produce various deeds. She stated that she has already reviewed Exhibit 22 which consists of true and exact copies of the deeds that are in her protocol, except for the fact that certain information pertaining to social security numbers of the people appearing before you has been redacted.

## Exhibit 22

Attorney María Torres stated that Deed number 1 is a Purchase Assuming Mortgage dated February 25, 1995 in which Mr. Luis Enrique Kolb Ortiz and Mrs. Carmen Teresa Guzman Moran appear as the sellers and Dr. Edgar Reyes Colón appears as the buyer. The property that is being purchased by Dr. Reyes is the one that is located in block C-10 in Santa Cruz, Bayamón. Attorney María Torres testified that the deed reflects that the purchase price was $70,000 and it had a mortgage of $50,246.83 and the difference of $19,753.18 was previously received. The deed states on page 4 that: "...manifiesta la parte vendedora haberlos recibido de manos de la parte compradora en esta misma fecha en Moneda del Curso Legal y Corriente de los Estados Unidos de América." The deed stated that the seller states having received from the buyer on this same date in currency of legal tender. Mrs. Torres testified that the monies were not necessarily received on the same act of execution of the deed. She stated that she asked the sellers if they had received the monies and they answered that they had received the same told her that the monies were received. Attorney Torres clarified that the monies were received by the sellers prior to the act of execution of the deed. She testified that she did not see an exchange of money during the act of execution.

Attorney Torres stated that Dr. Reyes' parents own a property in Santa Cruz, Bayamón. The property is where the office is located. The address of the office is # C-22.

Mrs. Torres stated that deed # 2 is a deed of Judicial Sale executed in Ponce on February 20, 2002 by which Dr. Reyes purchased an apartment in Condominio Torre de Oro in Ponce, Puerto Rico. Attorney Torres stated that deed # 4 is a purchase assuming mortgage dated September 9, 2004. She testified that the transaction that took place with the execution of this deed was that Dr. Edgar Abner Reyes Colón sold areal property to Mr. Jaime Soler Perez and Ivette Perez Vega. Attorney Torres clarified that Mrs. Nydia Fernandez Cruz which is the wife of Mr. Jaime Soler Perez appeared in the deed to acknowledge that the monies used by her husband to acquire 50% of the property

interest of this purchase was of a private nature of her husband which was acquired by inheritance. Mrs. Torres testified that the purchase and sale clause starts at page 4 of the deed and reads, "Efectúase esta compraventa por el convenio y estipulado precio de $755,000 de los cuales la parte compradora ha expedido un cheque por la cantidad de $78,403.34 para el total de la hipoteca que actualmente grava la propiedad, quedando la misma libre de cargas, los restantes $676,596.66 serán satisfechos de la siguiente forma; la cantidad de $22,500 que fueron entregado a la parte vendedora de manos de la parte compradora al momento del otorgamiento del Contrato de Opción y Compra y los restantes $654,096.66 manifiesta el compareciente de la Primera Parte haberlos recibido de manos de la parte compradora en esta misma fecha en Moneda del Curso Legal y Corriente de los Estados Unidos de América por lo que ha hecho entrega de las más formal y eficaz carta de pago." This purchase and sale was made for the agreed and stipulated price of $755,000 of which the buyer has issued a check for the amount of $78,403.34 for the total payment of the mortgage that currently encumbers the property leaving it free from the encumbrances. The remaining $676,596.66 will be paid in the following way: the amount of $22,500 that were delivered to the seller by the buyer at the moment of execution of the Purchase Option Agreement and the remaining $654,096,66 the first appearing party states having received from the buyer on this same date in currency of legal tender of the United States of America for which he has delivered the most formal and efficient letter of payment.

Attorney Torres testified that she does not recall whether the amount of $654,096.66 was paid by the buyer to the purchaser in her presence. She stated that the deed reads that it was paid on the same date. Attorney Torres stated that she understood the difference between a buyer paying the purchase price before the execution of a deed versus when the buyer pays the purchase price in your presence while executing a deed. She stated that it is possible that the purchase price was paid in her presence, but she does not recall. She further testified that the deed reads that the purchase price was paid before the execution of the deed. That is what the parties said.

Mrs. Torres testified that Dr. Edgar Reyes appeared before her on June 30, 2005 to execute deeds number 17, 18 and 19. She stated that Dr. Reyes appears in deed number 17 which is a cancellation of mortgage note and he must have been the one who provided her with the information to prepare the deed. Mrs. Torres testified that deed numbers 18 and 19, are both Purchase of Sale deeds in which Dr. Reyes provided her with the information to prepare the same.

Attorney Torres testified that she has known Francisco Quintero for approximately twenty (20) years. She stated that she met Francisco Quintero because he is the brother of a woman that used to be my neighbor and he is the one who represented the corporations in the deeds. She stated that Dr. Quintero is a family friend of the Reyes-Colón family. Mrs. Torres testified that she believes that Dr. Francisco Quintero studied medicine with Dr. Edgar Reyes. She stated that Dr. Quintero and Dr. Reyes were good friends.

Attorney Torres stated that she does not recall whether the execution of these three (3) deeds were done at the same time and in the same place. She testified that in Deed #17, Dr. Edgar Reyes appeared before her to cancel a mortgage that was encumbering the office #507 at Arturo

Cadilla Building. She stated that she does not recall whether the purchase deeds number 18 and 19 were executed at the same time by the seller and buyer. She testified that does not remember going to any other place to obtain the signature of the appearing parties of the deeds.

Attorney Torres stated that at the time the deeds were executed, she was at her private office in Nogal Avenue. She testified that her office was not near the Reyes & Reyes law firm. Mrs. Torres testified that in deeds number 18 & 19, attorney Nilsa Colón de Reyes is the one executing the corporate resolutions authorizing Dr. Quintero to appear on behalf of Inmobiliara Canarias. Attorney Torres testified that the corporate resolution was signed before her as Notary Public on that same date.

Mrs. Torres stated that she does not remember if Dr. Reyes at that time was the owner of Inmobiliaria Canarias. The one who appears in the deed as President of Inmobiliaria Canarias is Dr. Quintero. Attorney Torres testified that she has no knowledge as to whether Dr. Edgar Reyes incorporated Inmobiliaria Canarias and Inmobiliaria Asturias. She stated that in the deeds in which Inmobiliria Canarias or Inmobiliaria Asturias appeared, the one who always appeared was Dr. Quintero as an officer of the corporation. She testified that at this time, she did not know that the owner of Inmobiliaria Canarias was Dr. Edgar Reyes.

Attorney Torres testified that pursuant to Deed #18, Dr. Edgar Reyes sold office #307 at the Arturo Cadillo Building to Inmobiliaria Canarias. On page 4 of Deed #18, it states that the purchase price was paid on the same date but prior to the execution of the deed. Mrs. Torres stated that she specifically mentioned in this deed that the purchase price was paid prior to

the execution of the deed because those were the representations of the appearing parties. The deeds reflect what the parties had told her. The purchase price for Arturo Cadilla was $575,000.

Mrs. Torres testified that pursuant to deed #19, Dr. Edgar Reyes sold a property at Candelero Abajo, Humacao better known as Palmas del Mar to Inmobiliaria Canarias. She stated that deed #19 on the third page specified that the purchase price was paid on the same date, June 30, 2005, but prior to the execution of the deed. Attorney Torres stated that she did not find anything strange that these two buddies were executing two (2) deeds of sale of over $1 million dollars and the purchase price was not paid in a check before you, but that they stop somewhere else and then went to your office. She testified that she had no reason to doubt from either of the two. She stated that on page 4 of the deed, it states that you provided the parties with the proper admonishments required by law. Attorney Torres testified that the admonishments that she remembers giving to the parties were that they had to have title studies, to present the deeds to the Property Registry, to notify the CRIM of the change in property owner. She stated that she usually requests a title study before executing deeds. Attorney Torres testified that she did not caution the parties that in deeds in which the notary public cannot give faith of the payment of the purchase price in her presence those deeds are presumed to be fraudulent because for her the deeds were not fraudulent. She further testified that it is her understanding that the language included in the deeds does not imply that there is a fraudulent conveyance presumption. Attorney Torres stated that she does not know of any jurisprudence from the Supreme Court that holds that a presumption of fraud arises when the notary cannot attest

that the exchange or the payment of the purchase price was done in her presence.

Mrs. Torres testified that she always asked the parties whether in fact the payment was done before the execution of the deed. She stated that she does not remember since this is a 2005 deed, but she must have asked Dr. Reyes and Dr. Quintero on this occasion whether a payment was made and the answer must have been yes, but she does not know recall. Attorney Torres stated that she does not remember who paid her for these deeds. She testified that she does not remember receiving a check from Inmobiliaria Canarias. She further stated that she would never present the deeds to the Property Registry for recordation, unless one of the parties requested that the deed be presented at the Property of the Registry. She stated that she does not remember whether in this occasion one of the parties requested that this deed be presented to the Property Registry for recordation. Mrs. Torres stated that Dr. Reyes' office is located at # 507 Arturo Cadillo. She testified that she does not ask her clients the reasons for the transactions. Attorney Torres stated that if she has a doubt as to the validity of a transaction, then she would investigate the facts and details regarding the transaction. Mrs. Torres stated that in this case, she did not have a doubt as to the validity of the transaction; namely Dr. Reyes selling his office to Inmobiliaria Canarias that was being represented by his friend, Dr. Quintero and that the certificate of corporate resolution was executed by Dr. Reyes' mother and the exchange of over a million dollars for the acquisition of those properties were not paid before you.

Attorney Torres testified that the transaction of deed # 20 which was executed on July 28, 2005 consisted in Dr. Reyes constituting a mortgage in guarantee of a mortgage note on a property at the Dorado Beach East urbanization in the amount of $675,000. This deed was executed in less than thirty (30) days from the prior deeds dated June 30, 2005 in which Dr. Reyes sold his office and the Palmas del Mar property. The Dorado Beach property had a first mortgage with R & G in the original amount of $1,212,570. She stated that this deed was executed to constitute a second mortgage in the amount of $675,000 over the Dorado Beach property. She testified that the mortgage note was payable to the bearer. Mrs. Torres testified that the note becomes effective upon the presentation of the note. She stated that she does not know whether Dr. Reyes had to negotiate the note for the mortgage to become effective.

Mrs. Torres stated that on page 6 of deed # 20, on the third paragraph the property valuation is included as required by the Mortgage Law. She testified that the value was added by a typewriter because the day the deed was executed the value is included on the deed. She testified that the value of the mortgage property was provided by the client but she corroborates the same with the amounts of the mortgage notes. Mrs Torres testified that Dr. Reyes told her that the value of the Dorado property was $2 million. She stated that she does not remember, but Dr. Reyes possibly had to show her some document in which the property was valued. Attorney Torres testified that she was not aware that three (3) days after the execution of the deed (as of July 31, 2005), Dr. Reyes told his accountant that the Dorado Beach property was valued at $1.3 million. She testified that she could not ascertain whether the reason that Dr. Reyes told her that the property was valued at $2 million was to be able to register another lien that would exceed the true value of the property.

She stated that on page 4 of deed # 20, it reads that the mortgage note was returned to the appearing parties so that they would keep it or negotiate it, however they believe it is more convenient to their interests, Mrs. Torres testified that she did not discuss with Dr. Reyes what he was going to do with the mortgage note and what was more convenient to his interests. He is the one that decides what is more convenient to his interest. She stated that she returned to Dr. Reyes the mortgage note.

Mrs Torres stated that the transaction of deed # 21 which was executed on July 28, 2005 was a constitution of a second mortgage in guarantee of a mortgage note which Dr. Reyes realized over apartment penthouse 2-N in ST. Mary's condominium. This property has a first mortgage in favor of R & G in the original amount of $1,248,800. The second mortgage that was constituted pursuant to deed # 21 was for $750,000. She stated that on page 6 of deed # 21, the penthouse at St. Mary's condominium was valued at $2.5 million. Mrs. Torres testified that Dr. Reyes provided the information regarding the value of the penthouse to be included in the deed. She stated that she believed Dr. Reyes regarding the value of the penthouse. Attorney Torres testified that she must have seen some document that provided a value for the penthouse which was valued $500,000 more than the Dorado Beach East house. Mrs. Torres stated that in her opinion since the penthouse was in Condado, the value was greater than a house in Dorado Beach East. She stated that she trusted Dr. Reyes in providing the information regarding the value of the property. Mrs. Torres testified that she trusted Dr. Reyes because he is a serious and righteous person. Attorney Torres testified that she did not know that Dr. Reyes in July 2005 told his accountant that the Condado pent-

house's value was $1.2 million, less than half of the value disclosed in deed # 21. Mrs. Torres stated that if she had known the true value of the Dorado Beach East and the Condado penthouse as he told his accountant, she would have disclosed the correct amount. She further testified that the she did not find anything abnormal regarding the execution of the two (2) deeds constituting second mortgages at the Dorado Beach house and the Condado penthouse, in less than thirty (30) days after selling his office and the Palmas del Mar property and even assuming that the value provided in the deeds, exceed the value of the properties.

Attorney Torres stated that she had no reason to mistrust. She had no negative criteria to think otherwise. She stated that she complied with all of her notarial duties under the law.

Mrs. Torres testified that in deed # 25 which was executed on December 30, 2005 the transaction that occurred was that Dr. Reyes sold to Inmobiliaria Asturias the penthouse apartment 2-N in St. Mary's building in Condado for $1,933,359.85. She testified that the buyer was Inmobiliaria Asturias. She stated that she did not know if Dr. Reyes was the owner of Inmobiliaria Asturias because all of the transactions were done by the President of the corporation, Dr. Quintero. She stated that in deed # 25, Inmobiliaria Asturias was represented by Dr. Quintero. Dr. Quintero's appearance was authorized by a corporate resolution signed by attorney Nilsa Colón Perfecto, Dr. Reyes' mother and she notarized the corporate resolution. Attorney Torres testified that she was unaware that on August 25, 2005, the Superior Court of Puerto Rico had issued an Order prohibiting Dr. Reyes from selling any real properties. She stated that she would have never executed this deed if she knew this act was in violation of a court Order. She

further testified that Nilsa Colón or Dr. Reyes did not mention anything to her regarding the prohibition to sell.

Mrs. Torres stated that in deed # 25 on page 4, she disclosed that this property was encumbered by mortgages which were in the total amount of $1.9 million. According to the deed, the buyer had to pay the seller the remaining balance of $25,000. She stated that the seller, Dr. Reyes had told her that he had received the remaining balance of $25,000 on that same date, but prior to the execution of the deed, Mrs. Torres stated that she does not recall seeing a check for $25,000. Attorney Torres testified that she did not caution the parties regarding the presumption of fraud that arises when in this case the balance of the purchase price was not paid in her presence because she had no reason to caution the parties because she had no reason to think that it was fraud.

Attorney Torres stated that she does not recall where Dr. Reyes resided during the year 2005. She testified that Dr. Reyes used to live at the penthouse # 2 but she does not know the dates when he lived there. She testified that she has not visited Dr. Reyes at the penthouse. Attorney Torres stated that she must have ordered a title search for all of the deeds. She said that she does not remember preparing a closing statement for these transactions. She further stated that she does not recall whether Dr. Reyes requested a title study and/or a closing statement.

Attorney Torres stated that she did not see any red flags as to the fact that Dr. Reyes within the period from June to December 2005 sold his office, sold his residence at penthouse # 2, registered a second mortgage over the property at Dorado Beach and conducted all these transactions with corporations that he created that were being represented by Dr. Reyes' best friend in which she never saw a penny being delivered to the seller. Attorney Torres stated that these were normal corporate transactions.

Mrs. Torres stated that Deed # 25 reads on page 3, that the original amount of the R & G mortgage was in the amount of $1,248,800 and that it is now reduced at this time to the amount of $1,158,358.85. She stated that deed # 25 reads that the second mortgage is in the amount of $750,000 pursuant to deed # 21 that was executed on July 28, 2005. Mrs. Torres testified that she possibly requested the balance of the second mortgage note but she does not recall since the deed was executed in the year 2005. She stated that she does not remember the reason she included the same amount of $750,000 for the balance of the second mortgage. Mrs. Torres testified that she was unaware that the second mortgage note had not been negotiated.

Mrs. Torres testified that in deed # 6 was executed on September 28, 2006. The transaction that occurred was a purchase and sale transaction. The sellers were Mario Cesar Miranda Torres and Laura Peterson Sanchez and the buyer was Inmobiliara Asturias which was represented by Dr. Quintero with a corporate resolution that was executed before Attorney Torres. She stated that she does not recall if the corporate resolution was executed by attorney Nilsa Colón. Mrs. Torres testified that the property that was sold was office # 606 in the Torre San Pablo Condominium. Mrs. Torres testified that it is possible if her mind does not fail her that the office # 606 at the Torre San Pablo Condominium is being used after the deed was executed by Dr. Reyes and/or his professional corporation Cosmetic & Hair. She stated that she does not know whether Dr. Quintero has used office # 606 at the Torre San Pablo as his medical office.

Attorney Torres stated that deed # 7 was executed on December 1, 2006. She stated that in this occasion, Dr. Quintero appeared before her representing Inmobiliaria Asturias to cancel the second mortgage that had been registered on the St. Mary's penthouse # 2. She stated that on page 3 of deed # 7, it reads that Dr. Quintero had told her that he had satisfied the $750,000 mortgage note and that the mortgage note had been delivered to him with an endorsement. Attorney Torres clarified that satisfied means that he paid. She stated that she does not remember who endorsed the mortgage note because she returns the mortgage note. She testified that as a notary public she stated that Dr. Quintero told you that he had paid the $750,000 and that he had satisfied the second mortgage and that he had the note that was endorsed to him so he was entitled to request the cancellation.

Mrs. Torres testified that deed # 2 executed on May 1, 2009 is the resolution of the purchase sale appearing as the first party Inmobiliaria Asturias represented by Franciso Quintero and Edgar Abner Reyes Colón in which she explained that Inmobiliaria Asturias had acquired penthouse 2-N in the year 2005 and that the appearing party for the second part, Dr. Reyes states that the purchase and sale transaction was made with the purpose that the seller at that time would have liquidity in anticipation of some negotiations and payment transactions with creditor Banco Popular de Puerto Rico for which he had informed and had obtained consent. Unfortunately, these settlement transactions did not prosper, thus they decide to execute this deed of purchase and sale to set aside this purchase and sale and upon mutual agreement to annul the same. She further stated that the deed reads: "Por tal razón las partes compare-

cientes otorgan la presente escritura de Resolución de compraventa para dejar sin efecto la compraventa antes mencionada y de mutuo acuerdo resueleven anular la misma y dejar sin efecto alguno el contrato de Compraventa efectuado mediante la escritura pública número veinticinco (25) otorgada el día veinticinco de diciembre de dos mil cineo (2005), ante la notaria subscribiente, sobre la finca descrita en el párrafo PRIMERO de esta escritura y expresamente hacen constar que se han restituido las prestaciones que mutuamente se entregaron con motivo del referido contrato." "For such reason the appearing parties execute this deed of resolution of purchase and sale set aside the purchase and sale mentioned above and upon mutual agreement result to annul it and to set aside the purchase and sale agreement made by public deed # 25, executed on December 25, 2005 before the undersigned notary over the plot described on the first paragraph of this deed and expressly state that the considerations that they have mutually delivered as motive of the referred agreement have been reinstated."

Mrs. Torres stated that it must be a mistake that deed # 25 which was the deed of sale was executed on December 30, 2005 not on December 25, 2005 as stated on deed # 2 which is the resolution of the purchase sale. She stated that deed # 2 was prepared by her, not by attorney Nilsa Colón. Attorney Torres testified that the parties mutually restituted the considerations. She stated that they had informed her that Dr. Reyes received back penthouse # 2 at St. Mary's and Dr. Reyes paid back the $25,000 he had received from the sale. Mrs. Torres stated that this was not done in her presence Attorney Torres stated that she presumed that Dr. Reyes returned to Inmobiliaria Asturias the $750,000 Asturias paid for the second mortgage. She stated that she did not

witness the exchange of checks and/or monies before her.

Attorney Torres testified that deed # 3 executed on May 1, 2009 was also a resolution of purchase and sale but due to error it was titled Purchase and Sale. However, the next deed is an act to cure and clarify that it was a resolution of purchase and sale. She stated that the resolution of purchase and sale was for the office # 507 at Arturo Cadilla. She testified that the resolution of purchase and sale was based on the same reasons of the prior resolution which was what Dr. Reyes told her. She testified that in this case, the parties expressly stated that they had restituted what they had previously provided to each other. Mrs. Torres stated that pursuant to deed # 18 executed in the year 2005, Inmobiliaria Canarias had paid Dr. Reyes $575,000. Attorney Torres stated that she does not remember seeing Dr. Reyes returning to Inmobiliria Canarias the amount of $575,000. However, they told me that they had restituted the respective considerations and that is what is stated in the deed.

Attorney Torres testified that she included in the deeds what the parties had represented to her. She testified that the deeds stated what Dr. Reyes had told her which is that he had sold the properties in order to obtain liquidity and settle a debt with Banco Popular. She testified that as a lawyer and notary public she did not question the business reason as to why these two corporations would resolve these transactions four (4) years later because Dr. Reyes was unable to reach an agreement with Banco Popular because the transactions were not illegal. Attorney Torres testified that fraudulent transactions are illegal, but she did not see any red flags in these transactions.

Attorney Torres testified that deed # 7 dated November 27, 2013 reads that Dr. Reyes had acquired an interest of 50% in the property that is described as office # 401 in the Adaligia Condominium. His brother, Eric had acquired the remaining 50%. She stated that pursuant to this deed, Eric Reyes transferred his 50% interest in this property to his parents in payment of a debt.

No cross examination.

Attorney Manuel Segarra appeared in representation of Dr. Francisco Quintero to inform the court that he plans to draft the proposed stipulation of testimony and circulate it to counsel. If the testimony is not stipulated, then Dr. Quintero will be here Monday afternoon.

The court stated that as the case evolves, it seems that the fact pattern is more complicated than the one originally envisioned. This case was initiated back in the year 2006. Judge Carlo presided it and afterwards it was reassigned to Judge Tester who recused himself. In 2010 the case was assigned to Judge Lamoutte. By 2012, I thought I had written an opinion that was going to clarify pending matters. On May 23, 2012, the Opinion and Order was entered (Docket No. 404). From May 23 to August 10, 2012, orders were entered scheduling a hearing to determine the facts in order to make a final decision. It appears that the docket numbers and motions keep exponentially increasing since we are now in docket No. 598.

The court's bench Order was that the hearings were continued to both Monday at 2:00pm and Tuesday at 2:00pm. The court will enter an Amended Order regarding the additional hearing dates by Monday morning.

Attorney Nieto inquired whether there was going to be a definite limit imposed by the court as to the duration of this case,

given that the petitioning creditors are the ones that are setting the pace. The court stated that it has been lenient for a good cause. They are setting the pace because they were not put in a position to inform the court of what the pace would be because of the discovery issues that have happened throughout the travel of this case. The court stated that it has been more lenient with the petitioning creditors because they have not been placed in a position to move the court, inform the court regarding the witnesses and the length of time it would take because of the Involuntary Debtor's failure to comply with the discovery requests. The court must take the case as it stands today. The court is unable to tell how much time that would be.

The court stated that if the parties place the court in a position to set that limit, the court will set it. However, at this time the court has no idea because of the travel of the case and the discovery issues and whether the parties have tried to resolve pending matters.

Attorney Abesada informed the court that he would issues another subpoena to Mr. Eric Reyes Colón.

The court informed that it requested a transcript of the arguments made yesterday by both parties and the court's statements before and after the arguments.

/s/
Enrique S. Lamoutte
United States Bankruptcy Judge

## Minute Entry

### Hearing Information:

Involuntary Debtor: Edgar Abner Reyes Colon

Case Number 06-04675

Date/Time/Room: 11/16/2015/ 2:00pm/ osjcrt2

Bankruptcy Judge: Enrique S. Lamoutte

Courtroom Clerk: Darhma Zayas

Reporter/ECR: Carlos Aponte

### Matter:

Evidentiary hearing to consider the following: (i) whether there are special circumstances compelling the court to obviate the three (3) creditor statutory requirement in 11 U.S.C. § 303(b); (ii) whether the involuntary debtor was not paying his debts as they became due as required by 11 U.S.C. § 303(h) (Docket Nos. 404 & 488).

Motion for Entry of Order for Relief as a Sanction for Involuntary Debtor's Discovery Violations (Docket No. 501).

Opposition to Motion for Entry of Order for Relief and Request to Reconsider Denial of Order Limiting Scope of Discovery (Docket No. 518)

### Appearances:

Eldia Díaz Olmo, Banco Popular de Puerto Rico ("BPPR")

Roberto Abesada Aguet, BPPR

Gerardo Pavia Cabanillas, Popular Auto, Inc.

Fernando Van Derdys, Involuntary Debtor

José Nieto Mingo, Involuntary Debtor

Manuel Segarra Vazquez, Dr. Francisco Quintero

### Proceedings:

Attorney Díaz Olmo informed the court that BPPR's next witness is Dr. Francisco Quintero. Attorney Manuel Segarra stated that they had filed a statement but there is no agreement as to the testimony. Dr. Quintero will testify. However, Attorney Segarra requested that counsel approach the bench regarding a matter that we

could put on the record but confidentially document as to a particular document.

Counsel for Dr. Francisco Quintero and counsel for BPPR approached the bench.

**Dr. Francisco J. Quintero Peña's Testimony (fifth witness) Testifying under the same oath.**

<u>Exhibit 24—Dr. Franciso Quintero's proposed testimony</u>

Dr. Francisco Quintero stated that he has previously seen the document marked as Exhibit 24 and he recognized his signature on page 3 of the proposed testimony. He testified that there were various drafts prepared before the final draft that was sent by e-mail. The drafts were discussed with his attorney. Dr. Quintero stated that he only met with his lawyer yesterday to revise the final draft. He testified that he did not provide Dr. Reyes with a copy of the draft before it was submitted to the other attorneys. He stated that Dr. Reyes did not see the draft before the attorneys of record of Banco Popular. He testified that Dr. Reyes and/or his attorneys did not request any deletions to the previous drafts. He stated that in his presence and what he recalls is that there were no calls' made to the attorneys representing Dr. Reyes.

Dr. Quintero testified that he is single and was previously married to Sara López for 13-14 months. He stated that he has a son named Yahil Quintero Santos who is 35 years old. He stated that he completed a B.S. from the University of Puerto Rico in 1981 and then he graduated from medicine in 1985. He testified that Dr. Reyes was his classmate at the UPR School of Medicine. He stated that Dr. Reyes was not in the same pre-med class, but they were in the same University. Dr. Quintero testified that they were close friends since 1983. He

then completed his residence in internal medicine in Ohio and his fellowship in Gastroenterology in New York. Dr. Quintero stated that Dr. Reyes did not do at the same time his studies in New York.

Dr. Quintero stated that since he returned to Puerto Rico, he has had a private practice in Manatí. He stated that he has never had an office in Bayamón, Puerto Rico. He stated that Dr. Reyes is not the godfather of his son. He is the godfather of both of Dr. Reyes' children.

He further testified that Dr. Reyes had appointed him as Trustee of his estate as part of his estate planning. He testified that he does not remember whether Dr. Reyes told him that he had executed a last will and testament.

Dr. Quintero stated that he does not remember the exact date when he started using the accounting services of Román Negrón. He stated that Dr. Reyes recommended that he use the services of CPA Román Negrón. Dr. Quintero stated that he does not recall exactly until when he used the services of CPA Román Negrón, but it was until more or less the year 2014. He stated that Dr. Reyes asked him in the year 2005 to be a corporate officer for Inmobiliaria Asturias and Inmobiliaria Canarias as part of his estate planning. Dr. Quintero testified that since it has been so many years he does not recall who told him that these corporations were part of Dr. Reyes' estate planning. He stated that he does not recall the exact details of that particular moment. Dr. Quintero testified that at that time, Dr. Reyes told him that his involvement as corporate officer of Inmobiliaria Asturias and Inmobiliaria Canarias was part of his estate planning. Thereafter, he testified that he does not remember agreeing to be a corporate officer of any other of Dr. Reyes' corporations. He testified that he does not remember being an officer and/or director of

Inmobiliaria Madrid, Inmobiliaria Baleares or Inmobiliaria Galicia.

He further testified that he did not ask Dr. Reyes as to why he did not appear in any of the public records of Inmobiliaria Asturias and Inmobiliaria Canarias as a part of those corporations. He stated that Dr. Reyes had told him that it was important to deal with the arrangements that he wanted to reach with Banco Popular. He testified that Dr. Reyes did not explain to him why it was important for Dr. Quintero's name to appear in the corporate records, but not his name (Dr. Reyes). Dr. Quintero testified that Dr. Reyes requested his help to deal with the debt with Banco Popular and he did. He testified that the assistance he provided Dr. Reyes to allow him to use his name in the corporate records of those two (2) entities was to pay the debt he had with Banco Popular since he was in the process of negotiating the same. Dr. Quintero stated that he does not know how excluding Dr. Reyes' name from the public records and including his name would help Dr. Reyes pay the debt to Banco Popular.

Dr. Quintero testified that he recalls being related to Inmobiliaria Baleares, LLC of Florida. He stated that he has money invested in that entity. He believes that is another corporation of Dr. Reyes, He stated that throughout the years he invested approximately $400,000 in a land purchased ten (10) years ago which to this date has not been sold. The land was purchased in the year 2005. Dr. Quintero testified that it was financed by the owner and little by little throughout the years it was paid off. The owner of the land was Inmobiliaria Baleares. He testified that he paid the $400,000 in checks throughout five to seven years.

## Exhibit 25—Articles of Organization Inmobiliaria Baleares, LLC

Dr. Quintero testified that the registered agent of Inmobiliaria Baleares, LLC is Richard Lara. He stated that he has met Mr. Richard Lara. He stated that he is not sure whether he met Richard Lara in Puerto Rico or in the United States. Dr. Quintero stated that this is the same Richard Lara that was representing Dr. Reyes in this case a couple of years ago. He stated that this entity was organized in January 12, 2005 as it reads in this document. He stated that he does not know who is the managing member of this entity. Dr. Quintero testified that the second page of the document reads that the managing member is Eric Reyes. He stated that the document does not refresh his memory as to who is the managing member of the corporation because he did not remember.

Dr. Quintero testified that he deals with Dr. Reyes when he has any matter or transaction related to Inmobiliaria Baleares of Florida. He stated that he has a 10% interest in this corporation and does not know who has the remaining 90%. He stated that he communicated with Dr. Reyes regarding the issues of the land.

## Exhibit 26—Office of the Property Appraiser (Detailed Report)

Dr. Quintero testified that now there is only one property because the one below was sold. He stated that he does not remember exactly when the one below was sold. Dr. Quintero stated that he believes that both properties were purchased in the year 2005. He is not sure as to the exact number of payments that he made for his 10% participation in these properties. He stated that one payment was made in the year 2005 and the other payments thereafter.

Dr. Quintero testified that Juan Carlos Mas sold the smaller property to Inmobiliaria Baleares. He stated that the purchase price for this property was around $4.8 million. Dr. Quintero stated that the $4.8 million was self-financed by Mr. Mas. Dr. Quintero stated that he does not remember how much money was provided as a down payment. He stated that he provided some money for the down payment and he imagines Dr. Reyes contributed to the down payment as well. Dr. Quintero testified that he is unaware whether anybody else contributed monies towards the down payment.

Dr. Quintero stated that he recognized Exhibit 17 since that is his handwriting. He testified that he sent this document to his accountant on June 3, 2005 which disclosed that he had a 10% investment in commercial property in Miami, Florida which cost $4.2 million and that the present value as of 2005 was $6.5 million. Dr. Quintero stated that his notes disclose that he owns a 10% interest of equity which equates to $650,000 and that it has no debt (Exhibit 17). He stated that he committed an error in the 2005 notes because it had not been paid off. Dr. Quintero testified that the sale of the commercial property in Miami was auto-financed by the owner of the property, Mr. Mas. He further testified that he does not recall whether the financing of the property was done personally by Mr. Mas or by a legal entity. Dr. Quintero testified that the approximations and the other ones he provided to his accountant in the year 2005 seem logical. Dr. Quintero stated that as of June 2005, he was still paying his 10%. The same was paid throughout the years (around 5 to 7 years). He stated that at the present, it has been paid and has not been sold.

**Exhibits 27 & 28—Dr. Quintero's individual income tax returns for the years 2004 and 2007**

Dr. Quintero testified that these seem to be his income tax returns for the years 2004 and 2007. He testified that for the year 2004 he reported a gain of $104,471 in Schedule M (Professions and Commissions Income). In the year 2007, Dr. Quintero testified that his gain as reported in Schedule M (Professions and Commissions Income) was $150,970. He testified that he does not recall the amount that he paid in the year 2005 for his 10% interest. He stated that he does not remember to whom the checks were made payable. He testified that he does not remember who had endorsed the checks. He further stated that he would deliver the checks to Dr. Reyes.

Dr. Quintero testified that his investment in commercial property in Florida of $650,000 which appears as an asset in his May 31, 2005 personal statement of financial condition (Exhibit 18) is the same error that is based on the information that was sent. Dr. Quintero testified that he did not send the information regarding the Investment in closely held corporations in the amount of $1,325,000 that appears in his May 31, 2005 Statement of Financial Condition. He testified that as of May 31, 2005, he did not have investments in closely held corporations in the amount of $1,325,000. He stated that he does not remember whether he used this financial statement for any purpose. Dr. Quintero testified that he does not recall in particular if he provided a bank with this personal financial statement.

Dr. Quintero testified that today was the first time he realized that there is false information in two (2) items in his May 31, 2005 personal financial statement. He testified that Exhibit 18 was prepared by the Roman accounting firm. Dr. Quintero testi-

fied that Note F of his personal financial statement as of May 31, 2005, states that he owns 100% of the stocks of Inmobiliaria Canarias Cxa Corp. and Inmobiliaria Galicia CxA Corp., but he did not prepare this financial information. He testified that he did not include this information (Note F) in what he had prepared in the handwritten document (Exhibit 17). Dr. Quintero testified that during this time he was a president and agent of the corporation. He stated that he does not recall the reason as to why the preparation of his financial statement as of May 31, 205 was requested.

Dr. Quintero testified that he did not provide his accountant the information in Note F which informs that he is the owner of 100% of the stocks in Inmobiliaria Canarias and Inmobiliaria Galicia. He further stated that he does not recall whether he requested his accountant to prepare his personal statement of financial condition as of May 31, 2005. He stated that he does not remember whether he paid for the preparation of this financial statement. Dr. Quintero testified that he did not say that he was the owner of 100% of the stocks in two corporations. He further testified that he was not helping Dr. Reyes to hide assets, but was helping him to pay off his creditor Banco Popular so that Dr. Reyes would have liquidity.

Dr. Quintero testified that he does not recall the purpose for using his personal financial statement of condition as of May 31, 2005, Dr. Quintero in his proposed testimony disclosed that he did not have any recollection regarding the deeds. He stated that he has not been diagnosed with any type of disease that affects his memory. He testified that he understood that he was only the resident agent of Inmobiliaria Canarias and Inmobiliaria Asturias. He stated that he does not recall the purpose

he sent his handwritten notes to his accountant in June 2005 since that was more than ten (10) years ago.

Dr. Quintero testified that he does not recall whether he has seen documents from 2005 until before today's hearing date (November 16, 2015) regarding Inmobiliaria Madrid, Inmobiliria Baleares and Inmobiliaria Galicia.

### Exhibit 29—Schwab One Organization Account Application

Dr. Quintero testified that on the first page of Schwab One Organization Account Application for Inmobiliaria Baleares, CxA that was not his handwriting. He testified that he was not sure whether that was his signature on page 2 of the application. Dr. Quintero stated that he does not recall exactly signing an application to open an account at Charles Schwab for Inmobiliaria Baleares, CxA. He stated that he does not recall whether he authorized anybody to use his personal information to open an account at Charles Schwab.

Dr. Quintero stated that on page 809 of the Charles Schwab account agreement he appears as president of Inmobiliaria Baleares, CxA. He testified that he does not recall if he was ever the president of Inmobiliaria Baleares, CxA. Dr. Quintero stated that he is not sure of who Criselid Rivera is. Dr. Quintero testified that he is not sure if that is his signature on page 809. He further testified that he is not sure if that is his signature at the bottom of page 810. Dr. Quintero testified that that is not his handwriting on page 811.

Dr. Quintero testified that he does not recognize the signature that appears on page 30. He stated that before today, he does not remember having seen these documents. On page 830, it discloses that Eric Reyes appears as President of Inmobiliaria Baleares. Dr. Quintero testified that he did

not know who was the real president of Inmobiliaria Baleares.

He testified that he does remember dealing with these Charles Schwab accounts. He stated that he would request disbursements to make payments. He stated that he would issue a check request to Charles Schwab to make payments regarding matters of Dr. Reyes. Dr. Quintero stated that Dr. Reyes would call him to make the check requests. He stated that he does not recall whether Dr. Reyes ever gave him written instructions. Dr. Quintero testified that he made no use of the monies deposited in these accounts for his personal use. He stated that he derived no benefit from the monies in these accounts, it was a favor for a friend.

Dr. Quintero stated that on page 1150, the Charles Schwab account had as of October 31, 2005, a total account value in the amount of $1,036,818.30. He testified that he does not know where the $1 million dollars came from.

Dr. Quintero testified that the check request made on October 30, 2007, that is on page 1082 is not his handwriting. He stated that he does not recognize the handwriting. The document states that the same was sent by E. Reyes. This was a check request to be issued in the amount of $95,000 made payable to Lina Prestol. Dr. Quintero testified that he does not know who Lina Prestol is and does not remember having dealt with her. He stated that Ram Kolluri is a money manager from New Jersey. Dr. Quintero stated that he does not recall the company Ram Kolluri worked for. He had a personal account with Schwab in which Mr. Kolluri was engaged to manage and invest. Dr. Quintero stated that Ram Kolluri was a money manager associated with brokerage firms. Dr. Quintero testified that he would use Ram Kolluri's services.

Dr. Quintero testified that page 1083, he recognized his handwriting and his signature. He testified that this is a check request made in the year 2010 in the amount of $171,000 to be made payable to C.R.C. of South Florida. Dr. Quintero testified that he does not recall the business Dr. Reyes had with C.R.C. of South Florida. Dr. Quintero stated that he does not recall who Migdalia Díaz was, which was the person to whom he instructed the check be delivered to. He stated that he does not remember if this was an instruction that was provided to him by Dr. Reyes.

He stated that page 1080 originated from his phone number, but that the number that is displayed on the top of the page is not his fax number. Dr. Quintero testified that he does not remember sending this document to Charles Schwab, but that it is possible. He stated that the signature looks like his, given that sometimes he changes his signature if he's in a hurry. Sometimes his signature includes his second last name Peña, and sometimes he shortens his last name Quintero. This is a request to wire $80,000 to the account of Castro Southeast Realty Services, LLC. Dr. Quintero testified that he does not recall the business reason for this wire transfer.

Dr. Quintero stated that on page 1085, that is his handwriting at the bottom and his signature. He testified that Mr. William Cameron is a person that used to work for Dr. Reyes. He testified that he had written that Mr. Cameron was his personal assistant in order to facilitate the pick up of the check. This document is for two (2) check requests each of $10,000 to be made payable to "Alguacil." Dr. Quintero testified that he does not remember the business that was being dealt with by Dr. Reyes at the time.

He further stated that on page 1081, that is his signature. He testified that this a

request in the amount of $35,500 to be made payable to attorney Juan Casilla. He stated that he had written that Mr. Cameron was his personal assistant in order to facilitate the pick up of the check. Dr. Quintero testified that he does not remember the purpose of paying $35,500 to attorney Juan Casilla. He stated that he is not sure of whether he met attorney Juan Casilla.

He stated that on page 1079, that is his signature. He testified that he does not remember the purpose for this check request in the amount of $58,418.15. He stated that he did not have a personal assistant by the name of Anibal Ramos. Dr. Quintero testified that on pages 1093 and 1097 there are instructions that a check be made payable to Anibal Ramos, his personal assistant.

Dr. Quintero testified that Anibal Ramos was never his personal assistant. He stated that he does not know the type of relationship that existed between Dr. Reyes and Anibal Ramos. He further stated that he included that Anibal Ramos was his personal assistant to facilitate the check pick up for Dr. Reyes' business purposes.

Dr. Quintero testified that he does not recall who Magaly López is. He stated that Gabriel Canales is a real estate agent in Miami, He was the agent for the purchase of the two (2) properties. He stated that he does not recall if he was the agent regarding the sale of the smaller property. On page 1087, wire transfer instructions were given on June 8, 2012 and the property was acquired in the year 2005. Dr. Quintero testified that he does not know if there was another property in the state of Florida that was acquired with the use of monies from this account.

He stated that on page 1090, the check request is for the amount of $26,750 and is being paid to the trust account of the law firm of Mase Lara Eversole P.A. Dr. Quintero stated that he does not know why this amount was paid to this law firm. He testified that this is the same Richard Lara that is in charge of Inmobiliaria Baleares, LLC in Florida.

Dr. Quintero testified that while he was performing all these transactions for Dr. Reyes, he knew that Dr. Reyes was trying to fix his debt with Banco Popular through a workout. He stated that a workout is to talk to the person that manages the debt and try to reach a payment agreement.

He testified that he does not remember how many bank accounts Inmobiliaria Canarias had. Dr. Quintero stated that he appeared on certain deeds dated June 30, 2005 to acquire some of Dr. Reyes' properties. He testified that he stands by what the deeds sustain even though he has no recollection regarding the deeds because if the deeds so state it must have happened but he does not recall.

Dr. Quintero further testified that on June 30, 2005 he represented Inmobiliaria Canarias that acquired a property Dr. Reyes had at Palmas del Mar. He stated that he agreed to this transaction in order to help Dr. Reyes obtain liquidity to be able to pay Banco Popular in the payment arrangement. Dr. Quintero testified that he stands by what the deed states. He stated that if the deed states that he paid Dr. Reyes $550,000 in representation of Inmobiliaria Canarias for the purchase of the Palmas del Mar property, then it must have happened, but he does not remember the mechanics of the transaction. Dr. Quintero stated that he does not remember where he obtained the monies ($550,000) in representation of Inmobiliaria Canarias to pay Dr. Reyes for the Palmas del Mar property. He testified that he does not remember whether he paid with a check or in cash.

Dr. Quintero testified that on June 30, 2005 he acquired on behalf of Inmobiliaria Canarias, office # 507 in the Arturo Cadilla Building for $575,000. He stated that he does not remember where he obtained the $1.1 million to make the payment to Dr. Reyes for the Palmas del Mar property and office # 507 in the Arturo Cadilla Building (Exhibit # 22—deed # 18 & deed # 19). He testified that he does not remember whether he provided the information for the execution of these deeds to Attorney Torres Cartagena. Dr. Quintero stated that he knew Attorney Torres Cartagena before the date of the execution of deeds because she is his sister's friend. He stated that he does not recall whether he has used the services of Attorney Torres Cartagena for anything that is not related to Dr. Edgar Reyes. Dr. Quintero stated that he does not think, but is not sure whether Attorney Torres Cartagena has done any notarial work for him, besides all of these transactions that pertain to Dr. Reyes.

Dr. Quintero testified that he does not remember the mechanics of these two transactions (deed # 18 and deed # 19), in particular where he obtained the $1.2 million to go to the closing and purchase these properties. He stated that it is possible that Dr. Reyes intervened in all of this, but he does not know how Dr. Reyes intervened in all of this. He stated that he did not have that kind of money. Dr. Quintero testified that he does not know whether Inmobiliaria Canarias had that kind of money ($1.2 million). He testified that the annual corporate report of Inmobiliaria Canarias as of December 31, 2004 disclosed that it did not have any assets or liabilities (Exhibit 9). Dr. Quintero testified that he does not remember whether he paid $1.2 million to Dr. Reyes.

Dr. Quintero testified that he just found out that in the prior year (in the year 2003), Eric Reyes was President of Inmobiliaria Canarias. He stated that he had no information as to the reason Dr. Reyes removed his brother (Eric Reyes) from the position of President of Inmobiliaria Canarias and appointed him precisely in the year in which these two (2) deeds were executed (June 30, 2005). He testified that he does not know whether Eric Reyes was removed as President of Inmobiliaria Canarias because he did not want to sign those (2) deeds as an attorney on behalf of the corporation. Dr. Quintero testified that he does not know what happened to the Palmas del Mar property from the time the property was purchased on June 30, 2005 to the time it was sold. Dr. Quintero testified that as previously stated in his statement he was not involved in the day to day operations of the corporation, the finances or the corporate reports.

Dr. Quintero testified that regarding the sale and purchase deed # 16 dated October 31, 2007 (Identification # 23) in which he appeared representing Inmobiliaria Canarias as the seller of the Palmas del Mar property to Johanna Rivera Benitez he pleads the fifth amendment because this deed has to do with a case that is before a federal court. Dr. Quintero explained that at this moment, there is no case pending against him, but they came to visit him and he had to provide documentation to the grand jury. He testified that he does not remember if he provided a copy of this deed.

Attorney Diaz Olmo argued that corporations may not plead the fifth amendment and Dr. Quintero in this deed was representing a corporation as its president. Attorney Segarra argued that Dr. Quintero may plead the privilege because he acted in his personal capacity and also the deed is outside of the relevant period. The court

determined that as to the issue of the dates, there is not much concern because if they relate back to transactions during the relevant period, the court will accept it. The court expressed its concern on how allowing this testimony would affect ongoing criminal proceedings and balancing that with accepting or denying this testimony and how critical is that testimony in light of what the court has already heard. The court will not allow the document or further questioning of the witness which may incriminate him personally. Attorney Diaz Olmo stated that the witness had to invoke the fifth amendment every time a question is asked.

Dr. Quintero stated that deed #16 on page 4 reads that the seller received the amount of $545,212.13 by means of an electronic transfer. He testified that he does not remember to which corporate bank account the electronic transfer was made to. He stated that he does not remember how many bank accounts Inmobiliaria Canarias had at the time. He testified that he does not remember who gave the instructions for this payment to be made by a wire transfer. Dr. Quintero testified that he does not know who would have the bank records of Inmobiliaria Canarias. He then stated, that he would receive some of the bank statements and then he gives the same to Dr. Reyes. He testified that he does not know which bank statements he would receive because he would not even look at them. Dr. Quintero testified that he still receives some bank statements once a month. He further testified that he does not remember from which institutions he received last month's bank statements because he does not even look at them. He just sends them to Dr. Reyes.

### Exhibit #30

Dr. Quintero testified that his name is on that R & G bank account statement and

under his name it reads DBA (doing business as) Inmobiliaria Asturia. He stated that he does not remember opening that R & G bank account under the DBA of Inmobiliaria Asturia. Dr. Quintero testified that he does not know where the address is which is on the bank statement. The address is: Urb Santa Rosa, 3147 Ave Maria PMB 88, Bayamón, PR 00959. He testified that he does not recall whether he receives these bank statements. Dr. Quintero testified that the deposits that are disclosed in these bank statements were not made by him. The deposits were made by Dr. Reyes. He stated that he does not know whether the deposits were made in cash or by check. Dr. Quintero testified that the purpose of opening the bank account under his name as DBA Inmobiliaria Asturias in which Dr. Reyes would deposit monies in this account and then transfer the monies to pay the penthouse mortgage loan was because Inmobiliaria Asturias had acquired the penthouse debt during the time he was a corporate officer and the bank statements were under his name. He testified that Dr. Reyes would pay the mortgage loan and he kept living in the penthouse.

Dr. Quintero stated that he stands by the deed and the deed reads that Inmobiliaria Asturias had assumed the penthouse mortgage (the debt). He testified that the penthouse mortgage was being paid by Dr. Reyes with the monies he would deposit in his account. Dr. Quintero testified that he did not engage in any efforts with the bank for Asturias to assume the mortgage obligation of the penthouse because Dr. Reyes kept living the penthouse and paying for the mortgage. He testified that he is not aware of banking laws related to money laundering.

The court stated that it would modify its ruling regarding Identification #23. The court stated that it accepts the document

as Exhibit # 23 and reaffirms its decision as to not allowing any questions from the witness that would incriminate him based upon the fifth amendment as a person. The documents as long as they refer to a corporation or partnership may not claim the privilege (Exhibit 23).

Dr. Quintero testified that the two (2) deeds in which he appeared on behalf of Inmobiliaria Canarias to purchase the Palmas del Mar property and the one in which he appeared on behalf of Inmobiliaria Canarias to acquire the office of Dr. Reyes at the Arturo Cadilla Building were not simulated transactions because they were done to help pay the debt to Banco Popular. He testified that he does not remember the details of the transaction such as where he obtained the $1.2 million to purchase these properties and paying the $1.2 million to Dr. Reyes. He testified that he does not remember the details of the transaction because all of these transactions were designed by Dr. Reyes. Dr. Quintero stated that Dr. Reyes was the one who controlled all of the corporations.

Dr. Quintero stated that on December 30, 2005, the corporation he represented acquired the penthouse at Saint Mary's. He testified that he does not remember where he obtained the $25,000 that were given to the seller as part of the purchase price. He testified that on December 1, 2006 he appeared before Attorney Torres Cartagena to cancel the second mortgage that was for $750,000 (Exhibit 24-Dr. Quintero's statement) pursuant to the deed. The deed states that he had informed the notary that the corporation had paid the amount of $750,000. Dr. Quintero stated that he does not remember exactly how the $750,000 was paid, but he believed it was paid between corporations. He stated that he does not remember to which corporation he paid the $750,000. He stated that

he does not remember paying with a check the $750,000. Dr. Quintero explained that when he refers to between corporations it means between corporations owned by Dr. Reyes. He further testified that he does not recall that this transaction was resolved on May 1, 2009 but that he reviewed during the weekend the documents pertaining to the same. He testified that he does not remember receiving the $25,000 plus the $750,000 that he paid for the second mortgage but if the deed so states, it must have happened. Dr. Quintero testified that he is unable to explain how the corporations benefitted from the resolution of the purchases because as he has stated before he did not control the finances or the accounting. He stated that he was not part of the decision making process of the corporations. He stated that these transactions were done in order to help Dr. Reyes pay the debt to Banco Popular. Dr. Quintero testified that he does not know whether the corporations had any corporate business purpose in returning the properties to Dr. Reyes.

/s/
Enrique S. Lamoutte
United States Bankruptcy Judge

### Minute Entry

*Hearing Information:*

Involuntary Debtor: Edgar Abner Reyes Colon

Case Number 06-04675

Date/Time/Room: 11/17/2015/ 2:00pm/ osjcrt2

Bankruptcy Judge: Enrique S. Lamoutte

Courtroom Clerk: Darhma Zayas

Reporter/ECR: Angel Méndez

*Matter:*

Evidentiary hearing to consider the following: (i) whether there are special circum-

stances compelling the court to obviate the three (3) creditor statutory requirement in 11 U.S.C. § 303(b); (ii) whether the involuntary debtor was not paying his debts as they became due as required by 11 U.S.C. § 303(h) (Docket Nos. 404 & 488).

Motion for Entry of Order for Relief as a Sanction for Involuntary Debtor's Discovery Violations (Docket No. 501).

Opposition to Motion for Entry of Order for Relief and Request to Reconsider Denial of Order Limiting Scope of Discovery (Docket No. 518)

### *Appearances:*

Eldia Díaz Olmo, Banco Popular de Puerto Rico ("BPPR")

Roberto Abesada Aguet, BPPR

Gerardo Pavia Cabanillas, Popular Auto, Inc.

Fernando Van Derdys, Involuntary Debtor

José Nieto Mingo, Involuntary Debtor

### *Proceedings:*

**Mr. William Cameron's Testimony (sixth witness). Testifying under the same oath.**

Mr. William Cameron stated that he currently lives with Migdalia Díaz but they are not married. Mr. Cameron testified that he knows Dr. Reyes because he used to work for him for a year (during 2012-2013), Mr. Cameron stated that Migdalia Díaz currently works with the government and before that she used to work with Dr. Reyes as the office manager for about four (4) to five (5) years. He stated that he was Dr. Reyes' chauffeur.

Mr. Cameron stated that Dr. Quintero is an acquaintance and that he knows him through Dr. Reyes. He testified that he has seen Dr. Quintero on three (3) occasions; namely; (i) once at Dr. Reyes' home in Dorado Beach East; (ii) another time at the office; and (iii) here in court. Mr. Cameron stated that he saw Dr. Quintero at the Dorado Beach East home because he went one day to make some repairs and he saw Dr. Quintero at Dr. Reyes' home. Dr. Quintero was washing clothes at the property. He stated that Dr. Quintero was alone at the Dorado Beach East property. Mr. Cameron stated that he has not done any messenger work for Dr. Quintero. He testified that he has never received instructions from Dr. Quintero to pick up checks at Charles Schwab. Mr. Cameron testified that when he was employed by Dr. Reyes, he went to Charles Schwab to pick up sealed envelopes. Mr. Cameron testified that he was instructed by Dr. Reyes to pick up the envelopes at Charles Schwab on one (1) or two (2) occasions. He stated that he really did not think that Migdalia Díaz picked up checks at Charles Schwab because he was the one that used to go make deposits to the bank and run errands on the street. Mr. Cameron stated that after picking up the sealed envelopes, he would take them to Dr. Reyes' office.

Mr. Cameron testified that he came to know about the existence of Inmobiliaria Canarias through Anibal Ramos because he went to the bids with him. He testified that Anibal Ramos was like a realtor and he would attend real estate foreclosure sales. Mr. Cameron stated that Anibal Ramos was Dr. Reyes' friend. However, he is not sure if Dr. Reyes and Anibal Ramos had a business relationship related to the foreclosure sales. Mr. Cameron testified that during the time he was employed by Dr. Reyes he would go to foreclosure sales and sometimes he would attend the same during working hours.

**Exhibit # 31—State Court Complaint in Case No. DCP 2012–0067 (Inmobiliaria Canarias, CXA represented by William Cameron Colomba v. Jose Vazquez Arroyo, Felicita Feliciano, John Doe Richard Doe)**

Mr. Cameron testified that as part of the complaint there is a sworn statement and a deed. He stated that in the Sworn Statement it reads that William Cameron Colomba is appearing as representaive of Inmobiliaria Canarias, CxA. In the deed of sale it reads that William Cameron Colomba is appearing as representative of Inmobiliaria Canarias, CxA. Mr. Cameron testified that he was appointed by Anibal Ramos to appear as the representative of Inmobiliaria Canarias for that deed. He stated that he does not know the relationship Anibal Ramos had with Inmobiliaria Canarias. Mr. Cameron testified that he saw the corporate resolution that authorized him to appear on behalf of Inmobiliaria Canarias at the foreclosure sale, but did not read the same carefully. He does not remember who signed that certificate of corporate resolution. Mr. Cameron recognized his signature on the sworn statement. Mr. Cameron testified that Mr. Anibal Ramos was the person who requested him to appear at the foreclosure sale and at the execution of the deed. He stated that the foreclosure sale and the deed execution were done in the afternoon, not during his working hours. He stated that his working hours were the hours Dr. Reyes would be working at his office. Mr. Cameron explained that as Dr. Reyes' chauffeur, he would pick him up at his house, take him to his office, and then he would pick him up at the office and take him back to his home. He stated that sometimes, Dr. Reyes would leave early from his office around noon or 1:00pm and sometimes he would leave his office late

around 8:00pm or 9:00pm. Mr. Cameron stated that he does not remember the specific time during this deed was executed, thus he cannot corroborate whether the same was done during working hours. Mr. Cameron testified that he did not receive additional compensation from Mr. Ramos or from anybody else to represent Inmobiliaria Canarias during the execution of this deed.

No cross examination.

**Mrs. Criselid Rivera Muñoz (seventh witness). Testifying under the same oath.**

Mrs. Criselid Rivera stated that she has been married to CPA Félix Román Negrón since the year 1998. She stated that she has been working at the office of CPA Félix Román Negrón since she was married on and off. However, Mrs. Rivera testified that she began working full time at the office after she had her second child in the year 2002.

Mrs. Rivera stated that she has known Dr. Edgar Reyes Colón since she began working at the office or since she was married. She testified that she knows Dr. Francisco Quintero because he is a client. Mrs. Criselid Rivera testified that she did not have any relationship with any of the following Corporations: (i) Inmobiliaria Canarias; (ii) Inmobiliaria Asturias; (iii) Inmobiliaria Madrid; (iv) Inmobiliaria Baleares; and (v) Inmobiliaria Galicia.

She testified that she executed as officer of these corporations an annual report for one (1) year. Mrs. Rivera stated that she does not remember the year. It could have been 2006 or 2005. (Exhibit 13). She testified that her name appears in the annual report for Inmobiliaria Baleares Cxa Corp. for the year 2006 and the term of her appointment was until July 31, 2007. In the 2007 annual report for Inmobiliaria Baleares, Mrs. Rivera stated that the term of

her appointment expired on July 31, 2008. She stated that those were the only two (2) years that she appeared as an officer of Inmobiliaria Baleares. Mrs. Rivera explained that she would appear as an officer of Inmobiliaria Baleares even though she had no relationship with any of the Inmobiliarias in order to be able to file the corporate annual report on time with the Department of State without the imposition of penalties, given that the client did not sign the document on a timely manner, we would sign the document with the client's authorization. Mrs. Rivera stated that she recognized her signature in the 2006 corporate annual report for Inmobiliaria Baleares. She testified that in the year 2007, Dr. Francisco Quintero signed the corporate annual report for Inmobiliaria Baleares. Mrs. Rivera testified that Dr. Francisco Quintero was the one who would normally sign the annual reports.

**Exhibit # 29—Schwab One Organization Account Application**(pages-805, 808-811)

Mrs. Rivera testified that besides the two (2) annual reports for Inmobiliaria Baleares which she signed for a specific purpose, she did not sign any other document for Inmobiliaria Baleares. Mrs. Criselid Rivera testified that she did not write the information on the first page of the Schwab One Organization Account Application (Exhibit # 29, page 805). She stated that she did not know who wrote that information. Mrs. Rivera stated that she recognized Dr. Quintero's signature on the application (Exhibit # 29, page 808). She further testified that she had not written her name in block letters under the heading of "Certification of Organization Resolutions" on the Organization Account Agreement, Mrs. Rivera testified that on that same page, under the line item signa-

ture and date required that that is not her signature and that is not her hand writing in block letters next to the signature that is dated 02/05/09 (Exhibit # 29, page 809). She stated that she was sure that that was not her signature or her handwriting, Mrs. Rivera stated that she did not authorize for anybody to sign on her behalf. She stated that she had no type of relationship with Inmobiliaria Baleares as of February 5, 2009. Mrs. Rivera testified that that was not her handwriting (Exhibit # 29, page 810). She testified that that was not her handwriting in block letters or her signature (Exhibit 29, page 811) and she did not authorize anybody to sign this form. She further stated that she was not related to Inmobiliaria Baleares at that time.

Upon comparison of the two signatures, Mrs. Criselid Rivera, testified that the signature on the 2006 annual report of Inmobiliaria Baleares is her signature, but that the signature that appears on the Charles Schwab account application is not her signature.

**Exhibit # 32—Copies of Checks with Mrs. Criselid Rivera's signature**

Mrs. Criselid Rivera testified that identification # 32 consists of copies of four (4) checks that she provided that have her signature.

Mrs. Rivera stated that she does not know anybody by the name of Ivette Santiago. She testified that she had no relationship with Inmobiliaria Baleares by that time and she did not sign the application related to that account, she would be unable to answer any particulars related to the Baleares Charles Schwab account (Exhibit # 29). Mrs. Rivera testified that she does not have any information as to the source of funds that were deposited in the Baleares Schwab account.

No cross examination.

**Attorney Eric Reyes Colón** was called to testify at 3:05pm and he is not present to testify and he was specifically summoned today as per Docket No. 612 and the service of that Order is the one at Docket No. 613. Attorney Nieto informed that to his knowledge, Mr. Eric Reyes Colón is undergoing medical treatment. Based upon that, the court will enter a separate Order directing Attorney Eric Reyes Colón to show cause within seven (7) days why sanctions should not be imposed for failure to appear as summoned and furthermore why his nonappearance should not be referred to the U.S. District Court for criminal contempt for a violation of a summons Order. In this court's opinion, the Bankruptcy Court, the Bankruptcy Judge, has no criminal contempt jurisdiction, unless it is a specific action before the court. It does have civil contempt powers and consequently, any criminal contempt issue which maybe inferred to be a violation of the dignity of the court is for the U.S. District Court to entertain, not this court. Thus, this court is ordering Attorney Reyes Colón to show cause why the issue should not be referred to the U.S. District Court to prosecute criminal contempt for the nonappearance.

Attorney Abesada informed the court that given Attorney Eric Reyes' nonappearance, their next witness is BPPR's corporate representative Amalia Delgado.

**Amalia Milagros Delgado Torres (eighth witness) BPPR's corporate representative**

Amalia Milagros Delgado Torres stated that she currently works at Banco Popular de Puerto Rico. She stated that she began working for BPPR on March 16, 2001. Mrs. Delgado testified that she has been working in the banking industry since 1984. Mrs. Delgado testified that she worked as a relationship officer in the workout department at Banco Popular from the year 2001 to the year 2010. She stated that from the year 2010 to the present she is a supervisor at the workout department which is also referred to as the special loans department. Mrs. Delgado explained that the workout or special loans department is a unit that collects distressed loans which are on default depending on the collateral.

Mrs. Delgado Torres testified that as a relationship officer during the years 2004-2005 she had to evaluate borrowers' financial condition and collateral status in order to collect the amounts owed, meaning the loans in default. She testified that during the time she worked as a relationship officer at the special loans department she dealt with commercial credit facilities that were granted by Banco Popular to Grupo Toraya and Perfetto Group. Mrs. Delgado Torres stated that these commercial loans were unsecured. She testified that these credit facilities were initially granted to Grupo Toraya in October 2002 and the personal guarantors were Mr. Carlos Cusnier and Dr. Edgar Reyes. Mrs. Delgado Torres testified that Banco Popular relied on Dr. Reyes' personal balance sheet as of June 30, 2002 to approve him as guarantor of these loans.

Mrs. Delgado Torres testified that she recognized **Exhibit # 2** which is Dr. Reyes' balance sheet as of June 30, 2002 that is in the credit file. She explained that a personal financial statement such as the one in **Exhibit 2** is very important to unsecured commercial loans because unsecured loans do not have any collateral to mitigate any risk, thus the bank relies on personal financial statements to grant the credit with the guarantor's signature. She stated that during the period of 2004-2005 she had worked out the credit facilities of Grupo Toraya and Perfetto Group. She testified

that she received an updated financial statement as of July 31, 2005 from Dr. Reyes as guarantor of these loans. Mrs. Delgado stated that she recognized **Exhibit # 4** that is, Dr. Reyes' balance sheet as of July 31, 2005 because she received that balance sheet from Dr. Reyes. She testified that she reviewed the July 31, 2005 balance sheet because at that time, Dr. Reyes was proposing a discounted settlement from the bank and we needed to assess his financial condition to determine if it was justifiable to approve a discounted payoff settlement pursuant to his personal financial condition. Mrs. Delgado Torres testified that Banco Popular relied on the July 31, 2005 balance sheet. She stated that the result of her analysis regarding the July 31, 2005 balance sheet was that she noticed a significant reduction in assets in approximately $8 million when compared to the 2002 financial information. Mrs. Delgado Torres testified that after this finding, we requested Dr. Reyes to explain and clarify the significant reduction in assets in order for the bank to understand Dr. Reyes' significant change in his financial condition by that time. She testified that after significant follow up requests at the end of November, Dr. Reyes through his attorney at the time Charles Cuprill sent us an explanation regarding the diminution of assets. She testified that she recognized **Exhibit # 19** because that was the letter that was initially sent to Attorney Cuprill through our attorney and his response. Mrs. Delgado Torres stated that she relied on the response (information) dated December 13, 2005 provided by Mr. Cuprill as Dr. Reyes' attorney, but she found that it did not explain in detail all the changes that were disclosed in the financial statement. Mrs. Delgado Torres testified that after receiving the explanation disclosed in the letter dated December 13, 2005, the bank's reaction

was to continue the negotiations with Dr. Reyes to try to reach a settlement. She testified that they were not fully satisfied with the explanation but we focused on reaching a negotiation between the parties instead of consistently identifying all the changes.

Mrs. Delgado Torres stated that she has seen **Exhibit # 21** before, in particular the first document which is a motion filed by Dr. Edgar Reyes in the Superior Court of Bayamón one day after Attorney Charles Cuprill's letter dated December 13, 2005. She testified that this is a motion that refers to an Order that was entered initially on August 5, 2005 in which Dr. Reyes agreed that he would not dispose of any assets (real estate assets) and that if assets were to be disposed of, it would be with the bank's consent. Mrs. Delgado Torres testified that the bank's position after this motion was filed on December 14, 2005 was that the bank did not want to obstruct the process of collecting or making available the funds to pay the outstanding loans in default. Thus, the bank agreed that Dr. Reyes could dispose of assets (real estate property) to provide additional funds to be applied against the outstanding debt, but had to put the bank in a position to understand every transaction. She explained that the conditions required by Banco Popular for the sale of real estate property were that Dr. Reyes had to provide the bank with title studies, the settlements of the sales to understand the expenses and the disbursements regarding the disposition of real estate assets in order for the bank to understand whether that transaction generated funds to be applied to the outstanding defaulted loans. Mrs. Delgado Torres stated that the settlement of the sales is equivalent to the closing statement as it is referred to in Banco Popular's motion in state court re-

garding its position as to the authorization of real estate property.

Mrs. Delgado Torres stated that she had seen before the last document which is part of **Exhibit # 21**. She explained that the document is a court Order dated January 25, 2006 authorizing Dr. Reyes to dispose of his real estate assets as long as he complies with the conditions requested by Banco Popular. Mrs. Delgado Torres testified that subsequent to this Order, Banco Popular never received a title study or a closing statement from Dr. Reyes. She clarified that Banco Popular did not receive from Dr. Reyes a title study or a closing statement before this Order was rendered. Mrs. Delgado Torres testified that Banco Popular did not receive any proceeds from any real estate sale executed by Dr. Reyes.

Cross examination.

Mrs. Delgado Torres testified that she has ben working in the banking industry since 1984 and she began working in the workout division of Banco Popular since March 16, 2001. She explained that the purpose of a workout is to collect distressed loans depending on the collateral and the earnings. She stated that a workout could be the same thing as a collection action. Mrs. Delgado Torres testified that a workout is a process of collection it does not matter the process either a restructuring or litigation, the objective is to collect. She testified that the workout is part of a collection action. Mrs. Delgado Torres that she is not an attorney and does not file collection actions on behalf of Banco Popular in court. She stated that their attorneys file the collection actions in court. Mrs. Delgado Torres testified that Banco Popular's attorneys file collection actions depending on the bank's instructions which in turn depend on the characteristics of each relationship. She stated that the bank's instructions on whether to file a collection action depend on several conditions such as: (i) availability of the borrower; (ii) borrower's responsiveness; (iii) willingness to provide information and meet with the bank, etc. She stated that whether the workout process is something that occurred before filing a collection action in court depended on whether the bank is in a position to negotiate and borrower's responsiveness. Mrs. Delgado Torres testified that the legal collection efforts are determined by federal laws and banking regulations which regulate the bank depending on whether it is an unsecured loan, or a loan secured by real estate collateral. The bank is regulated and the actions that the bank has to take depend also on the amount of time the loan has been in default. Thus, it is a combination of factors. She stated that if a loan is secured by real estate whether the bank files a foreclosure action to collect on the loan depends on probably a proposal from the borrower and the negotiations or actions that could happen within a time frame. Mrs. Delgado Torres testified that the negotiation process with the bank is always open until the end of the foreclosure. Even at the last part of the foreclosure, the bank is willing to negotiate with the borrower as long as the transaction or the proposal meets the bank's requirements and is a good transaction for both parties. She stated that Grupo Toraya's loan was an unsecured loan. Mrs. Delgado Torres testified that the Perfetto Group loan was partially secured with personal property, meaning chattel, equipment. She explained that the total amount of the loan is partially secured with the very small amount of the equipment's value in relation to the total amount granted. She testified that she does not recall the amount. She further testified that she did not structure this particular loan and she was not involve in determining the adequacy of the security

for this loan. Mrs. Delgado Torres explained that she does have personal knowledge as to whether the loan was partially secured or completely secured because the documentation is included in the credit file. All transactions are specified in the credit file. She stated that originally she did not participate in the process when the credit was granted.

Mrs. Delgado Torres explained that the principal debtor in the Grupo Toraya loan was the corporate entity and there were personal guarantors. She explained that when the Grupo Toraya loan defaulted in April 2004 there was an extension of the defaulted loans and a period of 6 months was granted for Grupo Toraya to restructure and make the turnaround that they informed the bank they would do to pay the loan. After the 6 months expired, Grupo Toraya did not pay. Thus, the relationship officer in charge of that loan contacted Dr. Reyes and tried to meet with him and negotiate with him to make a settlement, but nothing came out of it. Mrs. Delgado Torres stated the there was another guarantor for this loan and the bank also tried to collect from this other guarantor. She testified that the bank did not execute the chattel mortgage (its security interest) over the loan because the bank understood that it was not worth to foreclose on that chattel because it would more expensive to dispose of those assets than what the bank would collect from them. Mrs. Delgado Torres explained that when the credit was structured, the most significant factor was Dr. Reyes' financial position as a guarantor because it was his business and he was the one who presented his venture to the bank. At that time, the risk was concentrated in his personal financial position and that is why he signed an unlimited and unconditional personal guaranty to protect the bank against the

risk of a start up operation. Mrs. Delgado Torres testified that there was another personal guarantor who also signed the same personal guaranty but Mr. Cusnier did not have the financial strength (capability) that Dr. Edgar Reyes' had at the time. She further testified that the bank can decide where to focus its collection efforts. It is a matter of deciding whether the bank may collect from one source or another source.

Mrs. Delgado Torres testified that she understood what a perfected security interest in personal property meant. She stated that a perfected security interest in personal property is the equipment the bank had a chattel over and if the debtor defaults, the bank has the prerogative to collect from the liquidation of that asset. She further testified that at the time, the bank was in the middle of negotiating with Dr. Reyes a settlement transaction. Mrs. Delgado Torres testified that as part of the negotiation process, Dr. Reyes offered to Banco Popular $2 million. She testified that Dr. Reyes had made several offers to the bank that were never formally presented to the bank and if they were presented to the bank were not according to the conditions that the bank would accept that offer. The $2 million dollars were not offered as a lump sum payment or a short term payment. The $2 million dollars were offered to be paid during a two (2) year time frame with no interest bearing and made in several payments. These terms were not acceptable to the bank. Mrs. Delgado Torres testified that the bank made a counteroffer that it would accept a first payment of $1 million dollars and grant 36 months for the payment of the remaining $1 million at a certain interest rate that she does not recall at this moment. The bank did accept the $2 million dollar offer, but under different terms and conditions offered by Dr. Reyes' initially.

Mrs. Delgado Torres explained that what matters to the bank is how was Dr. Reyes willing to pay the $2 million dollars which affects the bank's decision as to whether it will accept the offer. She further testified that Dr. Reyes made offers over a period of almost two years that never materialized because they were not acceptable to the bank. She stated that the bank was openly negotiating with him and making counteroffers. Mrs. Delgado Torres testified that Dr. Reyes did not offer Banco Popular to mortgage his real estate properties. She stated that Dr. Reyes never offered any real estate property to refinance. She stated that his brother once in an initial meeting at the end of March 2005 offered to restructure the loan with a real estate collateral and the bank was more than willing to consider that proposal and the bank requested a written formal proposal. The bank waited three (3) months for the formal written proposal and for the updated financial conditions that were requested in order for the bank to be able to consider his proposal and the bank never received the proposal. Mrs. Delgado Torres testified that three (3) months after his brother offered the real estate properties for the loan restructuring, the bank received a proposal of $1 million to settle the full debt and this offer was not accepted by the bank. Then he came back with another proposal and the bank, by then requested an updated financial statement to assess the conditions under which Dr. Reyes was requesting the discounted payoff settlement.

Mrs. Delgado Torres explained that the bank conditioned the disposition of the real estate subject to placing the bank in a position to be able to understand the transaction under which Dr. Reyes was disposing of his assets to assess whether the transaction would generate proceeds that the bank could collect from that disposition. Mrs. Delgado Torres testified that the bank did not receive title studies or closing statements. She stated that she did not know that a closing statement was at Attorney Sergio Ramírez de Arellano's office. Mrs. Delgado Torres explained that it was Dr. Reyes who offered the bank the disposition of the properties to generate funds to be applied to the debt. The bank imposed these conditions in order to understand whether these transactions would generate proceeds to pay the loan, Mrs. Delgado Torres testified that there was an Order from the Court prohibiting the disposition of the real estate assets because the bank had originally requested an Order for protection because Dr. Reyes was disposing of his assets and the bank would not have any means of collection of the debt. She testified that instead of disposing of his assets without the bank's knowledge, Dr. Reyes agreed he would dispose of his assets as long as it would generate funds to pay his loan.

Mrs. Delgado Torres testified that it was not her decision to authorize the filing of the involuntary bankruptcy petition. She stated that the decision to file this involuntary bankruptcy petition was made by the bank and their attorneys. Mrs. Delgado Torres stated that the bank at the moment was represented by Mr. José Escalera who was the manager of the unit and herself. She further stated that when the involuntary bankruptcy petition was authorized there was a pending proceeding in the Bayamón Superior Court. Mrs. Delgado Torres testified that Mr. Escalera and herself authorized the filing of the state court case. She stated that the decision to file the involuntary bankruptcy petition was not done as an additional collection action. She testified that when they analyzed Dr. Reyes' updated financial statements they noticed that in Dr. Reyes previous state-

ment there was an investment in New York companies and that there was a significant reduction in assets. The only new asset in the financial statement he provided was an apartment in Miami (Brickell), thus he was investing in real estate outside of the jurisdiction of Puerto Rico and we understood that this was the more pertinent venue if the bank was going to claim assets outside of Puerto Rico where Dr. Reyes was investing his money.

Mrs. Delgado Torres testified that she is familiar with some of the e-mails that were exchanged between Attorney Sergio Ramírez de Arellano and Attorney Charles Cuprill.

The court stated that the involuntary bankruptcy petition was signed by Amalia Delgado as the bank's representative and Sergio Ramírez de Arellano as the attorney. The court stated that the allegations are in the petition and the same have to be sustained. There are two issues in this case: (i) whether or not the special circumstances doctrine under the facts applies, given that the court already found that there are more than 12 creditors; and (ii) whether the debtor is not making payments as they become due. The court declined to apply the special circumstances to the second factor.

Mrs. Delgado Torres testified that she does not recall any information as to whether Attorney Sergio Ramírez de Arellano told Attorney Charles Cuprill that if Dr. Reyes did not present a better offer, he had instructions to file an involuntary petition. Mrs. Delgado stated that she had not seen that particular communication from Attorney Sergio Ramírez de Arellano (**Identification A**). She stated that what she recalls is constant efforts from Attorney Ramírez de Arellano to Attorney Cuprill regarding a settlement and a negotiation that was supposed to be presented to the bank during the whole year. They exchanged many communications regarding the settlement that they were going to present to the bank but during those settlement conversations they were trying to reach an agreement. She testified that she believed that the information that was exchanged during that period was for the purpose to negotiate a settlement, thus she does not recall exactly this particular communication.

She further testified that the bank did not decide to file the involuntary bankruptcy petition specifically because they had failed to reach an agreement. The bank was worried about assets that were being transferred or that disappeared from the financial statements without a proper explanation. The bank decided to file suit in federal court because Dr. Reyes was acquiring properties outside of Puerto Rico, Mrs. Delgado Torres testified that a year and half prior to the filing of the involuntary petition, the bank met with Dr. Reyes to discuss this situation but he never provided a reasonable explanation.

Mrs. Delgado Torres testified that the bank knew about the decrease of Dr. Reyes' assets as of July 31, 2005 (**Exhibit # 4**) as compared with the previous financial statement (June 30, 2002 balance sheet—**Exhibit # 2**) that he had provided to the bank. She stated that she does not recall a meeting to discuss the July 31, 2005 financial statements. Mrs. Delgado Torres testified that she recalls that there was a meeting and there he submitted his financial statements. She stated that at that meeting what was discussed was his proposal to the bank at that time. One of the many proposals that were submitted at that time. Mrs. Delgado Torres testified that the bank decided to file the involuntary petition in light of the entire financial condition that was presented to the bank taking into account the June 30, 2002 fi-

nancial statement and the July 31, 2005 financial statement.

Re-direct.

Mrs. Delgado Torres explained that in the special loans department there is a difference between early stage and late stage workout. She testified that when she began working on the Grupo Toraya loan it was on the late stage. She stated that she recalled the questions posed by Attorney Abesada regarding the December 13, 2005 letter from Charles Cuprill to Sergio Ramírez de Arellano providing an explanation as to Dr. Reyes' diminution of net worth from 2002 to 2005. Mrs. Delgado Torres testified that Banco Popular relied on that document to file the involuntary petition because that was the explanation that was given by the borrower regarding the changes in his financial condition.

/s/
Enrique S. Lamoutte
United States Bankruptcy Judge

## Minute Entry

### *Hearing Information:*

Involuntary Debtor: Edgar Abner Reyes Colon

Case Number 06-04675

Date/Time/Room: 12/14/2015/ 2:00pm/ osjcrt2

Bankruptcy Judge: Enrique S. Lamoutte

Courtroom Clerk: Darhma Zayas

Reporter/ECR: Ziara Bittman

### *Matter:*

Evidentiary hearing to consider the following: (i) whether there are special circumstances compelling the court to obviate the three (3) creditor statutory requirement in 11 U.S.C. § 303(b); (ii) whether the involuntary debtor was not paying his debts as

they became due as required by 11 U.S.C. § 303(h) (Docket Nos. 404 & 488).

Motion for Entry of Order for Relief as a Sanction for Involuntary Debtor's Discovery Violations (Docket No. 501).

Opposition to Motion for Entry of Order for Relief and Request to Reconsider Denial of Order Limiting Scope of Discovery (Docket No. 518)

### *Appearances:*

Eldia Díaz Olmo, Banco Popular de Puerto Rico ("BPPR")

Roberto Abesada Aguet, BPPR

Gerardo Pavia Cabanillas, Popular Auto, Inc.

Fernando Van Derdys, Involuntary Debtor

José Nieto Mingo, Involuntary Debtor

Francisco Moya Huff, Eric Reyes Colón

Attorney Aguayo, Eric Reyes Colón

### *Proceedings:*

**Attorney Eric Yamil Reyes Colón (ninth witness).**

Mr. Eric Reyes Colón stated that he is single and that he is an attorney at law since the year 1997. He testified that he has only met with Attorney Aguayo regarding the testimony that he will give today. He stated that he has not been provided by a third party, other than Attorney Aguayo, with any type of brief or information regarding the evidence that has been submitted to the court in this case.

**Exhibit # 25—Electronic Articles of Organization of Florida Limited Liability Company: Inmobiliaria Baleares, LLC**

Attorney Reyes Colón stated that he knows of the entity Inmobiliaria Baleares, LLC. He stated that he does not have a pecuniary interest in this entity. Mr.

Reyes Colón testified that this is the first time that he has seen **Exhibit # 25.** He stated that he was the managing member of that entity when it was created. Mr. Reyes Colón stated that as of today, he is unaware of the status of the managing member for this entity. He stated that he does not remember having resigned to his position as managing member of Inmobiliaria Baleares, LLC. Attorney Reyes Colón testified that his brother, Dr. Edgar Reyes appointed hin to the position of managing member of Inmobiliaria Baleares, LLC. He stated that he is not aware if Inmobiliaria Baleares has any other authorized officers. Attorney Reyes Colón testified that he does not know if his brother is the sole proprietor of this entity. He stated that he does not know who persons of interest in that entity are and has no records regarding Inmobiliaria Baleares, LLC. Attorney Reyes testified that he does not know who has the records of this particular entity. He testified that he is the resident agent of some companies that Dr. Reyes created.

### Exhibit # 26—Office of the Property Appraiser: Detailed Report

Attorney Reyes testified that he has no functions as managing partner of Inmobiliaria Baleares, LLC. He stated that he does not remember signing documents on behalf of Inmobiliaria Baleares, LLC. Attorney Reyes testified that he does not remember appearing in deeds whereby Inmobiliaria Baleares, LLC purchased real estate properties in Florida. He further testified that he does not remember appearing on a deed in which Inmobiliaria Baleares, LLC sold a real estate property in Florida. Attorney Reyes stated that he recognized the property on the right, the large lot that appears on **Exhibit # 26.** He stated that he does not recognize the other

property, at least not by the document. Mr. Reyes Colón testified that he did not participate in the negotiation process to acquire that property. He stated that he does not know who participated in the negotiations process to acquire that property. Mr. Reyes Colón testified that he does not remember whether Inmobiliaria Baleares purchased a third property in Florida.

### Exhibit # 33: Office of the Property Appraiser: Summary Report regarding Tract D, Cutler Ridge Crossings

### Exhibit # 34: Special Warranty Deed regarding Tract D, Cutler Ridge Crossings

Attorney Reyes Colón stated that he has not seen before this third property which consists of adjacent lots (**Identification # 33**). He testified that he does not remember signing a deed to sell this third lot of land. Mr. Reyes stated that **Identification # 34** is a document titled, *Special Warranty Deed* regarding Tract D, Cutler Bridge Crossings, parcel ID # 30 60070260040. Attorney Reyes that the parcel identification number is the same as the one in **Identification # 33** as the one in the Special Warranty Deed. He testified that page 2 of the *Special Warranty Deed* is signed under affidavit number 3,664 executed before notary public María Torres Cartagena. Attorney Reyes Colón stated that the signature that appears on this document is his signature. He testified that he did not remember signing that document, but he remembers now. He further testified that the other two (2) signatures to the left are witnesses of his signature. The signatures of the two (2) witness are of Edgar Reyes Colón and of Antonio Pagán. Attorney Reyes Colón stated that he does not remember this document. He does not remember signing it. He testified that he does not remember anything. He clarified that he does not remember this

particular document. He does not recognize this document. Mr. Reyes Colón stated that this document is dated July 6, 2012 and that he does not remember signing the same in the year 2012.

Attorney Reyes Colón stated that he knows his own signature, but that he could not be able to testify concerning a signature that is not mine. He testified that he has no idea about who Antonio Pagán is. He stated that he has no recollection of who Antonio Pagán is which was one of the witnesses regarding his signature in this document. He stated that he would not be able to tell whether that Antonio Pagán is the same as Attorney José Antonio Pagán, a friend of his brother's. Attorney Reyes Colón stated that he would not be able to tell if Antonio Pagán was the same José Antonio Pagán Nieves who was attorney that was representing Dr. Francisco Quintero in these proceedings. He testified that he has seen his brother's signature.

Mr. Reyes Colón stated that he sees his brother's signature in the 2005 annual report of Cosmetics & Hair Surgery Center, PSC (**Exhibit # 16**). He testified that as a lay person he would not dare issue an opinion as to whether that is the same signature upon comparing the signature of Dr. Reyes in the 2005 Cosmetics & Hair Surgery Center, PSC's annual report and that of Dr. Reyes' signature as a witness to his signature in the Special Warranty Deed. He further testified that he does not dare give an opinion as to whether those two (2) signatures look alike because that is not his signature. Mr. Reyes Colón testified the signature that seems more like his brother's signature is the one that appears to the left hand side of the document that is on the right hand side. He further stated that he does not know if the Antonio Pagán that signed that document with him

in the year 2012 is attorney Jose Antonio Pagán Nieves.

Attorney Reyes Colón testified that he did not forge his brother's and Antonio Pagán's signatures that appear on the warranty deed (**Identification # 34**). He stated that he does not remember who else was with him on that date. Mr. Reyes Colón stated that he does not know for how much that property was sold. He testified that he does not remember seeing a check for the payment of the purchase price of this property. He stated that he does not know if Inmobiliaria Baleares, LLC has a bank account. Attorney Reyes testified that he does not remember when the large lot of land he identified was acquired nor for how much it was purchased for. He further testified that he does not know from where the funds came from to acquire these properties. He further testified that he does not know with any certainty whether Dr. Francisco Quintero has an interest in any of these properties. He stated that he has no personal or direct knowledge as to whether Dr. Quintero has any interest in any of these properties. He stated that he has no answer as to having being told anything about this matter. Attorney Reyes Colón testified that as managing partner of Inmobiliaria Baleares, LLC he has never received any payment from Dr. Quintero.

Attorney Reyes Colón testified that he does not have any information regarding a property purchased by Dr. Reyes Colón and Dr. Francisco Quintero in Culebra. He further testified that Inmobiliaria Baleares has an investment account with Charles Schwab. It was clarified that it was Inmobiliaria Baleares CxA that has the account with Charles Schwab not Inmobiliaria Baleares, LLC. Attorney Reyes Colón stated that he does not know whether Inmobiliaria Baleares, LLC has a bank account

and/or investment account in Puerto Rico or elsewhere.

Mr. Reyes Colón testified that his best understanding is that the owner of the apartment Dr. Reyes has in Brickel, Miami is Dr. Reyes. He stated that he is not aware whether this apartment was transferred to a corporate entity in which he was a representative. Mr. Reyes Colón testified that years ago he was appointed by his brother resident agent for some corporations his brother had. Attorney Reyes Colón testified that based on what he had just seen, he was also appointed managing partner of Inmobiliria Baleares of Florida, He stated that if his brother appoints him without his knowledge or authorization as resident agent, corporate officer, managing member of corporations he would not be able to know given that it is without his knowledge. He testified that when he was appointed resident agent of the corporations that were registered in Puerto Rico he was aware of these appointments. Attorney Reyes Colón stated that at a given point in time he noticed that he was appointed president of all the corporations.

Attorney Reyes Colón testified that that could be his handwriting in the Charles Schwab Organization Account Application (**Exhibit # 29**, pg. 805). He stated that he does not appear on this page (**Exhibit # 29**, pg. 809). He testified that he does not know if that is his handwriting on the Organization Account Agreement (**Exhibit # 29**, pg. 809). Attorney Reyes clarified that based upon his signature which appears on the reverse side of the organization account document which is a complimentary document (**Exhibit # 29**, pg. 828), he stated that that could be his handwriting on page 826 (**Exhibit # 29**, pg. 826). He testified that the handwriting on page 826 (**Exhibit # 29**) on the basis of how it

was written, looks like his own handwriting, in addition to the fact that it has his signature on the back. He stated that the information that appears on page 826 is correct. Mr. Reyes Colón recognized his signature on page 830 (**Exhibit # 29**).

Attorney Reyes Colón testified that he does not know Mrs. Criselid Rivera. He testified that as to the process of opening this account he only knows the basic process. He stated that at a given point in time they went to Charles Schwab and signed a document. He explained that he went with his brother to Charles Schwab to open the account. However, he does not remember how much money was initially deposited. He further stated that he did not provide any monies for the opening of this account. He testified that it was his brother, Dr. Edgar Reyes Colón who deposited money in that account. He stated that he does not remember there being any exchange of money at that time. He testified that he does not remember exactly, but he does not remember any exchange of monies. Attorney Reyes Colón testified that they would inform the payments that were going to be made and Dr. Edgar Reyes would make the withdrawals. He stated that it was his brother Edgar Reyes the one that would make the withdrawals. Attorney Reyes Colón stated that he does not know whether Dr. Francisco Quintero was authorized to make withdrawals from that account. He testified that he did not ask his brother the reason as to why he did not sign the documents to open this account, given that the monies deposited belonged to him and he was authorized to make withdrawals.

Mr. Reyes Colón testified that Juan Casilla is an attorney from San Juan that went to law school with him. He stated that he does not use the professional services of Attorney Juan Casilla. They are friends. He testified that as a friend, he uses the

services of Attorney Juan Casilla. After reviewing, page 1079 of **Exhibit # 29**, Attorney Reyes Colón testified that he does not know why Dr. Edgar Reyes would order a check request in the amount of $35,500 made payable to attorney Juan Casilla. He stated that he does not know of any work that was done in the year 2011 by attorney Juan Casilla for Inmobiliaria Baleares CxA or for the benefit of his brother. He testified that he did not prepare this document (**Exhibit # 29, pg. 1079**).

Attorney Reyes Colón stated that he does not know a person by the name of Anibal Ramos. He testified that he does not have any information as to why his brother would request a wire transfer of $80,000 to Casto Southeast Realty Services, LLC (**Exhibit # 29, pg. 1080**). Mr. Reyes Colón testified that the handwriting that appears on page 1082 of **Exhibit # 29** does not look like his handwriting. He stated that he did not write what appears on page 1082. He further testified that on the top right hand side of the document it reads E. Reyes but that those are not his initials. He testified that he has no relation with this document and that E. Reyes could mean Edgar Reyes. Attorney Reyes Colón stated that he understands that the initials ER are not his because the handwriting that appears below is not his.

**Exhibit # 35—Attorney Edgar Reyes Colón's initials**

Attorney Reyes Colón stated that he is a notary public. He was a handed a piece of paper in which he initialized the same in the usual manner he initializes documents (**Exhibit # 35**). Attorney Reyes Colón testified that he does not have any information that he can recollect which pertains to the check request that was made on that date (**Exhibit # 29, pg. 1082**). Mr. Reyes

Colón testified that he does not know Lina Prestol. He stated that he does not know an entity by the name of CRC of South Florida. He testified that he does not know if that was the entity from which Inmobiliaria Baleares LLC acquired the lots of land in Florida

**Exhibit # 36—Charles Schwab letter dated February 9, 2007 regarding money transfer to CRC of South Florida, Inc.**

Attorney Reyes Colón testified that he has not seen this document before and cannot identify the transaction that was made (**Exhibit # 36**). He stated that he does not recall any money transfers that were made to CRC of South Florida. Attorney Reyes Colón testified that he does not know how Inmobiliaria Baleares, LLC paid for the land in Florida. He stated that he does not recall if Inmobiliaria Baleares, LLC paid for the properties in Florida with the monies that were in the Charles Schwab account. He further testified that the monthly statements would arrive at his office and then we would take them and place them in a file and send them to Dr. Reyes. Attorney Reyes Colón clarified that the monthly statements would be sent to Dr. Reyes without opening the same. He stated that even though he was President of Inmobiliaria Baleares he would send the monthly statements unopened because that is what he did from the very first day and he continued doing this. Mr. Reyes Colón explained that he would do this because back then he thought he was only the resident agent of Inmobiliaria Baleares. He testified that he became aware that he was more than resident agent when he saw a document that indicated that he had another position besides that of resident agent and there was no change in the functions that he performed. Attorney Reyes Colón stated that if he were asked about other withdrawals regarding that particular Charles Schwab account his an-

swer would be that he has no information because they were made by his brother, Dr. Edgar Reyes. He stated that he would not know of every instance his brother withdrew monies from the Charles Schwab account. He testified that he has no information as to the withdrawals made by Dr. Quintero.

## Exhibit #37—Certificate of Incorporation: Azure Management Corp.

Attorney Reyes Colón testified that A liana Management was a company that belonged to a person that worked with Gelatto. That person was Enrique Zapata. He stated that Dr. Reyes nor him had any interest in Aliana Management. Mr. Reyes Colón stated that he does not remember Azure Corporation, He explained that identification #37 refreshes his recollection as to Azure Management which was a corporation that was created for the purpose of providing administrative services for properties and the acquisition of properties. He testified that he signed the certificate of incorporation. He testified that the handwriting on the certificate of incorporation could be his. Mr. Reyes Colón stated that as far as he remembers, this corporation did not have operations. He testified that Magaly López is his significant other. He indicated that the Nilsa Colón who appears as an incorporator is his mother.

Attorney Reyes Colón stated that his partner, Magaly López engages in decoration and construction for a living.

## Exhibit #38: May 30, 2012 letter from Dr. Francisco Quintero to Charles Schwab

Mr. Reyes Colón stated that the document is a letter to Charles Schwab instructing to make a payment for $25,000 from the Baleares account to Magaly López. He testi-

fied that he does not recall exactly the reason for that payment, but that he knew about it. Attorney Reyes Colón stated that there were many things that were pending regarding work that they had done for Gelatto and for the warehouses and moving the equipment and also the hours of work related to this. He testified that Gelatto was not operating in the year 2012, but these were expenses that had remained pending since Gelatto's closing and were being paid in the year 2012. Attorney Reyes Colón explained that what was paid was work that was done but the payment for the same was pending. He testified that many things were left pending and at some point in time, he asked his brother if he could pay her for the work performed for Gelatto. Dr. Reyes agreed and paid Magaly López (**Exhibit #38**).

## Exhibit #39: Certificate of Formation of a Limited Liability Company: Integrated Consultants & Legal Advisors, LLC

Mr. Reyes Colón stated that he currently works as an attorney and uses the corporate entity named Integrated Consultants and Legal Advisors to do his business. He testified that he incorporated **Integrated Consultants & Legal Advisors, LLC** at the end of the year 2012 (December 31, 2012). Attorney Reyes Colón stated that the document is the certificate of formation for Integrated Consultants & Legal Advisors, LLC. He testified that the address is: condominio Ada Ligia, 1452 Ashford Avenue, San Juan, Puerto Rico. He stated that the office number is not listed, but that the office number is #401. Mr. Reyes Colón testified that office #401 was owned by his brother and him. He stated that he no longer owns the office, but he does not know whether his brother still owns the remaining 50%. Attorney Reyes Colón testified that he acquired his share of that office approximately around the

year 2000 or 2002. He stated that he paid around $50,000 from his own money.

Attorney Reyes Colón testified that he knows of the entity Cosmetics & Hair Surgery Center because it is the company that is owned by his brother. He stated that his brother operates his business as a cosmetic surgeon through Cosmetics & Hair Surgery Center. He stated that he does not remember whether he was ever asked to be a resident agent or officer of this corporation.

Mr. Reyes Colón stated that he does remember being resident agent for various corporations created by his brother. He stated that he was referring to corporations that had names from Spain. He testified that the following corporations sound familiar and that he only appears as resident agent for: (i) Inmobiliaria Asturias; (ii) Inmobiliaria Baleares; (iii) Inmobiliaria Canarias; (iv) Inmobiliaria Galicia; and (v) Inmobiliaria Madrid. Attorney Reyes Colón testified that he appears as President and Treasurer in the 2004 annual report filed by Inmobiliara Canarias filed in the year 2005 (**Exhibit 9**). He stated that his term as President and Treasurer for Inmobiliaria Canarias was indefinite pursuant to the 2004 annual report. Mr. Reyes Colón testified that in the 2005 annual report for Inmobiliaria Canarias, Dr. Francisco Quintero Peña is the new President, Secretary and Treasurer. He stated that Francisco Quintero Peña continues to be the President of Inmobiliaria Canarias from thereon. Mr. Reyes Colón testified that he does not know the reason why he was removed from his indefinite position of President and Treasurer of Inmobiliaria Canarias. Attorney Reyes Colón testified that he does not remember requesting his brother to remove his name from Inmobiliaria Canarias in order not to appear in certain deeds that were going to be executed.

Mr. Reyes Colón testified that in the 2004 annual report for Inmobiliaria Asturias he appears as resident agent and as President and Treasurer of this entity for an indefinite term (**Exhibit # 10**). He stated that he was removed thereafter (from the year 2005) from the positions of President and Treasurer and was replaced by Dr. Francisco Quintero who was appointed indefinitely as President, Treasurer and Secretary. Attorney Reyes Colón testified that he does not remember requesting his brother to remove him from the positions of President, Treasurer and Secretary of Inmobiliaria Canarias and Inmobiliaria Asturias because he knew that Dr. Reyes was going to perform certain property transfers with those two (2) corporations. He testified that he does not remember being removed as President, Treasurer or Secretary from any of the other corporations.

Attorney Reyes Colón testified that he does not know the source of the $1.9 million in depreciable assets that is disclosed in the 2006 annual report for Inmobiliaria Asturias (**Exhibit # 10**). He stated that he does not know whether the $1.9 million in depreciable assets is from a property that was transferred by his brother to Inmobiliaria Asturias.

Mr. Reyes Colón stated that he does not know the source of the $1,950,000 million in depreciable assets that is disclosed in the 2005 annual report for Inmobiliaria Canarias (**Exhibit # 9**). Attorney Reyes Colón stated that he thinks that the only shareholder of all the Inmobiliarias is his brother, Dr. Edgar Reyes. He testified that he does not have in his possession any corporate records regarding any of the Inmobiliaria corporations. He further stated that he does not have any knowledge of any bank accounts of any of the Inmobiliarias. He stated that he would receive

monthly bank statements from probably all of the Inmobiliarias. He stated that he really cannot specify, but he remembers receiving monthly statements from Charles Schwab.

Mr. Reyes Colón testified that in the 2004 annual report for Inmobiliaria Baleares he appears as President and Treasurer of this entity for an indefinite term (**Exhibit # 13**). He further testified that he remained as President and Treasurer for Inmobiliaria Baleares for the years 2005 and 2006. He testified that he does not know why he was removed in the year 2007 from the positions of President and Treasurer. Mr. Reyes Colón stated that he does not remember requesting his brother to remove him from the corporate positions because of the monies that were being transferred to the Charles Schwab account. He testified that he does not know the source of the $146,425 in investments that is disclosed in the 2004 annual report (**Exhibit # 13**). He stated that he does not know if these monies were deposited in the Charles Schwab account. Mr. Reyes Colón stated that in the 2005 annual report while he was still President of Inmobiliaria Baleares, the investments increased to a bit over $1 million dollars. He stated that he does not know if these investments constitute the monies that were deposited at Charles Schwab. He stated that he did submit sworn statements with the annual reports. Attorney Reyes Colón testified that he never asked his brother the source of the $1 million dollars that was disclosed in investments of the corporation. He stated that he was just aware that the monies came from his brother. Mr. Reyes Colón testified that he was not aware that he was helping his brother hide assets from his creditors. Attorney Reyes Colón testified that he did not ask his brother what he was doing regarding and that he did not

have any knowledge of what his brother was doing. He testified that back then, he had no reason to ask his brother why he incorporated five (5) different corporate entities in one year, appoint him as resident agent, president, treasurer and secretary on all of them in which Dr. Edgar Reyes' name did not appear in any of them and transfer millions of dollars. Attorney Reyes Colón testified that he never had any reason to ask his brother about this.

Attorney Reyes Colón stated that in the 2007 annual report for Inmobiliaria Baleares he no longer appears as the President of the corporation. He testified that he did not know that he had been removed as President of that corporation and he did not request his brother to remove him. He testified that he does not recollect another account besides the Charles Schwab account in which Baleares deposited money. He stated that he is not aware of any bank account that has been opened outside the jurisdiction of the United States. He testified that he does not remember being an authorized signatory in any account open outside the jurisdiction of the United States.

Mr. Reyes Colón stated that he was the resident agent, President and Treasurer of Inmobiliaria Madrid until the year 2007 (**Exhibit # 15**). He testified that Inmobiliaria Madrid in the year 2006 had investments in the amount of $1,492,810. However, attorney Reyes Colón testified that he does not know where these investments were deposited. He stated that he only knows that these monies belonged to his brother. He further testified that he does not remember any of the Inmobiliarias holding notes payable to the bearer issued by his brother. He further testified that he does not remember ever having endorsed a mortgage note payable to the bearer which was issued by his brother. Attorney Reyes Colón stated that he does not re-

member appearing in a public deed regarding transfers made to or from any of Inmobiliarias.

Attorney Reyes Colón stated that he knows attorney Richard Lara which is a lawyer from Florida. He stated that Mr. Richard Lara is not his attorney. Attorney Richard Lara is Dr. Reyes Colón's attorney. Mr. Reyes Colón testified that he would not be able to tell whether attorney Richard Lara is the resident agent of Inmobiliaria Baleares, LLC. Mr. Reyes Colón testified that he does not know whether Inmobiliaria Baleares besides the three (3) parcels of land in Florida, acquired additional real estate property in and/or outside the United States.

No cross examination.

Attorney Abesada stated that he wanted to call the court's attention to a specific issue which is that they do not know what evidence, if any, will be presented by Dr. Edgar Reyes in this evidentiary hearing. This court's Order in Docket # 488 specifically instructed that the proposed findings of fact should make reference to a witness, document or an exhibit. However, Dr. Reyes in Docket # 562 submits 32 proposed findings of fact that make no reference to a witness, document or exhibit and most of the proposed findings are procedural instead of substantive findings. Attorney Abesada disclosed that BPPR attempted and was unable to depose Dr. Reyes. Attorney Abesada requested a finding from this court as to whether Dr. Reyes should be precluded from presenting any evidence in his favor. He further stated that the reasons for this request were also discussed on November 12 upon commencing this hearing's oral argument regarding the violations of this Court's Orders. Attorney Abesada argued that under Rule 37, a Court may sanction a disobedient party by prohibiting the same

from supporting or opposing designated claims or from introducing designated matters into evidence. Attorney Abesada stated that in their second motion for sanctions at Docket # 534, one of the remedies requested was that if the entry of Order was not going to be sanction imposed by the court before the evidentiary hearing, then the alternate request was that Dr. Reyes be precluded from presenting any evidence in his favor.

Attorney Van Derdys stated that Dr. Reyes will not be presenting witness testimony or evidence. He stated that they filed a motion today which is based on legal grounds stated by this Honorable Court at the beginning of the hearing. It is a motion to dismiss due to the lack of this court's statutory power to entertain the involuntary petition under Law v. Siegel.

The court stated that he read Dr. Reyes' motion, but that does not answer the question. Attorney Van Derdys replied that Dr. Reyes will not present any evidence. The court stated that there is no need to rule on BPPR's request because the Involuntary Debtor has stated that he will not present any evidence.

**CPA Eduardo Soria Rivera (tenth witness). Expert witness.**

**Exhibit # 40—Mr. Eduardo Soria's Curriculum Vitae**

Mr. Eduardo Soria Rivera stated that he works in Soria LLC in which he is the managing member and sole stockholder of the corporation since January 2014. He informed that Sorial LLC is a corporation dedicated to accounting and legal consulting services. Mr. Soria clarified that Soria LLC is a limited liability corporation. Mr. Soria testified that prior to working at Soria LLC, he was stockholder and partner of BDO Puerto Rico for 8 years. Before that, he worked 6 years in a local

accounting firm, Aquino De Cordova & Alfaro in which he also became a partner.

Mr. Soria stated that he has a bachelor's degree in business administration with a concentration in accounting from the University of Puerto Rico obtained in 1995. He stated that he has a juris doctor degree from the Interamerican University of Puerto Rico obtained in 2007. Mr. Soria stated that he is a licensed CPA since 1996 and a licensed attorney since 2008. He stated that both licenses are active and have never been suspended or revoked. Mr. Soria stated that he has never had any disciplinary proceeding held against him in any of the two professions. He stated that he has two certifications related to business valuation which are; accredited in business valuation (ABV) and certified valuation analyst (CVA). He stated that he also has a certification as an expert in internal controls, certified internal auditor (CIA) and a certification as a specialist in fraud, which is the certified fraud examiner (CFE). Mr. Soria explained that all of these certifications require a professional background, an exam and continuing education requirements. He stated that in order to maintain the certifications he is usually required continuing education requirements every 2 or 3 years including the CPA license and the attorney at law license. He stated that he has been able to maintain all the certifications since he obtained them.

CPA Soria testified that he obtained the certified fraud examiner certification since the year 2001. The CFE certification is issued by the Association of Certified Fraud Examiners which is an organization that is headquartered in the United Stated but it is a world wide organization which certifies persons to investigate and deter fraud. Mr. Soria testified that he obtains the continuing education requirements in the United States for the certified fraud examiner certification. He stated that he obtains all his continuing requirements in the United States for all of his certifications except for his attorney license. He testified that since he obtained the CFE in the year 2001, he has attended approximately 15 to 20 seminars related to the CFE certification. He disclosed that the detail of the continuing education is included in the *curriculum vitae*. Mr. Soria stated that he has been an instructor in the field of forensic accounting and fraud since the year 2001. He stated that he has given around 12 to 15 seminars related to the topic. He stated that he has also been an instructor in the field of financial institution fraud or fraud against financial institutions. Mr. Soria disclosed that he has taken seminars regarding financial institution fraud. CPA Soria testified that he is knowledgeable regarding the process to request and approve commercial credit because banks have consulted him regarding the process.

CPA Soria testified that he has been qualified as an expert witness in accounting and financial matters. He stated that he began work as an expert witness in court cases since the year 2001. He further stated that he has been appointed as an expert in financial cases at least 70-80 times. He stated that he has been qualified as an expert witness in bankruptcy court, district court and local courts. Mr. Soria testified that he has testified as an expert witness in cases before Honorable Judge Lamoutte. He testified that approximately in 75% of the cases in which he has worked as an expert witness are in the field of fraud and forensic accounting. Mr. Soria disclosed that in this case he does not remember exactly what is his rate per hour, but that it should be around $125-$150 per hour.

Mr. Soria testified that he recognizes Identification #40 as his curriculum vitae which he prepared. Mr. Soria stated that the first part of his curriculum vitae are his credentials which include his experience, his expertise and publications. The second part of the curriculum vitae is the list of cases in which he has been appointed as an expert. He stated that his curriculum vitae describes the cases in which he has testified or has been deposed. It also includes a detail of the seminars in which he has been an instructor and includes a detail of all the seminars he has taken since the year 2000. CPA Soria stated that he has been present since November 12, 2015 to listen to all the testimonial evidence. He testified that he has reviewed all the documents that have been submitted in this hearing as exhibits.

*Voir dire.*

Mr. Soria testified that in 70-75% of the cases that he has worked on have dealt with forensic accounting and fraud, Mr. Soria testified that all of the cases that are in his curriculum vitae involved forensic accounting because forensic accounting is anything that you do in testifying in a court of law. Mr. Soria stated that many of the cases are related to family law, construction law and all of these cases have something do also with fraud. Mr. Soria explained that forensic accounting is a broad concept that includes all of the cases.

CPA Soria testified that he would review the cases one by one (starting on page 4 of his curriculm vitae) and indicate if there was misappropriation of assets and/or fraud. Mr. Soria testified that the Ana Julia Rondón v. Francisco Aguayo case, liquidation of assets/ valuation dealt with fraud. Mr. Soria explained that the description of his involvement which in this case reads evaluation of damages and preparation of report pertains to the description of the case, not to the detail of work or a description of the work that was done in the case. Mr. Soria stated that in fraud there is damages. He explained that he does not have to make reference to fraud or misappropriation of assets. Mr. Soria testified that the description in the Senprodimex case was the evaluation of certain misappropriation of assets because that case was specifically related to a fraud scheme. Mr. Soria explained that the other cases do not use the word evaluation of fraud as part of his involvement because damages is included within fraud. When there is fraud, there are damages.

The court interjected and stated that he had asked 2 questions: (1) whether you had an objection to accepting Mr. Soria as an expert witness in the field of financial accounting and fraud and financial accounting and you stated no. The court could have stopped right there and accept Mr. Soria as an expert witness. The court then asked question #2: do you have an objection to accepting the curriculum vitae as **Exhibit #40** and you replied yes because you had questions or doubts regarding the qualifications of Mr. Soria, thus the court gave you the opportunity to *voir dire* the witness, even though you had no objections to accepting Mr. Soria as an expert witness. Now we are questioning what information was included or not as described in the cases as fraud examination or not. The court stated that this has been in the record since November 2, 2015 because that information is in the proposed findings. Irrespective of the description of the nature of the work, do you have any other issue to present or clarify regarding the qualifications of Mr. Soria. Attorney Van Derdys replied that he did not have any other issue. The court proceeded to accept Mr. Soria as an expert witness in financial

accounting, fraud and forensic accounting and accepts the curriculum vitae as **Exhibit # 40.**

**Exhibit # 41—Report on Forensic Analysis and Investigation of Potentially Fraudulent Transactions between Involuntary Debtor and Several Corporate Entities for the Transfer and/or Disposal of Assets Resulting in a Reduction of Net Worth**

Mr. Soria testified that one of his specialties is the valuation of businesses. He stated that he is a certified valuation analyst (CVA) since 1998 and accredited in business valuation (ABV) since 2006. He explained that he was engaged by Banco Popular as an expert witness in this case in order to determine whether there was a fraud regarding some suspicious transactions that occurred between 2002 and 2005 which had the effect of decreasing Dr. Edgar Reyes' net worth by $8 million dollars. He further testified that he was asked to review whether Dr. Reyes was paying the debts as they became due to determine if he qualified for the special circumstances exception.

Mr. Soria stated that as a result of his engagement he prepared an expert report and a supplemental report. He stated that he prepared his expert report on October 30, 2015. He explained that his expert report consists of the following: (i) a transmittal letter; (ii) a table of contents; (iii) an executive summary; (iv) case background information; (v) the scope; (vi) the methodology; (vii) his findings; (viii) a section called impact which is the conclusion; (ix) the signature; (x) list of documents examined; (xi) the curriculum vitae; (xii) and the exhibits.

CPA Soria testified that the exhibits that are attached to his report are documents ordinarily used by experts in his field of practice. He stated that he also reviewed the evidence that has been marked in this case as exhibits before rendering a report. Mr. Soria explained that most of the exhibits that are included in the report are already exhibits in the case. He stated that maybe 70% of the exhibits have already been submitted as exhibits in this case. Mr. Soria testified that he has reviewed the evidence that has been submitted in this case to elicit opinions in this court as an expert witness.

**Exhibit # 42—Supplemental Report for Forensic Analysis and Investigation of Potentially Fraudulent Transactions between Involuntary Debtor and Several Corporate Entities for the Transfer and/or Disposal of Assets Resulting in a Reduction of Net Worth**

Mr. Soria stated that as a result of this engagement he prepared a supplemental report which is dated November 10, 2015. He explained that his expert report consists of the following: (i) a transmittal letter; (ii) the findings of facts; (iii) the detail of the exhibits that he used to prepare the supplemental report; (iv) the conclusion; and (v) a CD with the information that was obtained from Charles Schwab. CPA Soria explained that he prepared a supplemental report mainly because they received information from Charles Schwab and also because we received information from CPA Román that was important for the case. He stated that the documents that he used and referenced to prepare the supplemental report are ordinarily used by experts in his field of practice.

The court stated that Identification # 42 be marked as Exhibit # 42 based on the Fed. R. Evid. 703 and subject to cross examination as provided for in Fed. R. Evid. 705. Attorney Nieto requested from the court a ruling on the motion to dismiss which was filed today and is in Docket No.

636. Said ruling on this motion is relevant. The Involuntary Debtor's objection to the expert report and to the entire testimony of the expert witness premised on the argument made in the motion to dismiss that notwithstanding the conclusions that may be contained in the expert report, as a matter of law the determination that the court could reach on the basis of the evidence presented by the expert witness is irrelevant as a matter of law. Thus, we state our objection for the record on those grounds to the expert testimony, notwithstanding the fact that the court has yet to rule on the motion to dismiss.

The court stated that Attorney Nieto was correct in stating that the court has yet to rule on the motion to dismiss that was filed today at 10:45:42 am. That is hours before this hearing commenced. Notwithstanding, the court has read the motion and the motion to dismiss is hereby denied on the same grounds that were stated at the hearing held on November 12, 2015 for which there are detailed minutes at Docket No. 633 which are being incorporated that indicate the reasons as to why this type of motion had been denied before. As a matter of fact, at that hearing the court advanced some of the grounds which are now being pled with more detail and analysis in the motion. However, the court had indicated at the hearing and repeats now that the it will not make a decision of the special circumstances in a vacuum because that may constitute an advisory opinion. The court stated that the evidence needs to be presented and that has been the court's position throughout this case. It is clearly stated in the minute entry where the court details the reasons requiring the evidence to be presented. At that time there was no evidence before the court. The court adds now, for the record, that in addition to what was stated at the hearing

held on November 12, 2015, as detailed in the minutes at Docket No. 633, that the evidence presented up to now shows that the Debtor may, and the court stresses the word may, have manipulated the debt and creditor structure pre-filing of the Involuntary Debtor petition. If such a finding is ultimately made by this court, which is not being made at this point, then the special circumstances may move this court to conclude that the Debtor did really have less than twelve (12) creditors. It is the court's position that a ruling on the issue of whether or not the special circumstances applies will depend on the facts. The court stated at the November 12, 2015 hearing that the case of <u>Marrama</u>, the case of <u>Law v. Siegel</u>, and this case present factual scenarios that are different. Thus, the court will read the context of the special circumstances in light of what is before the court, which is the filing of an involuntary petition, not the conversion from one chapter to another or as in <u>Law v. Siegel</u> which is the issue of exemptions. The court stated that that was its ruling and which may be entered in a separate order.

Attorney Nieto requested the court to reconsider its position and to be allowed to address the court because it is the alleged Debtor's position that the specific issue raised in the motion to dismiss is being once again not being considered by the court to the extent that the court reiterates that the issue in this case is whether or not special circumstances are present and the issue that is being raised by the alleged Debtor is that the doctrine is not valid at all as a matter of law.

The court stated that that was its position, and that he may ultimately prevail in another forum, but at this moment the court has not decided the issue for the same reasons it stated before. The court stated that it has been very clear, and the reason why the court has made the bench ruling

is because by stating that the court has not decided on the motion to dismiss which was filed hours ago, then we may have to stop the whole proceeding regarding the presentation of evidence, and the court declines to do so. The court stated that throughout the life of this case there has been a history of attempts to prevent the evidence from being presented before this court. The court will not continue to delay proceedings which have already been protracted for that same reason which is trying to prevent the evidence from being presented before this court. The court will not continue to delay proceedings which already have been protracted for that same reason of trying to prevent that the evidence which has finally been presented to the court throughout the several days. The court stated that if there are any requests for reconsideration put the same in writing and the court will give it due consideration.

Attorney Nieto stated that the request for reconsideration consists in a ruling as to the validity of the law. The issue that is being raised by the alleged Debtor is not being addressed. The issue that is being presented to the court is that in light of Law v. Siegel, the court simply has no authority to continue considering the involuntary proceeding that has been filed with less than 3 creditors and the court has not ruled on that particular request and that is why the alleged Debtor goes into some length in explaining a ruling on a legal issue and a ruling on whether or not the special circumstances are present in this case. Attorney Nieto requested a ruling on legal issue that requires no evidence and the position that is being presented today specifically is that under Law v. Siegel the court has no authority to continue entertaining the case without 3 creditors which is contrary to the express provisions of the

Bankruptcy Code and that is exactly what Law v. Siegel has ruled in 2014. To the extent that we do not have the court's ruling on this issue, we are in the same position and that is why the alleged Debtor is insisting in having a clear record. At this point, we do not have a ruling from this court regarding the legal validity of the special circumstances doctrine.

The court anticipated that it has to reconsider the issue of special circumstances in light of Law v. Siegel. However, Law v. Siegel did not overrule Marrama, it may have limited it, but it was under a different factual scenario. At this time, the court will not enter a ruling that Law v. Siegel will bar the doctrine of special circumstances in this case.

Attorney Abesada stated that for purposes of the clarity of the record, he disagrees that there has been no ruling from the court regarding the applicability of the special circumstances doctrine that was even decided by Judge Carlo when he was on the bench. On September 4, 2009 in a hearing in which Mr. Van Derdys and Mr. Nieto did not appear because they were not counsel of record, Judge Tester specifically explained that he was going to apply the special circumstances doctrine. At different times this court has ruled that it cannot apply the special circumstances doctrine in a vacuum because it needs the facts to determine whether the special circumstances exist or not. Otherwise, the court would be issuing an advisory opinion. Thus, attorney Abesada stated that he rejects opposing counsel statements that there has been no ruling from this court in this regard. Attorney Abesada stated that he makes reference to the November 12 oral argument before this court because the motion to dismiss is premised on the same arguments made on November 12 with the exception that it makes reference

to case law that the court cited on November 12, 2015.

The court stated that its ruling stands and requested a transcript of the hearing from the point in which Attorney Nieto raised the issue up to this point at 5:21:06 pm.

### Continuation of CPA Soria's testimony

Mr. Soria stated that he was hired to evaluate the financial transactions between 2002 and 2005 and all of the transactions related to those transactions to determine if the $8 million dollar decrease in net worth was due to some type of fraud. He stated that he was also hired to determine the amount of debts that were being paid and the amounts of debts that were not being paid to determine if the requirement of not paying debts its debts as they became due was met or not in this case. Mr. Soria testified that for the scope of his work he used the standards of the AICPA (American Institute of Certified Public Accountants), forensic investigation criteria or standards and the ACFE (Association of Certified Fraud Examiners) standards to evaluate and for his conclusion. Mr. Soria explained that since he is a CPA he has to follow the AICPA standards and since he has a fraud certification from the Association of Certified Fraud Examiners he has to follow their standards in order to perform this type of engagement.

CPA Soria testified that fraud as defined in the financial world is a representation of a material fact in order to deceive and the victim relied on the misrepresentation and there are damages. Fraud has 5 principal elements. Mr. Soria explained that the ACFE and the AICPA define fraud more or less as he has stated. That definition is included in his report (**Exhibit # 41**, pg. 12). He testified that the standards that these organizations require in cases of fraud consist in applying the definition of fraud and the correct methodology in order to evaluate. Also, both organizations are very strict in their ethical standards as to how the work is performed and as to the boundaries of investigation. Mr. Soria stated that the information is included on page 12 of the report which details the 4 elements, of which he divides them into 5 to make the explanation easier. Mr. Soria stated that page 12 reads: "a false representation or willful omission was made regarding a material fact." He stated that these 2 he divides usually in material fact and false representation. The other criteria, the perpetrator knew that the representation was false, thus there was an intention to deceive. The victim relied on the misinterpretation. In this case, the victim is the creditor and the victim suffered damages. The damages are that they have not been able to collect the debt. CPA Soria explained that the last criteria is that there is a connection between the damages and the false representation. He stated that the ACFE is the organization that defines and provides detail of the different fraud schemes that exist and there is a section to financial statement fraud in all of its different scenarios. He explained that financial statement fraud is when you use financial statements, which may be personal financial statements or corporate financial statements and these financial statements are used to deceive whomever is relying on that information. This is the typical type of fraud but it has many variations within it.

CPA Soria explained that financial institution fraud is the type of fraud that is performed against a financial institution. It has many variations, but mainly two variations which are that you either want to overstate your assets to obtain a loan or understate your assets or net worth in order not to pay debts. Mr Soria stated that in his report he explains what is finan-

cial statement fraud and financial institution fraud. Financial statement fraud is a federal felony as codified in the US Code. The reference is on page 13 of the report (**Exhibit # 41,** pg. 13). Mr. Soria testified that the methodology that he mostly applied in this case is the one prescribed by the ACFE that requires that you obtain information and evaluate the same and conduct depositions or interrogatories. Then one evaluates that information and compares it to the different types of fraud and then one decides whether a fraud scheme occurred or not.

CPA Soria testified that his opinion in this case is that there was a deliberate misstatement of the 2005 financial statements because there was a big understatement of the assets. Mr. Soria testified that Dr. Edgar Reyes did not include some transactions related to some mortgages and the monies obtained from these mortgages in 2004. Mr. Soria further testified that he did not include any information regarding the corporations that he owned. Mr. Soria testified that it is very clear that the corporations constituted his property. CPA Soria stated that Dr. Edgar Reyes tried to mislead Banco Popular as to his net worth in order to obtain a better treatment for the payment of the loan or a discount to pay less than the amount owed.

Mr. Soria testified that in his opinion the personal financial statements which were initially presented by Dr. Reyes as guarantor of the Grupo Toraya loan were also misstated because they included some properties which did not belong to Dr. Edgar Reyes. He testified that he listened to all of the witnesses that testified under oath in this case and that he reviewed all of the documentary evidence that has been marked as exhibits in this case. Mr. Soria stated that his report was issued before the evidentiary hearing began. CPA Soria testified that after listening to all the testimony of the witnesses and the presentation of all the documentary evidence his opinion has not changed. Mr. Soria stated that now he has more information to determine that there was a fraud in this case.

Mr. Soria stated that his report on page 5 states that as of December 31, 2003 Grupo Toraya had a loss of $467,000 and was experiencing a shortage of capital and cash flow problems (**Exhibit # 41,** pg. 5). He stated that he obtained this information through some notes that Banco Popular provided me with related to the collection efforts.

CPA Soria stated that he remember having examined **Exhibit # 6** which is Grupo Toraya PR, Inc. Financial Statements December 31, 2003 prepared and signed by RTC Roman, Torres on April 7, 2004. He stated that this is a document that he normally uses in his field of practice to render an opinion. The last paragraph states that, "the accompanying financial statements have been prepared assuming that the Company will continue as a going concern." Mr. Soria explained that "going concern" is an accounting principle which states that the auditor is assuming that the company will continue operating during the next fiscal year. He stated that regarding the financial condition of Grupo Toraya as is stated in the last paragraph which reads, "as discussed in Note 9 to the financial statements, the Company's significant operating losses raise substantial doubt about its ability to continue as a going concern." Mr. Soria stated that this means that the auditor believes that the company will not survive the next fiscal year and the explanation which explains why is included in Note 9. Mr. Soria testified that after reading Note 9, his assessment is as follows: first the auditor states that the company had an operational net loss of approximately $600,000 during

2003. It also mentions that the company has an operational deficit which means that its liabilities exceed its asset. Thus, it has a negative net working capital which means that the company in the near future will not be able to pay its debts as they become due and this is why the auditor believes that the company will probably not survive the next operational period. Mr. Soria stated that in Note 8 the net operational loss for 2003 is in the amount of $997,440 which is pretty significant for this company. The profit and loss statement which is on page 3, discloses for the year 2003 sales in the amount of $1.6 million dollars and a loss of $997,000. CPA Soria testified that this means that the company is a disaster because that loss when you consider the amount of the net sales is huge which means that they would have to almost double their sales in order to compensate for the difference. Mr. Soria testified that the relevance and importance of these financial statements is that during December 22, 2003 they created the Inmobiliaria Corporations. Thus, there should be a connection between this loss and the creation of those Inmobiliaria Corporations.

Mr. Soria testified that the financial statements of Grupo Toraya as of December 31, 2003 were prepared by CPA Román on April 7, 2004. Mr. Soria explained that April 7, 2004 is very important because that is the date that the financial statements are rendered to the stockholders. Also in April 16, Dr. Edgar Reyes mortgaged three (3) of his properties for $3 million dollars and that coincides with the issuance of these financial statements, Mr. Soria stated that the December 2003 financial statements and results coincide with the creation of the Inmobiliaria corporations. CPA Soria testified that he thinks that there is a very close relationship between what happened to Grupo Toraya and what they did to take the assets out of Dr. Edgar Reyes' balance sheet or personal financial statements. He stated that in April 2004, Dr. Edgar Reyes and Grupo Toraya had a forbearance of payment which coincides with the mortgages that were executed. Mr. Soria stated that in his report he stated that there was a loss of $467,000 but at that time we did not have the financial statements because Román provided the financial statements after he rendered the report, thus the loss was really $997,000. CPA Soria testified that page 5 of his report should read that as of December 31, 2003 Grupo Toraya had loss before income taxes was $997,440 (**Exhibit # 41, pg. 5**).

Mr. Soria stated that he reviewed **Exhibits # 1-4** before rendering an opinion in this case. Mr. Soria testified that he was present during the deposition of Mr. Félix Román Dávila and read the deposition transcript. He stated that he listened to Mr. Félix Román Dávila's testimony in this court. CPA Soria testified that after listening to Mr. Félix Román Dávila's testimony under oath and reviewing **Exhibit # 1 (Dr. Edgar Reyes Colón Balance Sheet November 30, 2001)**, his opinion is that Exhibit # 1 was prepared by Mr. Félix Román Dávila and he did not verify any information (**Exhibit # 1**). Mr. Soria testified that from the information that he has obtained Dr. Edgar Reyes' balance sheet includes a property which is the Dorado Beach residential property PR-market value in the amount of $1.1 million which at the time that property was not part of Dr. Edgar Reyes' estate at that date. CPA Soria stated that Dr. Reyes acquired the Dorado Beach property in July 2002. Mr. Soria stated that Dr. Reyes had an option for the Dorado Beach property and a deposit but he was not the owner of the property. Thus, there is an overstatement

of the assets regarding these financial statements. CPA Soria testified that he used the 2001 balance sheet information to compare it to the 2002 financial statements. He stated that the financial statements include a very large number of marketable securities and many real estate properties basically without any debt. Mr. Soria stated that his net worth was $8.7 million dollars (**Exhibit # 1**). He stated that as to the investment in NY Med-Group, Dr. Reyes also included it in the 2002 financial statements, but it was not included in the 2005 financial statements. He further stated that the only document that he has seen pertaining to this investment is the comparison (**Exhibit # 8**) which he does not know who did it, given that Mr. Félix Román did not do it.

CPA Soria that the office building—Condado PR with a market value of $200,000 is an office building related to Hospital San Carlos. That was one of the professional offices Dr. Reyes had and was included in the financial statements. He further stated that the two residential apartments in Condado that appear in the financial statements are located in the St. Mary's Building with a market value of $1.2 million (a penthouse) and $480,000 (second floor). Mr. Soria testified that he believes that Dr. Reyes' resides in one of them. He testified that the marketable securities are in the Charles Schwab investment account.

Mr. Soria stated that the November 30, 2001 balance sheet and the June 30, 2002 balance sheet (**Exhibit # 2**—June 30, 2002 Balance Sheet) are mostly the same. Total equity increased from $8.7 million dollars to $9.3 million dollars. It is basically the same balance sheet, slight difference. There is no liabilities, there is no debt related to those assets. Mr. Soria testified that Dr. Reyes' financial situation improved from the year 2001 to 2002. He stated that usually if you have a big net worth, it increases because the assets generate other assets. Mr. Soria stated that he was present when Mr. Román Dávila testified regarding the 2002 balance sheet. CPA Soria stated that Mr. Román Dávila had stated that he did not corroborate any of the information that was provided by Dr. Reyes.

CPA Soria testified that the October 31, 2002 balance sheet (**Exhibit # 3**) is mostly the same when compared to the June 30, 2002 balance sheet. The net capital increased from $9.4 million to $9.8 million in October 2002. Dr. Reyes' financial situation improved from June 30, 2002 to October 31, 2002.

Mr. Soria testified that after reviewing and comparing **Exhibits # 1-4**, his opinion is that there is a decrease of $8 million dollars in Dr. Reyes' net worth which is hard to believe. He stated that the decrease is hard to believe because the assets consist of real estate and marketable securities and there can be slight variations but one is not going to loose $8 million dollars. CPA Soria stated that the important thing is not the numbers, is the percentage of decrease. From $9 million to $1.5 million in net worth it is almost a 90% decrease in assets which is too much for a 3 year period and with these types of assets.

CPA Soria testified that the 2005 balance sheet does not include his debt to Banco Popular. He stated that the 2005 balance sheet reflects a net worth of $1.5 million and if he owes $2.5 million to Banco Popular, then he has a negative net worth and is technically insolvent. Mr. Soria stated that if this financial statement is correct, Dr. Reyes cannot pay the $2.5 million debt.

CPA Soria testified that from the testimonies he has learned that all the Inmobiliarias are corporations owned by Dr. Edgar Reyes. The values and the assets of those corporations are not included in that per-

sonal balance sheet. He further stated, that before Dr. Reyes did not have any debt and now he has a $2.9 million debt that is related to real estate properties, but the corresponding asset is not disclosed because when one takes out a mortgage or a loan you get monies from the bank. Mr. Soria stated that even if that money was received in 2004, it should have been disclosed as cash or marketable securities in this balance sheet. There is also a material misstatement as to the properties he purchased in Florida during the years 2004 and 2005. These properties should have been included in this balance sheet. CPA Soria testified that there are various misrepresentations and understatements of assets in this personal in this personal financial statement. Mr. Soria stated that the mortgage that he was referring to was the Mortgage payable—RG Mortgage Corp. in the amount of $2.9 million occurred in April 2004 which was at the same time as the Grupo Toraya financial statements were rendered. Mr. Soria stated that he could not trace that money into any assets in that financial statement.

CPA Soria testified that his recollection of Dr. Francisco Quintero's testimony was that those corporations were not his properties and he did not authorize the CPA to include those corporations in his financial statements, thus he is really sure that those corporations are not the property of Dr. Quintero, but are the property of Dr. Reyes (**Exhibits 17 & 18**). Even though, both financial statements were prepared around the same time by the same CPA.

Mr. Soria stated that he recalled what CPA Román Negrón testified as to Dr. Quintero's 2005 financial statement. CPA Soria stated that CPA Román Negrón had testified as to Note F that that was not the property of Dr. Quintero. CPA Soria testified that Note F is absolutely a material

misrepresentation of a financial statement and he knew that those corporations were not Dr. Quintero's property, but they belonged to Dr. Reyes'.

The court recessed and stated that the hearing will continue on Thursday, December 17, 2015 at 9:30am.

/s/
Enrique S. Lamoutte
United States Bankruptcy Judge

### Minute Entry

#### *Hearing Information:*

Involuntary Debtor: Edgar Abner Reyes Colon

Case Number 06-04675

Date/Time/Room: 12/17/2015/ 9:30am/ osjcrt2

Bankruptcy Judge: Enrique S. Lamoutte

Courtroom Clerk: Darhma Zayas

Reporter/ECR: Carlos Aponte

#### *Matter:*

Evidentiary hearing to consider the following: (i) whether there are special circumstances compelling the court to obviate the three (3) creditor statutory requirement in 11 U.S.C. § 303(b); (ii) whether the involuntary debtor was not paying his debts as they became due as required by 11 U.S.C. § 303(h) (Docket Nos. 404 & 488).

Motion for Entry of Order for Relief as a Sanction for Involuntary Debtor's Discovery Violations (Docket No. 501).

Opposition to Motion for Entry of Order for Relief and Request to Reconsider Denial of Order Limiting Scope of Discovery (Docket No. 518)

#### *Appearances:*

Eldia Díaz Olmo, Banco Popular de Puerto Rico ("BPPR")

Roberto Abesada Aguet, BPPR

Gerardo Pavia Cabanillas, Popular Auto, Inc.

Fernando Van Derdys, Involuntary Debtor

José Nieto Mingo, Involuntary Debtor

*Proceedings:*

**Continuation of CPA Soria's testimony**

**Exhibit # 43—CPA Soria's Presentation regarding Findings**

Mr. Soria stated that he prepared Identification # 43 which consists of a very brief presentation and summary of his findings in this case, CPA Soria explained that this is a chronological presentation of the significant transactions that occurred between 2003 and 2005. Dr. Reyes financial statements are dated July 2002 and July 2005. Mr. Soria stated that it is important to mention that in the year 2002, Grupo Toraya had a loss of $200,000 and that loss is reflected in the financial statements that were audited by CPA Félix Román. Mr. Soria stated that on December 22, 2003, CPA Félix Román incorporated the following corporations: (i) Inmobiliaria Asturias; (ii) Inmobiliaria Baleares; (iii) Inmobiliaria Canarias; (iv) Inmobiliaria Galicia; (v) Inmobiliaria Madrid; (vi) Star Angel Corp.; and (vii) Cosmetic Hair and Surgery Center. Mr. Soria stated that December 22, 2003 is a relevant date because it is very close to the closing of the financial statements on December 31, 2003. CPA Soria stated that by December 22, 2003, the stockholders of Grupo Toraya and Mr. Félix Román should have known that there was a significant loss in the year 2003 for Grupo Toraya. Mr. Soria testified that the $997,000 loss of Grupo Toraya did not pertain only to the year 2003, it was an accumulated amount throughout all the years. He stated that his opinion is that they knew that Grupo Toraya was going to have a very significant loss in order to create the corporations to shelter Dr. Reyes' assets. Mr. Soria testified that at the same time they were incorporating the various entities, Grupo Toraya was having a significant loss, thus the arrow is pointing down. Thus, there is a close relationship between the incorporation of the entities and the loss. CPA Soria stated that Dr. Edgar Reyes was one of the stockholders and guarantors of Banco Popular. Mr. Soria explained that Dr. Edgar Reyes provided a full guaranty on the commercial loan for Grupo Toraya and Perfetto Group. He stated that Mr. Cusnier, Dr. Edgar Reyes' business partner in these companies did not have the financial resources to pay the guarantee. Thus, Mr. Soria testified that the timing of the creation of the corporations is important and significant. Mr. Soria explained that it is very significant that they had $1.6 million dollars in sales and almost $1 million dollars in loss because of the volume of the business. If you have a $100 million dollar company and you have a $1 million in loss it is not that bad. However, a company that has $1.6 million in sales and has a $1 million loss is very hard to compensate that deficit.

CPA Soria testified that in April 2004, Dr. Reyes took out $3 million in mortgages with RG Mortgage and at the same time Grupo Toraya was not paying its debt to Banco Popular. Banco Popular provided Grupo Toraya (Dr. Reyes) with forbearance of payment in April 2004. CPA Soria stated that it is significant to see that the mortgages were created in April 2004 which is the same month that grupo Toraya had the forbearance from Banco Popular. Mr. Soria stated that there should be a relationship between the mortgages and the forbearance that Banco Popular gave to Grupo Toraya because Grupo Toraya and its stockholders knew that Grupo To-

raya could not pay its debt at that time. Mr. Soria testified that the CPA Félix Román must be included because he was very involved in all of these endeavors.

CPA Soria testified that as an expert witness, in his experience Dr. Reyes' motive in creating all these corporations on December 22, 2003 and then mortgaging the properties that had no liens on April 2004 was that he wanted to shelter his assets because he really did not need the $3 million dollars. He stated that for a person with a net worth of $9 million, there must be a good reason for taking out $3 million in cash and putting it in his pocket and that was to shelter that money from the collection process of Banco Popular. CPA Soria testified that in a regular business one can do this, but you cannot do this if you are trying to hide your assets from a creditor and one cannot misrepresent information. He explained that in a regular business you can do whatever you want with your money unless you have to pay somebody and are trying to deceive the creditors as to the whereabouts of the assets.

Mr. Soria stated that he remembers the testimony provided by CPA Félix Román in which he stated that the different corporations were created on December 22, 2003 because Dr. Edgar Reyes wanted to plan his estate. Mr. Soria testified that this is not a reasonable explanation because we have learned that there was no such consultation made to attorney Andújar. He also stated that this is not the way estate planning is done. For estate planning purposes one can transfer his or her assets to a corporation but one does not get a mortgage from the corporation. CPA Soria further testified that even though we know that all of the corporations belong to Dr. Reyes, they exclude them from the 2005 financial statements. Mr. Soria testified

that the problem are not the transactions but to hide these transactions from the creditor. Mr. Soria stated that these transactions were not included in the financial statements and thus, this is a misrepresentation that constitutes fraud. Mr. Soria testified that it is not normal in the ordinary course of business for a person that is engaging in estate planning not to appear in the corporations that he or she created.

CPA Soria testified that some of the money obtained from the $3 million RG Mortgage was transferred to the Inmobiliarias based on the annual reports which disclosed investments of Dr. Reyes. CPA Soria testified that his opinion is that the monies for the investments in the Inmobiliarias were funded by the financing of the properties.

Mr. Soria further testified that in the year 2005, Dr. Edgar Reyes sold the Arturo Cadilla property, which is where he has his professional practice, to Inmobiliaria Canarias. He stated that Dr. Reyes also sold the Palmas Plantation property to Inmobiliaria Canarias. In the year 2005, they make an investment in Miami with the company Baleares, LLC. CPA Soria testified that he knows that almost $4 million was invested in that property, but from the testimony he could not determine how much money he invested in the year 2005 for that particular real estate However, that particular real estate did not appear in the 2005 financial statements either. Mr. Soria further stated that the Arturo Cadilla and the Palmas Plantation transactions occurred in June 2005 and the financial statements are dated July 2005. The transaction with Baleares, LLC regarding the real estate property occurred in February 2005. Thus, this transactions as to the ownership of the real estate should have been reflected in the July 2005 financial statement. Mr. Soria testified that if one takes into consideration Dr. Quintero's fi-

nancial statements which disclosed that the investment in Baleares was worth $6.5 million, 90% of the $6.5 million had to be recorded as an asset in the 2005 financial statements, but it was not, Mr. Soria explained that Dr. Reyes also took $1.4 million in bearer notes against the Dorado beach east property and the St. Mary's penthouse # 2 apartment. CPA Soria testified that Dr. Reyes also experienced a decrease of $8 million in net worth and requested a discount to pay the debt of Banco Popular. Thus, he defaulted on the guarantee because in the year 2005, the collection efforts were really focused on the guarantor, Dr. Reyes. Mr. Soria testified that Dr. Reyes declared insolvency because in the 2005 financial statements he had $1.5 million in net worth and the loan of Banco Popular was in excess of $2 million. Thus, if one deducts $2 million from $1.5 million, one is insolvent.

CPA Soria explained that now that we know that all of the Inmobiliarias were owned and controlled by Dr. Reyes, it is his opinion that the values of all the Inmobiliarias (corporations) should have been included in the 2005 financial statements and they were not. Mr. Soria explained that he took the values from the corporate annual reports; namely: (i) Asturias had a value of $1,000; (ii) Baleares had a value of $1 million; (iii) Canarias had a value of $1.9 million; (iv) Galicia's value is undetermined because CPA Román testified that Galicia and Baleares had the same numbers in their annual reports and he thought that was an error. Mr. Soria stated that assuming CPA Román's testimony is correct, he cannot duplicate the amounts. Thus, it has some value but there is no way to determine the same; and (v) Inmobiliaria Madrid had value of $1.3 million. CPA Soria stated that Baleares and Madrid had investments in marketable securities as their principal asset. Asturias and Canarias had real estate as their principal assets since Dr. Reyes sold the Arturo Cadilla office and the Palmas Plantation property to Canarias and the St. Mary's penthouse apartment was sold to Asturias. CPA Soria testified that CPA Román failed to include that transaction in the corporate annual report, given that the transaction occurred in December 2005. He stated that the total value is $4.2 million. However, there are two (2) things which at this time cannot be determined namely; (i) the value of Galicia; and (ii) the value of real estate that was included in Asturias. Mr. Soria testified that the value of all the corporations should be in excess of $5 million. CPA Soria stated that the $5 million should have been included in Dr. Reyes' financial statements, but it was not. CPA Soria testified that he thinks that Dr. Reyes did not include the $5 million in his financial statements because he wanted to present a financial situation different from reality, in order to be able to have a discount on the payment of the loan. Mr. Soria stated that if you have $1.5 million in the financial statements and add $5 million, it adds up to $6.5 million and the debt was $2 million. Thus, in order for Dr. Reyes to obtain a discount on the debt payment he had to exclude the value of the corporations because if not, the bank will not give a discount.

CPA Soria stated that he examined Dr. Reyes' individual income tax returns and the tax returns of his professional corporation. He testified that Dr. Reyes' income for the years 2002 through 2005 did not decrease. The income increased during those years. CPA Soria stated that in the year 2012, the income is $2 million. Thus, there is no financial situation that we can relate to a decrease in net assets. CPA Soria testified that the understatement of

the financial statements constitutes a fraud scheme.

CPA Soria further testified that in April 2004, Dr. Reyes mortgaged the Dorado Beach East property in the amount of $1.2 million and the St. Mary's apartment (# A-2) was also mortgaged in the amount of $500,000. Mr. Soria stated that Dr. Reyes also mortgaged the St. Mary's penthouse (PH-2) in the amount of $1.2 million. He stated that the Dorado Beach property and the St. Mary's apartment and penthouse had no liens prior to these mortgages. CPA Soria testified that these mortgages account for almost $3 million and the loan proceeds accounted for in the 2005 financial statements is zero. Mr. Soria testified that when one obtains a mortgage what happens in a financial statement is that one has to disclose the debt but one also has to record the asset because one received cash from the mortgage. However, in this case there was no cash or any other investment related to this amount of money disclosed in the financial statements. Mr. Soria testified that he was not able to perform an exact trace of the $3 million dollar, but after looking at the corporate annual reports some of these monies was transferred to the corporations. CPA Soria testified that he cannot determine the exact amount of monies that were transferred to the corporations because the corporate annual reports are dated as of December 31 of each year and they state a balance but do not disclose detailed transactions. Thus, he knows in what year it happened but is unable to point out the month and the amount of all of the investments took place. CPA Soria testified that he is pretty sure that some of these monies appear in the Inmobiliarias as investments.

Mr. Soria stated that Dr. Reyes sold the Arturo Cadilla property to Inmobiliaria Canarias. Dr. Reyes also sold the Condesa del Mar property to a third party for $676,000 and he also sold the Palmas Plantation property to Inmobiliaria Canarias. CPA Soria testified that the total proceeds obtained from these sales was $1.8 million and the total proceeds accounted for in the July 31, 2005 financial statements was zero. Mr. Soria stated that we now know that the Arturo Cadilla office and the Palmas Plantation Dr. Reyes sold them to himself because he owned the properties and he owned the corporations and according to the testimony that he heard in court and the deeds, there was no consideration in these transactions. There was no cash.

CPA Soria testified that through the testimony of attorney María Torres Cartagena and the deeds that were presented there had been a resolution of sale for the Arturo Cadilla office and one of the apartments at St. Mary's, this means that these were simulated sales because they could revert the transaction without any consideration or problem. Mr. Soria testified that as to resolution that supposedly vacated the original sale there was also no consideration given for this transaction. CPA Soria stated that there as no consideration in the first transaction and there was no consideration for the resolution. Thus, it was as if nothing had happened. CPA Soria testified that the deed states that it was a sale to the corporation, but it was really a transfer of assets to the corporation. It was not a sale. Mr. Soria testified that there is no problem transferring assets to a corporation unless it is done with the intent to deceive a creditor. He stated that this is the important thing regarding this slide.

**Exhibit # 44—Dr. Reyes' Personal Financial Statements**

Mr. Soria stated that he recognized identification # 44 because he prepared it. He explained that he prepared this identification to illustrate the changes between the

2002 financial statements and the 2005 financial statements. The 2002 financial statement was provided by Dr. Edgar Reyes provided to Banco Popular to obtain the commercial loan and the 2005 financial statement was provided by Dr. Reyes to request a discount on the commercial loan debt.

CPA Soria explained that the first column of Exhibit # 44 is the description of the assets as they appear on the financial statements, then the Liabilities and Net Worth. The second column is the June 30, 2002 and the third column pertains to the July 31, 2005. Mr. Soria stated that this is an exact replica of the financial statements. Mr. Soria stated that in the year 2002, Dr. Reyes has a net worth of $9.3 million and in the year 2005 his net worth is $1.5 million and the net difference is $7.8 million. Mr. Soria stated that the change in total assets is a decrease of $4 million and the change in total liabilities is an increase of $3 million. The summation of these two figures is the decrease of $7,818,300 that Dr. Reyes experienced in his net worth. CPA Soria testified that Banco Popular rely on the 2002 and 2005 financial statements which were presented by Dr. Reyes. Mr. Soria explained that when you have a loan that does not have a significant collateral such as a real estate or a hard asset, they have to rely heavily on the financial capacity of the debtor. The debtor's financial capacity is evaluated by reviewing his personal financial statements and the individual tax returns. CPA Soria explained that these types of documents are very important in commercial lending when there is no significant collateral. The decision is based on these documents.

Mr. Soria explained that there are some blank spaces in the July 31, 2005 column because that particular asset was excluded from the financial statement. For example, item # 3 accounts receivable is an item related to Dr. Reyes' professional practice. That asset was excluded from the 2005 financial statements and it was probably due to two reasons which are that in 2002, Dr. Reyes had his professional practice under his name and in the year 2005, he was operating under Cosmetics and Hair Surgery Center. These two assets, the accounts receivables and pre-paid are supposed to assets of Cosmetics and Hair Surgery Center. However, Cosmetics and Hair Surgery Center is excluded from the total assets. Thus, these assets should have been included as part of the capital or the value of Cosmetics and Hair Surgery Center. CPA Soria testified that professional corporations that have one shareholder are usually pass through entities. Mr. Soria stated that for financial statement purposes they should have included the value of Cosmetics and Hair Surgery Center which was not included. Mr. Soria stated that in Dr. Quintero's financial statement the value of his medical professional practice was included and for Dr. Reyes it was not included by CPA Román when he prepared the financial statements. The hard assets of the professional practice were not even included. He further stated that the same explanation applies for the office, furniture and equipment which is related to his professional practice and were also excluded from his financial statements.

Mr. Soria explained that the cash account did not have a significant change. It increased by almost $200,000. The Keogh did not increase by much, $45,000 increase. The marketable equities securities account had a decrease of $1.6 million and he does not have a logical explanation for this decrease besides the fact that Dr. Reyes began to transfer all of his investments to the Inmobiliarias. Mr. Soria stated that he found that Inmobiliaria Galicia and Inmobiliaria Madrid had investment accounts.

He stated that he does not remember whether Inmobiliaria Baleares had a Charles Schwab investment account.

CPA Soria testified that he reviewed the Charles Schwab account evidence which was in the CD. Mr. Soria stated that he saw several transactions regarding transfers from the Schwab account of Dr. Edgar Reyes to other accounts which were not specifically identified in the statement such as withdrawals of $250,000 and transfers of $700,000 to other accounts which were not specified. Mr. Soria testified that this evinces that other accounts existed within Charles Schwab that he transferred the monies to those accounts, but he was unable to trace to which particular accounts the monies were transferred to.

CPA Soria further testified that the Dorado beach property appears in both the 2002 and the 2005 financial statements. There is also the real estate in Condado which is the St. Mary's penthouse apartment which is worth $1.2 million. There is also the Isla Verde property which is the property at Condesa del Mar which Dr. Reyes sold in 2004. There is the other Condado Property, the St. Mary's apartment (A-2) which was transferred to Inmobiliaria Canarias before the date of this financial statements, thus it is a mystery for him as to why this apartment (valued at $600,000) appears in this financial statement (year 2005). Mr. Soria testified that it is typical in this type of case in which you try to manipulate numbers in accounting in such a huge fashion there are always errors in the movements. Mr. Soria stated that he thinks that this is an error, given that they should have excluded the $600,000 given that this property was already transferred to Inmobiliaria Canarias.

Mr. Soria stated that the Bayamon Santa Cruz is a real estate property owned by Dr. Reyes. At first in the investigation there was some confusion because his parents also had a property in the same place but we were able to trace the property of Dr. Reyes and he was the owner as of 2005 pursuant to the title study and deed. Mr. Soria testified that this property was also excluded from the personal financial statement. The next item is the office at the Arturo Cadilla building which was transferred to Inmobiliaria Canarias. There are no assets in the financial statements related to the Inmobiliarias or to closely held corporations. Mr. Soria explained that this is an exclusion from the financial statements and it is an understatement of assets. The office building in Condado is the one at the Condominio Ada Ligia which was owned 50% by Dr. Reyes and 50% by his brother, Eric Reyes. Mr. Soria stated that he has documentation that Dr. Reyes is still the owner of that property, thus this property was excluded from the financial statement. This was improper to do. As to the Brickel apartment, Dr. Reyes acquired the same in 2003, 2004. This is the only new asset that he added to the financial statements. Mr. Soria stated that all the other assets were from the year 2002.

CPA Soria testified that it is a possibility that Dr. Reyes acquired the Brickel apartment with some of the $3 million he acquired by mortgaging his other properties. However, there is an excess in cash of $2.7 million since the apartment is valued at $325,000. Mr. Soria stated that we do not know what Dr. Reyes did with the $2.7 million.

Mr. Soria stated that he recalls the testimony of Amalia Delgado, the Banco Popular officer, regarding the concern that the bank had when it found out that Dr. Reyes had properties in Florida. He testified that this testimony is very relevant for his evaluation because it is obvious that Dr. Reyes started to move his assets outside the ju-

risdiction of Puerto Rico. Mr. Soria further stated that this transaction, the purchase of the real estate in Miami, opening a bank account and depositing monies in US Century bank in Miami. Mr. Soria stated that one does not engage in these transactions unless you are doing business over there and moving assets to another jurisdiction. Mr. Soria testified that Banco Popular's concern was well founded which was that Dr. Reyes was moving assets to another jurisdiction in order to avoid the collection process.

CPA Soria stated that the investments in NY Med Group and IBT Technologies were private equity investments that Dr. Reyes had in the United States. This is also of concern and these investments were also excluded from the 2005 financial statements without any reasonable explanation according to the communication that he had seen. The investment in Grupo Toraya is the only thing that is a real loss in the amount of $450,000. CPA Soria testified that from the financial statements, Dr. Reyes lost $450,000 from his net worth. He further stated that he is assuming as true, that Dr. Reyes put down $450,000 from his money. However, he does not have any information regarding this matter. Mr. Soria stated that the other account is a decrease of $115,000 in his personal effects and the deposit account which is not important. Mr. Soria explained that certain items were excluded from the financial statements and there was no reasonable explanation for the exclusion of these assets. Mr. Soria explained that they did this because they wanted to shelter Dr. Reyes from paying the debt. However, besides this reason, there is no reasonable explanation for the decrease in assets.

Mr. Soria stated that he remembers the testimony of CPA Román when he was asked if he had any explanation for Dr. Reyes decrease in net worth and he responded that he did not have any explanation for the decrease. CPA Soria testified that CPA Román knew Dr. Reyes for so long and handled his tax returns, his personal financial statements, his accounting and all of the Inmobiliarias, thus CPA Román knew that the decrease in Dr. Reyes' net worth was because of the exclusion of assets in the financial statements.

CPA Soria testified that CPA Román played a role in the decrease of Dr. Reyes' net worth because he participated in the preparation of the financial statements and also in the preparation of the annual reports. CPA Román participated in the preparation of Dr. Quintero's financial statements and he knew that Dr. Quintero was not the owner of the Inmobiliarias and he included the Inmobiliarias in that financial statement. CPA Soria testified that CPA Román participated in everything and it would be hard to believe that he did not know what was happening.

Mr. Soria further testified that CPA Félix Román prepared financial statements using his father's name instead of using the name of his accounting firm because when a CPA prepares financial statements certain standards must be followed and those standards require that a reasonable due diligence be performed in order to compile those financial statements. However, when you are not a CPA, you can do anything because you do not have to follow any standards. Thus, by using his father's letterhead, he avoided the responsibility of preparing financial statements through his accounting firm. Mr. Soria stated that it is interesting that he prepared Dr. Quintero's financial statement in May 31, 2005 and he prepared two months later on July 31, 2005, Dr. Edgar Reyes' financial statements under different standards. Mr. Soria testified that the obvious conclusion is that CPA Román prepared the financial state-

ments under his father's name in order to avoid the responsibilities that CPA's have when they do work under a CPA's letterhead. The problem is that when you do this, you are not avoiding responsibility because it does not matter on what paper the work is done, you are a CPA and one has to follow the standards. Even if you do the work under another person's name. Mr. Soria stated that it is also obvious that Dr. Reyes was a client of CPA Román, and not a client of CPA Román's father.

Mr. Soria stated that as to Dr. Reyes' liabilities, in the year 2002 he had $130,000 and in the year 2005, he had $3.4 million in liabilities that is an increase of $3.3 million. He had a credit line with Western Bank, a loan payable with MediCoop and a loan payable to Eurobank which are very small amounts. Dr. Reyes had a loan payable with Doral Bank which he cancelled. Mr. Soria stated that the $2.9 million which is disclosed has no corresponding asset in the financial statement that reflects what he did with that money, thus we do not know what he did with the $2.9 million. Mr. Soria testified that it is very noticeable, the amount of $3 million and spending this money in a three (3) year period is difficult to justify and understand considering that his medical practice was producing a lot of money also, CPA Soria stated that in February 2005 there was an investment in Baleares, LLC in Florida which we do not know what the investment was, because they certainly had to pay something to purchase the real estate.

CPA Soria stated that he recalled the testimony of attorney Cuprill and **Exhibit # 19** which is the letter in which attorney Cuprill on behalf of Dr. Reyes provides an explanation for the change of Dr. Reyes' net worth. He stated that he recalled that the letter stated that since the year 2002, Dr. Reyes divorced and that he had to pay approximately $4 million as a result of the divorce. Mr. Soria testified that from the documents that he examined it seems that Dr. Reyes did not have to pay anything for the divorce. Thus, based on the information that he has seen, it is not true that Dr. Reyes had to pay $4 million as a result of the divorce. Mr. Soria testified that another reason that was provided in the letter was that there was a significant decrease in tech stocks that cost Dr. Reyes $1.2 million. Mr. Soria testified that he knows that Dr. Reyes had an investment of $500,000 in IBT Technologies but there is no information or documentation as to the decrease in the value of these stocks. Mr. Soria stated that from his recollection there is no such decrease in the technology stocks for that date, thus that response is not reasonable. Mr. Soria testified that the other reason provided in the letter was that Dr. Reyes was diagnosed with a degenerative condition that only allowed him to work 3 times per week. CPA Soria testified that he has reviewed Dr. Reyes' tax returns and the tax returns of Cosmetics and Hair Surgery and the tax returns disclose that his practice was increasing dramatically. In the year 2005, Dr. Reyes had $1.3 million in his practice which is a very good volume for a doctor and in the year 2012, he had almost $2 million in his practice. Thus, he is doing very well. Mr. Soria stated that he does not know about the disease but he is still working and doing fine in his medical practice. Mr. Soria testified that he does not have any information to corroborate the other reason provided by Dr. Reyes by his attorney which was that he lost $800,000 in a medical group in New York as a result of the laws of the contracts with the labor unions in New York. CPA Soria testified that besides the explanation provided in the letter dated December 13, 2005 by Dr. Reyes' attorney he reviewed documents submitted through Dr. Reyes' attorneys

regarding other explanations as to his decrease in net worth. Mr. Soria stated that he reviewed **Exhibit # 8—Comparison and Review of Balance Sheets 2002 and 2005 revised by CPA Felix Roman** and his opinion regarding this exhibit is that it does not reflect the financial transactions as we have learned that they occurred. Mr. Soria testified that the reasons provided in Exhibit 8 are different from the ones provided by Mr. Cuprill in his letter. CPA Soria testified that they have used several documents in order to document their representations which are not true according to the evidence we have seen. For example, in Mr. Cuprill's letter there is no mention of the Inmobiliarias which were worth at the time almost $5 million. Mr. Soria stated that excluding a representation is a misrepresentation, CPA Soria stated that the explanations that they provided for each of the accounts, most of them are not true pursuant to the documents that he has seen. CPA Soria testified that the misrepresentations in **Exhibit # 8** consisted of the following: (i) on page 2, it discloses that the marketable securities declined based on the balance sheet of June 30, 2002 which shows incorrectly the amount of $1.7 million. Mr. Soria stated that this is a misrepresentation because that amount is correct. They provide an explanation as to why this amount is incorrect. CPA Soria that this document was prepared in order to establish that the 2002 financial statements were not correct. Mr. Soria stated that they try to explain the difference by stating that the assets that were included in the 2002 financial statements were not really assets of Dr. Edgar Reyes or were improperly included in that financial statement. He further stated that he believes that this is a misrepresentation. For example, their explanation for line item # 7, office furniture in the amount of $235,000 which is disclosed

in the 2002 but not in the 2005 financial statements is the following: In 2002, Dr. Reyes practice was not incorporated and his equipment and furniture was not fully depreciated. The office in San Carlos Hospital was closed. Mr. Soria clarified that the office in San Carlos is not the office at the Arturo Cadilla building which is his main office. By 2005 the equipment and furniture left in the other office had 12 years of use, totally depreciated and the practice became a PSC or Professional Services Corporation in 2004. Mr. Soria stated that of those $235,000 nothing passed to Cosmetics. They started a new corporation with new office furniture and thus, this new office furniture should have been in the Cosmetic financial statements and the value of Cosmetics and Hair Surgery should have been included in these financial statements.

Mr. Soria stated that regarding the investments of NY Medical Group and INT Technologies, the explanation provided is the following: All are the same, very speculative investments that lost value and as Gelattos (Toraya) were listed at a value that had no scientific or objective measure. Due to the fact that its remaining value in 2005, if any, is subjective there were not listed again. CPA Soria testified that there are different explanations in different documents as to the decrease in these investments. The letter by Attorney Cuprill on behalf of Dr. Reyes explained that the loss in value of NY Medical Group was due to the loss of contracts to provide medical services to the medical unions. Mr. Soria stated that he does not have an explanation for the different explanations in each document. For example, personal effects in 2002 were in the amount of $300,000 and in the year 2005 in the amount of $185,000. Mr. Soria stated that the explanation provided regarding the decrease is that it shows depreciation. Mr. Soria testified that

personal effects are jewelry, works of art, namely things that do not depreciate. Personal effects are not used in your business. If one uses something for the purpose of your business, that item depreciates but jewelry and watches do not depreciate. CPA Soria testified that **Exhibit # 8** discloses that the Isla Verde property (item # 10) was sold in September 2004 by Dr. Reyes' ex-wife, Ms. Tañon. Mr. Soria stated that this property was sold but it belonged to Dr. Edgar Reyes not to Ms. Tanon. He stated that as far as he knows, Dr. Edgar Reyes and Ms. Tanon were married with a prenuptial agreement.

Mr. Soria stated that the Arturo Cadilla office (item # 13) was sold or transferred to Inmobiliaria Canarias. However, in **Exhibit # 8,** the explanation provided was that this property was negotiated due to tax advantages and to get in a better position to pay Banco Popular; this transaction was never finalized as the settlement never finalized. CPA Soria testified that this transaction never occurred because there was no sale. That was just a transfer from his personal estate to his corporation and there was no money involved in this transaction to pay Banco Popular as a result of this transaction. CPA Soria testified that this is a misrepresentation.

Mr. Soria stated that **Exhibit # 8** also discloses property errors listed in 2002 and not listed in 2005 and they include the Santa Cruz property (item # 12) which is a property that belongs to Dr. Reyes. Exhibit # 8 states regarding the Santa Cruz property the following: mistakenly listed property that was supposed to be transferred in 2001 by Dr. Reyes' parents to their sons, transfer was never realized, property remains in his parents' estate. CPA Soria testified that this is not true, given that we know that there is a proper-

ty in the Santa Cruz sector that belongs to his parents and another one that belongs to Dr. Reyes. This is another misrepresentation. Mr. Soria stated that regarding the office building in Condado for $200,000 (item # 14). Exhibit # 8 discloses the following: this was incorrectly listed in real estate, but correctly priced. This refers to the value given to a fully furnished lease otolaryngology office in the lobby of San Carlos. Mr. Soria testified that this is not true, given that the Condominio Ada Ligia is on Ashford Avenue in Condado and San Carlos Hospital is in Santurce, Ponce de Leon Avenue. CPA Soria stated that they disclosed that since the hospital went bankrupt they lost that investment. He stated that this is not true and we have the deeds and documents to prove this.

CPA Soria testified that upon comparing **Exhibit # 8** and Attorney Cuprill's letter (**Exhibit # 19**) he concluded that both documents contain misrepresentations and they continue to document and present to the bank and to the court statements that are really not true.

Mr. Soria testified that regarding the $7.8 million difference in net worth, if one remembers his presentation, the value of the corporations was approximately $4.2 million and the value of the mortgages was $3 million. If one adds $4.2 million plus $3 million, the result is $7.2 million. Thus, we more or less have the explanation of the $7.2 million difference. Mr. Soria testified that the $600,000 difference should be related to the investment in Toraya which was lost. Definitely if one includes the value of the corporations and the value of the mortgages back to the financial statements one gets $7.2 million more and this is more or less the explanation of what happened. Mr. Soria testified that there are 2 main transactions; the ones related to the Inmobiliarias, the mortgages and the transactions in Florida which we know

was a big transaction but are unable to quantify the amount of money that he put in that corporation. He stated that one has to add the five (5) corporations, Baleareas, LLC, and the $3 million related to the mortgages in order to get to the $7.8 million, CPA Soria testified that his conclusion is that his net worth should have increased during those years and not decreased according to the transactions that happened.

Mr. Soria stated that when he examined Dr. Quintero's personal financial statements, he had almost $6.5 million in net worth in the year 2005 and in the year 2010, Dr. Quintero's net worth was $1.4 million in net worth. CPA Soria explained that there was a shifting of assets from Dr. Edgar Reyes' financial statements to Dr. Quintero's financial statements and this was done on purpose in order to perpetrate and document the movement of the assets. Mr. Soria testified that now we know that those corporations and the investments in marketable securities were not Dr. Quintero's but belonged to Dr. Reyes. CPA Soria stated that for him it is difficult to understand that Dr. Quintero had in his financial statements over $5 million that were not his and he did not notice. CPA Soria testified that after all of the transactions, all of the deeds and there was no transfer of money, it is hard for him to understand that they did not know that the purpose of doing all this was to avoid the collection process of Banco Popular. Mr. Soria stated that Eric Reyes is an attorney. Dr. Quintero is a doctor. The notary public is an attorney. CPA Román is a seasoned CPA. CPA Soria stated that this are not laypersons, they are professionals and very bright people. Mr. Soria stated that it is shocking for him that they did not notice that all of this was happening in order to avoid the collection process.

Mr. Soria testified that he cannot make any conclusions regarding intent but it is very obvious that they should have known and the amounts of the transactions are too big not to notice. The testimonies were not too forthcoming in their explanation. Mr. Soria testified that they knew about Dr. Reyes' decrease in net worth and concealment of assets.

CPA Soria stated that he listened to attorney María Torres Cartagena's testimony and reviewed the deeds she prepared. Mr. Soria testified that the transaction related to the sale of the two (2) properties to Inmobiliaria Canarias that transaction was $1.5 million and it was on the same date. Mr. Soria further stated that it is hard to understand that for this transaction attorney Torres Cartagena did not see any exchange of monies or the checks. CPA Soria stated that he is not a notary public, but he has seen many deeds and usually when there are related parties in the transaction one has to verify whether the transactions are simulated because people tend to engage in these transaction to avoid a collection process. There is a case that requires to verify whether these types of transactions are simulated. Mr. Soria stated that as a CPA, he would have seen this transaction as very suspicious since it involved 2 persons which he knows that they know each other, a corporation with no assets doing transactions of $1.5 million and one has no idea where the monies come from. Mr. Soria stated that he is not a notary public so he cannot opine as to that. Mr. Soria testified that in his experience it is not common to pay the purchase price before the deed is executed in particular when the transaction is for millions of dollars. One usually shows the transfer or the check. Mr. Soria stated that one usually does the exchange before the notary public because one wants the notary to

document the transaction so that one may protect oneself later on.

Mr. Soria stated that he listened to the testimony of Eric Yamil Reyes Colón. Mr. Soria testified that based on Eric Reyes' testimony and the documents he reviewed, in his opinion Eric Reyes should have known that those corporations were not his and that they were doing transfers without any particular business purpose. Mr. Soria testified that in his opinion Eric Reyes should have known that they were sheltering assets from the collection process.

CPA Soria opined that he knows that there was a change in President of some of the Inmobiliarias in which Eric Reyes Colón first appeared as President of the Inmobiliarias and then he was replaced by Dr. Francisco Quintero as President of some of the Inmobiliarias, but he does not have the financial documentation to answer a specific question. Mr. Soria stated that the roles changed throughout the process maybe because of the case, but he does not know why.

CPA Soria stated that as far as he knows that Inmobiliaria Asturias and Inmobiliaria Canarias were the two (2) Inmobiliarias which engaged in the simulated purchase of the Arturo Cadilla and the Palmas Plantation properties. Inmobiliaria Asturias was involved in the St. Mary's penthouse apartment and the other corporations had the investments. Mr. Soria stated that there are two (2) principal assets which are real estate and investments and what they did is they used the five (5) corporations; one was used for the professional practice and in two (2) corporations they put the real estate and in the other two (2) they put the investments. That is all they did.

Mr. Soria stated that for the Dorado Beach east property there was a bearer note and there is no evidence that the bearer note was negotiated but this note payable could be related to one of the bearer notes, but he does not know. Mr. Soria explained that if there is a bearer note on a property it leaves the property without equity. For example, if you have a mortgage of $1 million and the property is worth $1.5 million and then you have a bearer note of $500,000, then it seems that the property is fully encumbered. Mr. Soria testified that there is another bearer note for the St. Mary's property but he does not have any documentation regarding that negotiation or the proceeds of that money.

CPA Soria stated that one of the criteria that he was asked to evaluate was the generally not paying standard and on page 36 of his report (**Exhibit # 41**, pg. 35-36) he performed an analysis to determine the percentage of debt that was not being paid. Mr. Soria stated that he obtained this information and the list of creditors from the determinations of the court. There is a list of creditors and a total debt of $4.5 million. The proportion of the debt that is not being paid to the total debt results in 59%. However, there is a big if in this case and that is that the R & G Financial Corporation debt is a debt that belongs to the Inmobiliarias because there was a transfer. Thus, if you exclude the $1.5 million, the 59% increases. Mr. Soria testified that aside from the $2.5 million owed to Banco Popular the other large debt is the $1.5 million owed to R & G. CPA Soria stated that Inmobiliaria Asturias assumed the mortgage of the ph-2 apartment. Mr. Soria clarified that in order to do the adjustment, the $1.2 million debt of Inmobiliaria Asturias has to be taken out. However, the Dorado Beach east property is in his personal financial statements, thus one cannot exclude the entire $1.5 million. One has to deduct those debts that were trans-

ferred to the corporation such as the penthouse that was transferred on December 2005 to Inmobiliaria Asturias. As of November 22, 2006 the debt related to that property should have been excluded.

CPA Soria testified that according to the schedules, Dr. Edgar Reyes was not paying his debts as they became due because 59% of his debt was not being paid. Mr. Soria stated that one has to evaluate the amount of the debt, not only the amount of creditors. The amount and the significance and impact of the impact the debt. CPA Soria stated that page 35 refers to the standards that the court has to evaluate. The second standard is the proportion of the debt, in dollar value being paid. The proportion is in terms of amount of money; not the number of creditors. Those are the two (2) criteria that are being evaluated through the analysis. Mr. Soria explained that these standards as disclosed in Note 81 were obtained from Collier on Bankruptcy Involuntary Petition. CPA Soria explained that the 59% means that more than 50% of the debt was not being paid which is a material percentage in terms of the total debt. Mr. Soria testified that the materiality of the nonpayments as well as the debtor's general conduct of its financial affairs have to be evaluated. Mr. Soria stated that as to the second part, which is the debtor's general conduct of its financial affairs, the general conduct of the debtor has been that he has been trying to shelter his assets from the creditors as the evidence has shown.

CPA Soria testified that there were special circumstances as of November 22, 2006 because they were trying to shelter or hide assets from the bank. Dr. Quintero and his legal counsel made several misrepresentations to the bank regarding the fact that he had all of these corporations and all of these financial affairs. Mr. Soria testified

that they did this was not done by error, and was done on several occasions very openly and it was documented. CPA Soria testified that the standard of generally not paying its debts is met by the analysis that was done and he does not have any doubt that they were trying to hide Dr. Reyes' assets from his creditors. Mr. Soria testified that there is no other economic, logical or financial explanation for all of this. CPA Soria testified that the motive behind all of this is that if Dr. Reyes portrays a precarious financial situation he has the opportunity to negotiate with the bank for a lower payment of the debt. Mr. Soria testified that real estate and investments are real, hard assets. Thus, the only option that they had was to transfer those assets to other corporations because if not, they would not have had the opportunity to do what they did. Mr. Soria stated that obviously, this is not the correct way to do it, Mr. Soria stated that if you do not have debts, one can do whatever he or she wants with his or her money, such as bum $3 million dollars. However, if one has a debt to pay there are certain restrictions with what one may do and even with what one communicates to the creditor. CPA Soria testified that in this case, one of the problems was that what they portrayed to the creditor was not the reality of what Dr. Reyes was doing with his money.

Mr. Soria stated that in his supplementary report he included a CD of the Charles Schwab account of Inmobiliaria Baleares which he examined. CPA Soria testified that he saw in the Charles Schwab documents, transfers of monies to different entities such as payments and authorizations by Dr. Quintero, and also Dr. Reyes transferring monies to purchase real estate and to pay some debts not necessarily related to the Inmobiliarias but related to other companies within them. Mr. Soria testified that one of the reasons a person has to

transfer money from his pocket or his accounts to a corporation such as Inmobiliaria Baleares and then have that corporation transfer assets to another entity such as CRC of South Florida is that the more transactions one does, the harder it is to follow them. Otherwise, Dr. Reyes could not have paid from his own personal statement all of this debt and payments. Mr. Soria testified that as he sees it, they tried to shelter payments within the companies. Mr. Soria stated that now it seems pretty obvious, but without the evidence it was very hard to trace and follow all the transactions. This is how this type of trace works. The more transactions one does, the harder it is to follow.

CPA Soria concluded as an expert witnesses concluded that there was a misrepresentation of material facts and that there was an intention to deceive. The bank was misled throughout and there was economic loss to the bank. Mr. Soria testified that all of the criteria for a fraud to be named a fraud are met. Mr. Soria stated that the problem with your question and my answer is that the determination of fraud has to be done by the judge. Mr. Soria stated that the facts are given and that he provides his opinion. In his opinion all of the criteria that constitute a fraud are met, but the ultimate person that decides whether there was a fraud or not is the judge.

Mr. Soria testified that if one compares this case to all of the cases that he has regarding fraud and financial institution fraud, this is not a very typical case because people tend to be very careful with that they do with banks. Mr. Soria testified that he thinks that because of the wealth that the doctor had he thought that he would prevail with all of this structure. He further testified that his experience with all of the other banks, excluding Ban-

co Popular, probably the bank would not engage in all of this effort in order to get to this stage. Mr. Soria stated that for him it was surprising and probably has to do with his wealth. CPA Soria that after hearing the testimony of the witnesses it is easier for him to understand the scheme, but before that he thought differently. Mr. Soria stated that he thought that the corporations were owned really by Dr. Quintero. Mr. Soria testified that now he knows that they were owned by Dr. Reyes. CPA Soria that it is easier now for him to establish that he failed to include these corporations in the financial statements. However, without the discovery and without the depositions it is very hard to manage a case like this.

CPA Soria explained that transactions, bank statements, and income tax returns after November 22, 2006 are very important to the evaluation of this case such as the fact that they revoked certain transactions after the year 2006 is indicative that those transactions did not happen. Mr. Soria testified that when one does a fraud investigation one has to see documentation before the act was committed and after the act was committed because those are circumstances that would disclose relevant information to what one is trying to prove. CPA Soria testified that for example, Dr. Quintero's financial statements for the year 2010 are very relevant because they do not show any of these assets which means that these assets were not Dr. Quintero's but belonged to Dr. Reyes. In the year 2005, these assets were included in Dr. Quintero's financial statements in order to mislead the user of the financial statements.

CPA Soria testified that the corporate annual reports filed for each of the Inmobiliarias after the year 2006 are relevant because they disclose the transfer of most of the assets from his personal estate to the

corporations and then he moved throughout the corporations those assets. Dr. Reyes also made payments to homeowner's association, payments related to mortgages and these transactions need to be evaluated to determine whether the same are transactions that are done in the regular course of business of these corporations. CPA Soria stated that what we have seen is that these corporations were fully controlled and owned by Dr. Reyes and that he paid through the corporations things that were not related to the corporations but rather were related to his personal assets/estate. Mr. Soria testified that this commingling of assets means that those corporations are himself. That is why he said a couple of times that those corporations were made to shelter his affairs. A real corporation makes business, has a real purpose, and has operations, Mr. Soria stated that all of these corporations do not have operations. The only income that they have is the income from the rent that Dr. Reyes himself gives to the corporation in order to portray that he is paying some rent to a third party.

Mr. Soria testified that Inmobiliaria Canarias had no business purpose when it revoked the sale of real estate. He stated that the Arturo Cadilla office building is where Dr. Reyes has his professional practice which is very good. CPA Soria testified that there is no business reason or purpose as to why Dr. Reyes would want to sell to a corporation the office at the Arturo Cadilla building where he has his professional practice and where he continues to have his professional practice.

Mr. Soria testified that one of the arguments was that they were making an estate planning, but if that was the case, then why would they revoke all the transactions, why do the Inmobiliarias do not have the investments or the real estate anymore if they had such a good estate planning, why did they not continue with the estate planning.

Mr. Soria stated that he is aware that Dr. Edgar Reyes filed motions that explain that the reason these business transactions were made with certain real estate assets was to obtain the liquidity to pay Banco Popular. CPA Soria testified that in his opinion these transactions did not involve any monies. Thus, that is not the reason because Dr. Reyes did not receive any money or liquidity from these transactions. As to Dr. Reyes' statement for the record that Banco Popular authorized these transactions, Mr. Soria testified that he thinks that this is not true because in August 2005 there was a prohibition from the court prohibiting Dr. Reyes from disposing of his assets. In December 2005, an authorization was requested to dispose of certain real estate that was going to be sold to Asturias. However, the Asturias transaction did not bring Dr. Reyes any money. CPA Soria testified that all of the other transactions were performed before August 2005. Mr. Soria stated that he has not seen any document that evinces that Banco Popular was in agreement with all of the transactions that occurred. Mr. Soria testified that he thinks Banco Popular did not know as to the existence of the Inmobiliarias.

CPA Soria testified that Dr. Edgar Reyes' individual income tax returns and the tax returns of his professional corporation after the year 2006 are relevant to this case because one of the arguments that attorney Cuprill brought as a reason for the decrease in assets was the health problems of Dr. Reyes. However, it is obvious that by looking at the tax returns even if he has any health problems, he is doing very well in his professional practice. Mr. Soria also testified that another relevant point is that as his professional practice keeps growing,

Dr. Reyes' net worth should increase which means that right now he should have a much higher net worth than he did in the year 2005 according to the information presented in those tax returns.

The court asked if it was a common practice for individuals to transfer or sell a property to a corporation for tax purposes or tax planning. CPA Soria answered that it is a common practice.

Attorney Abesada informed the court that they have no further questions. He moved for the court to vacate the admissibility limitations on Exhibits # 7, 9,10, 13, 14, 15 and 16 which were the documents presented such as tax returns and annual reports in which the admissibility was limited to 2000 to 2006 but the documents after 2006 were not admitted and based on Mr. Soria's explanation we move for the same to be admitted. The court stated that the documents were admitted with the limitation as to relevance of dates.

Attorney Nieto Mingo stated that they wanted to restate their objection. The court stated that the documents admitted in evidence will be given whatever weight the court deems appropriate under the totality of the circumstances.

Attorney Abesada stated that the petitioning creditors rest their case.

No cross examination.

The court asked if there was any other evidence to be presented. Attorney Abesada stated that they had no more evidence to present and the petitioning creditors rest their case.

Attorney Nieto Mingo on behalf of Dr. Edgar Reyes Colón stated that after the submission by the petitioning creditors of their case, Dr. Reyes Colón wants to restate before the matter is taken under advisement by the court for resolution the arguments contained in the motion to dismiss filed under Docket No. 636 specifically for the following reasons: (i) since the beginning of this proceeding the involuntary debtor has questioned the legality of the involuntary proceeding that has been filed against him; (ii) in light of the fact that this court has never ruled on the validity of the special circumstances doctrine in this case and notwithstanding the efforts of the involuntary debtor in explaining how a legal issue as to the validity of the doctrine is something that can be decided by the court without receiving any evidence; (iii) and notwithstanding the fact that it has been thoroughly explained that when a court makes a decision on a legal issue that does not constitute in any way rendering an advisory opinion. The ultimate issue in this case is whether this involuntary proceeding is legal or not; and (iv) in deciding whether Banco Popular is going to be allowed to continue this proceeding without complying with the statutory requirement set forth in the Bankruptcy Code. This is the real controversy between two adversary parties and if the court were to resolve this issue as to whether as a matter of law the special circumstances doctrine is valid at all. The court would not be rendering in any way an advisory opinion. Notwithstanding, the court has selected to characterize the issue as one involving whether or not this doctrine, assuming its validity, is present in the instant case. Throughout this proceedings and the several days of evidentiary hearings, everything that has been entertained by the court has been whether or not there are special circumstances present in this case, when the issue in fact is whether or not that doctrine is valid. Attorney Nieto restated that in light of the Supreme Court decision in Law v. Siegel this court does not have the authority to allow such a proceeding. The reasons why this case fits within the ruling of Law v.

Siegel have been thoroughly presented to the court for resolution and the alleged debtor has insisted to the point that the court has reiterated in many ways that it is deciding this case and this specific issue for the same reasons stated in Docket No. 404 which is the May 23, 2012 Opinion and Order rendered by this court. Subsequently, in Docket No. 488 an Order was issued on August 10, 2015 in which the Court reaffirmed the ruling made in Docket No. 404. Attorney Nieto stated that its has been brought to the court's attention repeatedly that that is the only place where the court purports to address the issue without actually addressing or resolving the issue. In light of the foregoing, the alleged debtor reiterates that in the unequivocal ruling of the Supreme Court in Law v. Siegel, this Court has no authority to entertain an involuntary petition that is contrary to the express language of the Bankruptcy Code and that the issue of whether special circumstances are present in this case should have never been an impediment to resolving and ruling on the legal issue which this court had the obligation to resolve as a threshold jurisdictional issue. The fact that as a result the Involuntary Debtor has been forced to bring this issue to the attention of the Appellate Courts and that the courts have up to this point been under the assumption that this issue was going to be addressed during the evidentiary hearings and the fact is that at this point when the case has been submitted for resolution to the court, the court has not ruled on the issue. First when it was brought to the court's attention the problems and shortcomings with the legal analysis of the sole decision relied upon by this court to find merit to the special circumstances doctrine. That case is In re Moss which relies on a prior case from that court and that is the sole authority relied upon by the court. Notwithstand-

ing that and the fact that the court never addressed the shortcomings that were so clearly identified by the Bankruptcy Appellate Panel of the Ninth Circuit when it questions the soundness of that precedent because it was contrary to the express provisions of the Bankruptcy Code. Notwithstanding the fact that it has been brought to the court's attention that now under Law v. Siegel, the court clearly has no authority to entertain that petition. Notwithstanding, the efforts of the debtor, the court has chosen to receive evidence and to condition the ruling on the validity of the special circumstances theory or doctrine on the receipt of evidence. The alleged debtor reiterates that as for a ruling on a legal issue as this one, it is not necessary to receive evidence and there is no justification to allowing this proceeding to go on for this long resulting in irreparable and clear economic damage to the alleged debtor.

Attorney Van Derdys, on behalf of the Involuntary Debtor, stated that they preserve any and all rights to object to the contents and merits of the Expert Report presented by Mr. Soria.

The court stated that the report was admitted in evidence. The expert witness that wrote the report has testified. The expert witness has provided demonstrative evidence summarizing the contents of the report. You have opted not to cross examine and you state that you reserve the right to object to it. The court stated that whatever right you have to object to has been waived. Obviously, there is testimony before the court that does not necessarily mean that the court will accept or reject it in its totality. The court will give it whatever weight it deems under the applicable law.

Attorney Van Derdys clarified that he means that for subsequent purposes. The Court stated that it is each parties' right to

appeal the decision. The court stated that he is obviously reserving his right to appeal, assuming there is an adverse decision.

Attorney Nieto stated that as the court takes the case under advisement that the legal issue that has been presented by the alleged debtor be addressed and ruled upon in the ultimate disposition of the case.

The Court replied that as to the request, the court will consider the legal issue raised by the Involuntary Debtor at Docket No, 636 as the facts are now before the court. The court ordered that as to petitioning creditors, to file amended proposed findings in light of the evidence presented and to file a legal memorandum in response to the motion to dismiss filed by the Involuntary Debtor at Docket No, 636.

Attorney Diaz Olmo requested forty (40) days given that they will be out of the jurisdiction due to the Holiday Season. The Court granted 45 days and stated that as a matter of due process the court will provide time to reply. Attorney Nieto stated that they would like the opportunity to reply to the legal arguments presented. The court granted 14 days for replies. Attorney Nieto stated that that would be sufficient.

/s/
Enrique S. Lamoutte
United States Bankruptcy Judge